## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| J.A.V.;* J.G.G.;* and W.G.H.;* on their own behalf and on behalf of others similarly-situated, <br><br> *Petitioners–Plaintiffs*, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; PAMELA BONDI, Attorney General of the United States, in her official capacity; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD LYONS, Acting Director of the Director of U.S. Immigration and Customs Enforcement, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; MARCO RUBIO, Secretary of State, in his official capacity; U.S. STATE DEPARTMENT; ROBERT CERNA, in his official capacity as acting Harlingen Field Office Director for U.S. Immigration and Customs Enforcement; FRANK VENEGAS, in his official capacity as the Facility Administrator of the El Valle Detention Facility; <br><br> *Respondents–Defendants*. | Case No. _____ <br><br><br> **CLASS PETITION FOR WRIT OF HABEAS CORPUS AND CLASS COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

\* Motion for these Petitioners to proceed under pseudonym has been concurrently filed with this class petition and class complaint.

## INTRODUCTION

1.      Petitioners-Plaintiffs ("Petitioners") are Venezuelan men in immigration custody threatened with imminent removal under the President's Proclamation—signed in secret on March 14, 2025, and published the next day—invoking the Alien Enemies Act ("AEA"), a wartime measure that has been used only three times in our Nation's history: the War of 1812, World War I and World War II.

2.      By its terms, the AEA applies where the United States is in a "declared war" with a "foreign nation or government" or a "foreign nation or government" is or is threatening to engage in an "invasion" or "predatory incursion" against the "territory of the United States."

3.      The Proclamation, Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025),[1] purportedly authorizes "immediate" removal of noncitizens that the Proclamation deems to be alien enemies, without notice or any opportunity for judicial review.  It also contorts the plain language of the AEA by claiming that the Venezuelan criminal gang Tren de Aragua ("TdA") constitutes a a foreign government for purposes of the AEA and is engaged in an invasion or predatory incursion against the United States.

4.      But the AEA has never been invoked outside of war, and applies only to warlike actions: it cannot be used here against nationals of a country—Venezuela—with whom the United States is not at war, which is not invading the United States, and which has not launched a predatory incursion into the United States.

5.      Pursuant to the Proclamation, on March 15, the government deported at least 137 noncitizens to a brutal prison in El Salvador, without any review of any aspect of the

---

[1] *Available at* https://perma.cc/ZS8M-ZQHJ.

determination that they are alien enemies.  Petitioners, along with others who may be detained across the country and may not even know about their designations as alien enemies, were temporarily protected from these summary removals pursuant to the court's order in *J.G.G. v. Trump*, No. 1:25-cv-766-JEB (D.D.C.). Multiple judges have already held there is likely no authority for the government's actions. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *5–10 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (AEA predicates of "invasion" or "predatory incursion" not met); *id*. at *13 (Millett, J., concurring) ("The Constitution's demand of due process cannot be so easily thrown aside."); *J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 890401, at *2 (D.D.C. Mar. 24, 2025) (Boasberg, J.) ("before [petitioners] may be deported, they are entitled to individualized hearings to determine whether the Act applies to them at all").

6.      However, since the Supreme Court stayed that order on the basis that Petitioners had to proceed through habeas, Petitioners and others similarly situated to them are now all at imminent risk of removal. Although the Supreme Court made clear that individuals must now be given notice before they are removed pursuant to the Proclamation so they may challenge the government's actions in court, the government has yet to explain what notice it intends to provide.  That the government has yet to do so is especially problematic given the position it took prior to the Supreme Court's ruling in the D.C. Circuit: "the government in no uncertain terms [has] conveyed that—were the injunction lifted—it would immediately begin deporting the [petitioners] without notice." *J.G.G.*, 2025 WL 914682, at *12 (Henderson, J., concurring).

## JURISDICTION AND VENUE

7.      This case arises under the Alien Enemies Act ("AEA"), 50 U.S.C. §§ 21-24; the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101, *et seq.* and its implementing regulations; the Convention Against Torture ("CAT"), *see* Foreign Affairs Reform and

Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231); the All Writs Act, 28 U.S.C. § 1651, and the Fifth Amendment to the U.S. Constitution.

8.     This Court has subject matter jurisdiction under 28 U.S.C. § 2241 *et seq*. (habeas corpus), art. I, § 9, cl. 2 of the U.S. Constitution (Suspension Clause), 28 U.S.C. § 1346 (United States as defendant), 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. § 1651 (All Writs Act).

9.     The Court may grant relief pursuant to 28 U.S.C. § 2241; 28 U.S.C. § 2243; the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*.; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.

10.     Venue is proper in this District under 28 U.S.C. § 2241; 28 U.S.C. § 1391(b); and, 28 U.S.C. § 1391(e)(1) because at the time of filing the Petitioners were detained in the Respondents' custody within the Southern District of Texas; a substantial part of the events and omissions giving rise to the claim occurred in this district; Respondents Cerna and Venegas reside in this district; and Respondents are agencies of the United States or officers of the United States acting in their official capacity.

## PARTIES

### A. Petitioners-Plaintiffs ("Petitioners")

11.     Petitioner J.A.V. is a Venezuelan national who is detained at El Valle Detention Facility in Texas and who, having been nearly removed on March 15 pursuant to the Proclamation, is again at imminent risk of removal under the Proclamation.  J.A.V. is seeking asylum on the basis of his political views and fear of harm and mistreatment from multiple criminal groups, including the *Tren de Aragua*, on account of his sexual orientation.  Indeed, J.A.V. has already suffered physical violence and harassment on account of his sexual

orientation in Venezuela.  J.A.V. is HIV positive and requires access to daily medications and consistent medical care.  At his asylum interview on February 27, 2025, he was arrested and interrogated by ICE, during which time ICE questioned him about Tren de Aragua.  J.A.V. is not and has never been a member of Tren de Aragua—he was in fact victimized by that group and the group is one reason he cannot return to Venezuela.  Still, ICE proceeded to detain J.A.V., first at Moshannon Valley Processing Center in Pennsylvania.  On March 9, 20205, J.A.V was transferred with a group of other Venezuelans to El Valle Detention Facility in Texas. Notwithstanding the fact that J.A.V. had a master immigration calendar hearing scheduled for March 19, 2025, he was told on March 14, 2025, that that he was being moved in preparation for a flight with a group of other Venezuelans.  J.A.V was then informed that he would be put on a plane on Saturday March 15, 2025, or Sunday March 16, 2025. Because his immigration counsel alerted undersigned counsel, J.A.V. was able to secure a temporary restraining order in *J.G.G.* in the District of Columbia and was not deported on March 15. J.A.V. is still detained at El Valle and faces imminent removal. He fears being deported, being unable to speak with his attorney, and being denied adequate medical care.

12.     Petitioner J.G.G., a Venezuelan national who is detained at El Valle Detention Center in Texas and who, having been nearly removed on March 15 pursuant to the Proclamation, is again at imminent risk of removal under the Proclamation.  J.G.G. is seeking asylum, withholding of removal, and CAT protection because he fears being killed, or arbitrarily imprisoned, beaten and tortured by Venezuelan police since they have done so previously to him. He fears that the Venezuelan police will target him because of his political opinion, because his family member is a known dissident, and because the U.S. government has erroneously claimed he is a TdA member. During an interview with ICE, he was detained because the officer

erroneously suspected that J.G.G. was a Tren de Aragua member on account of his tattoos. J.G.G. is a professional tattoo artist. ICE questioned him about two tattoos, a rose and skull on his leg, which covers a monkey tattoo that he no longer liked, and an eye tattoo, which a fellow tattoo artist did for him—neither are associated with Tren de Aragua. While he was awaiting a hearing on the merits of his immigration applications for protection in Adelanto, California, J.G.G. was awakened at 2:00 am on March 6, 2025, and he was told that he was being released and that he had to sign documents that were available only in English to receive his property. J.G.G. then signed documents under false pretense. Instead of being released, J.G.G. was abruptly and without explanation transferred to El Valle Detention Facility in Texas. While in El Valle, he was awakened at 3:00am on March 14, 2025, and told without explanation that he was going to be transferred elsewhere. He was not transferred that day because the plane had malfunctioned. The next day the government again sought to remove him under the Proclamation. However, because his immigration counsel alerted undersigned counsel, J.G.G. was able to secure a temporary restraining order in *J.G.G.* and was pulled off another plane before being deported on March 15. J.G.G. is still detained at El Valle and faces imminent removal. J.G.G. fears that he will be removed under the Proclamation because he has tattoos, despite not being involved whatsoever with Tren de Aragua and despite his ongoing asylum proceedings.

13.    Petitioner W.G.H. is a 29-year-old Venezuelan national who is detained at El Valle Detention Facility in Texas and who, having been nearly removed on March 15 pursuant to the Proclamation, is again at imminent risk of removal under the Proclamation. W.G.H. lives in Brooklyn, New York, with his wife and his stepdaughter. W.G.H. requested asylum because he was extorted and threatened by multiple criminal groups in Venezuela, including Tren de

Aragua.  ICE arrested W.G.H. on February 20, 2025. He was assigned an attorney from

Brooklyn Defender Services.  On March 7, 2025, ICE filed a Form I-213 stating that W.G.H.

"has been identified as a Tren de Aragua gang associate."  He is not a member of Tren de

Aragua.  By March 10, 2025, W.G.H. had been abruptly transferred to El Valle, where many

other Venezuelans were also detained.  W.G.H. was scheduled to have immigration court

hearings on March 12, 2025, but he was not produced.  Guards began telling him that he would

be taken to a plane on March 15 or 16.  Because his immigration counsel alerted undersigned

counsel, W.G.H. was able to secure a temporary restraining order in *J.G.G.* and was pulled off

the plane before being deported on March 15. W.G.H. is still detained at El Valle and faces

imminent removal. He is terrified of returning to Venezuela or being sent to El Salvador.

**B.  Respondents-Defendants ("Respondents")**

14.     Respondent Donald Trump is the President of the United States.  He is sued in his

official capacity.  In that capacity, he issued the Proclamation under the Alien Enemies Act.

15.     Respondent Pamela J. Bondi is the U.S. Attorney General at the U.S. Department

of Justice, which is a cabinet-level department of the United States government.  She is sued in

her official capacity.

16.     Respondent Kristi Noem is the Secretary of the U.S. Department of Homeland

Security, which is a cabinet-level department of the United States government.  She is sued in

her official capacity.  In that capacity, Respondent Noem is responsible for the administration of

the immigration laws pursuant to 8 U.S.C. § 1103.

17.     Respondent U.S. Department of Homeland Security ("DHS") is a cabinet-level

department of the United States federal government. Its components include Immigration and

Customs Enforcement ("ICE"). Respondent DHS is a legal custodian of Petitioners.

18.     Respondent Todd Lyons is the Acting Director of ICE.  Respondent Lyons is responsible for ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. Respondent Lyons is a legal custodian of Petitioners. Respondent Lyons is sued in his official capacity.

19.     Respondent ICE is the subagency of DHS that is responsible for carrying out removal orders and overseeing immigration detention. Respondent ICE is a legal custodian of Petitioners.

20.     Respondent Marco Rubio is the Secretary of State at the U.S. Department of State.  He is sued in his official capacity.

21.     Respondent U.S. Department of State, which is a cabinet-level department of the United States government.

22.     Respondent Robert Cerna is the acting director of ICE's Harlingen Field Office, which is responsible for ICE activities in the Harlingen Area of Responsibility, which encompasses fifteen South Texas counties and is responsible for six detention facilities, including the El Valle Detention Facility. Respondent Cerna's place of business is in the Southern District of Texas, and he is an immediate legal custodian responsible for the arrest and detention of Petitioners. He is sued in his official capacity.

23.     Respondent Frank Venegas is the Facility Administrator of the El Valle Detention Facility, which detains individuals suspected of civil immigration violations pursuant to a contract with ICE. Respondent Venegas is the immediate physical custodian responsible for the detention of Petitioners. He is sued in his official capacity.

## BACKGROUND

**The Alien Enemies Act**

7

24.     The AEA is a wartime authority enacted in 1798 that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.

25.     The AEA, as codified today, provides that "[w]henever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies."  50 U.S.C. § 21.

26.     The AEA can thus be triggered in only two situations.  The first is when a formal declared war exists with a foreign nation or government.  The second is when a foreign nation or government perpetrates, attempts, or threatens an invasion or predatory incursion against the territory of the United States.

27.     To trigger the AEA, the President must make a public proclamation of the declared war, or of the attempted or threatened invasion or predatory incursion.  *Id.*

28.     The AEA also provides that noncitizens must be permitted the full time to depart as stipulated by any treaty between the United States and the enemy nation, unless the noncitizen has engaged in "actual hostility" against the United States.  If no such treaty exists, the President may declare a "reasonable time" for departure, "according to the dictates of humanity and national hospitality."  *Id.* § 22.

29.     Under the AEA, noncitizens who "refuse or neglect to depart" are subject to removal.  *Id.* § 21.

30.     The Act has been used only three times in American history, all during actual or imminent wartime.

31.     The AEA was first invoked several months into the War of 1812, but President Madison did not use the AEA to remove anyone from the United States during the war.

32.     The AEA was invoked a second time during World War I by President Wilson. Upon information and belief, there were no removals effectuated pursuant to the AEA during World War I.

33.     The AEA was used again during World War II, though it was never used as a widespread method of removal.

34.     On December 7, 1941, after the Japanese invaded Hawaii in the attack on Pearl Harbor, President Roosevelt proclaimed that Japan had perpetrated an invasion upon the territory of the United States.  The president issued regulations applicable to Japanese nationals living in the United States.  The next day Congress declared war on Japan.

35.     On the same day, President Roosevelt issued two separate proclamations stating that an invasion or predatory incursion was threatened upon the territory of the United States by Germany and Italy.  The president incorporated the same regulations that were already in effect as to Japanese people for German and Italian people.  Three days later Congress voted unanimously to declare war against Germany and Italy.

36.     Congress declared war against Hungary, Romania, and Bulgaria on June 5, 1942. Just over a month later, President Roosevelt issued a proclamation recognizing that declaration of war and invoking the AEA against citizens of those countries.

37.     Under these proclamations, the United States infamously interned noncitizens from Japan, Germany, Italy, Hungary, Romania, and Bulgaria (with U.S. citizens of Japanese descent subject to a separate order that did not rely on the AEA).

38.     It was not until the end of hostilities that the President provided for the removal of alien enemies from the United States under the AEA.  On July 14, 1945, President Truman issued a proclamation providing that alien enemies detained as a danger to public peace and safety "shall be subject upon the order of the Attorney General to removal from the United States."  The Department of Justice subsequently issued regulations laying out the removal process.  *See* 10 Fed. Reg. 12,189 (Sept. 28, 1945).  The AEA was never used as a widespread method of removal. The regulations required, *inter alia*, notice of the removal order to be served on the designated alien enemy and that the alien enemy had thirty (30) days thereafter to depart—during which time they could seek judicial review of the removal order. *Id*.

**Systemic Overhaul of Immigration Law in 1952**

39.     Following the end of World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA").

40.     The INA, and its subsequent amendments, provide for a comprehensive system of procedures that the government must follow before removing a noncitizen from the United States.  The INA provides the exclusive procedure by which the government may determine whether to remove an individual.  8 U.S.C. § 1229a(a)(3).

41.     In addition to laying out the process by which the government determines whether to remove an individual, the INA also enshrines certain forms of humanitarian protection.

42.     First, the INA provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ),

irrespective of such alien's status," may apply for asylum.  8 U.S.C. § 1158(a)(1).  To qualify for asylum, a noncitizen must show a "well-founded fear of persecution" on account of a protected ground, such as race, nationality, political opinion, or religion.  8 U.S.C. § 1101(a)(42)(A).

43.    Second, Congress has barred the removal of an individual to a country where it is more likely than not that he would face persecution on one of these protected grounds.  8 U.S.C. § 1231(b)(3).  That protection implements this country's obligations under the 1951 Refugee Convention and the 1967 Protocol relating to the Status of Refugees.  The relevant form of relief, known as "withholding of removal," requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum; granting that relief is mandatory if the standard is met absent limited exceptions.

44.    Third, the Convention Against Torture ("CAT") prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture. *See* 8 U.S.C. § 1231 note.  That protection implements the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"), Pub. L. No. 105-277, div. G, Title XXII, § 2242.  As with withholding of removal, CAT relief also requires the applicant to satisfy a higher standard with respect to the likelihood of harm than asylum and relief is mandatory if that standard is met. There is no exception to CAT relief.

**President Trump's Proclamation Invoking the AEA**

45.    On March 14, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA [Tren de Aragua], are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as

11

Alien Enemies." *See* Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua (Mar. 15, 2025).[2]

46.    Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15, despite making extensive preparations and attempts to remove class members under the Act.

47.    The Proclamation characterizes Tren de Aragua as a *hybrid criminal state* engaged in an invasion and predatory incursion into the United States as a basis to invoke the AEA. It also characterizes Tren de Aragua, a criminal organization, as a foreign nation or government, and does not name Venezuela itself as the "foreign government" as the target of the AEA invocation.

48.    The Proclamation alleges that Tren de Aragua is perpetrating, attempting, and threatening predatory incursions, hostile actions, and irregular warfare.

49.    The Proclamation thus states that all Venezuelan citizens ages fourteen or older alleged to be members of Tren de Aragua—and who are not U.S. citizens or lawful permanent residents—are alien enemies.

50.    The Proclamation provides no means or process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. Nor does it provide individuals with the statutory grace period in which they can both seek judicial review or arrange their affairs and leave voluntarily.

51.    Instead, the Proclamation invokes the statutory exception to the "reasonable notice" requirement by claiming that the individuals subject to the Proclamation are "chargeable

---

[2] *Available at*: https://perma.cc/ZS8M-ZQHJ.

with actual hostility," and pose "a public safety risk," making them subject to immediate apprehension, restraint, and removal.

52.    The government employs a standardized check list, "Alien Enemy Validation Guide," to determine who is an "alien enemy" subject to the Proclamation. An ICE officer completes the form, tallying points for different categories of alleged TdA membership characteristics. However, the methodology that Respondents employs for TdA membership relies heavily on physical attributes like tattoos, hand gestures, symbols, logos, graffiti, and manner of dress. Experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members.

53.    Noncitizens subject to the Proclamation are not afforded credible fear interviews for asylum, nor will claims for protection under the Convention Against Torture ("CAT") be recognized.

54.    Multiple judges have already found that the Proclamation is likely unlawful.

55.    First, the Proclamation does not satisfy the statutory requirements for proper invocation of the Alien Enemies Act. Tren de Agua, a criminal organization, is not a nation or foreign government and is not part of the Venezuelan government.  The United States is not in a declared war with Venezuela.  The United States cannot declare war against Tren de Aragua because it is not a nation.  And neither Venezuela nor Tren de Aragua, except in a metaphorical way, have invaded or threatened to invade the United States, nor has either engaged in a "predatory incursion" within the meaning of the AEA.

56.    Moreover, there is no process, notice or meaningful opportunity for individuals to challenge their designation as alien enemies. There is thus a significant risk that even individuals who do not fall under the terms of the Proclamation will be subject to it.

57.     The Proclamation also violates the process and protections that Congress has prescribed elsewhere in the country's immigration laws for the removal of noncitizens.

58.     As a result, countless Venezuelans—including Petitioners in this district and many others in untold jurisdictions throughout the country—are at imminent risk of removal pursuant to the Proclamation without any hearing or meaningful review, regardless of the absence of any ties to TdA or the availability of claims for relief from and defenses to removal.

59.     Respondents are likely now to seek to move Petitioners in secret, without due process, to a prison in El Salvador known for dire conditions, torture, and other forms of physical abuse—possibly for life. This has already borne out for over 130 individuals on March 15 who have lost all contact with their attorneys, family, and the world.

<b>CLASS ALLEGATIONS</b>

60.     Petitioners bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of all other persons similarly situated.

61.     Petitioners seek to represent the following Proposed Class: All noncitizens in custody in the Southern District of Texas who were, are, or will be subject to the March 2025 Presidential Proclamation entitled 'Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua' and/or its implementation.

62.     The proposed class satisfies the requirements of Rule 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  Hundreds from Venezuela will potentially be subjected to summary removal under the Proclamation and its implementation by Respondents.  The proposed class also includes numerous future noncitizens who will be subjected to the Proclamation.

14

63.    The class satisfies the commonality requirements of Rule 23(a)(2).  The members of the class are subject to a common practice: summary removal under the Proclamation contrary to the AEA, the INA, and the statutory protections Congress has enacted.  The suit also raises questions of law common to members of the proposed class, including whether the Proclamation and its implementation violate the AEA, the INA, and the statutory protections for asylum seekers.

64.    The proposed class satisfies the typicality requirements of Rule 23(a)(3), because the claims of the representative Petitioners are typical of the claims of the class.  Each proposed class member, including the proposed class representatives, has experienced or faces the same principal injury (unlawful removal), based on the same government practice (the Proclamation and its implementation), which is unlawful as to the entire class because it violates the AEA, the INA, and due process.

65.    The proposed class satisfies the adequacy requirements of Rule 23(a)(4).  The representative Petitioners seek the same relief as the other members of the class—among other things, an order declaring the Proclamation unlawful and an injunction preventing enforcement of the Proclamation.  In defending their rights, Petitioners will defend the rights of all proposed class members fairly and adequately.

66.    The proposed class is represented by experienced attorneys from the American Civil Liberties Union and the American Civil Liberties Union of Texas.  Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens.

67.    The proposed class also satisfies Rule 23(b)(2).  Respondents have acted (or will act) on grounds generally applicable to the class by subjecting them to summary removal under

the Proclamation rather than affording them the protection of immigration laws.  Injunctive and

declaratory relief is therefore appropriate with respect to the class as a whole.

## CAUSES OF ACTION[3]

### FIRST CLAIM FOR RELIEF

### *Ultra Vires*, Violation of 50 U.S.C. § 21, *et seq.*
### (All Respondents)

68.    All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

69.    The AEA does not authorize the removal of noncitizens from the United States

absent a "declared war" or a "perpetrated, attempted, or threatened" "invasion or predatory

incursion" into the United States by a "foreign nation or government."  *See* 50 U.S.C. § 21.  The

Proclamation on its face mandates Petitioners' removal under the AEA where those

preconditions have not been met.

70.    The AEA Process, which was purportedly established pursuant to the authority of

50 U.S.C. § 21, is not authorized by that law.

71.    The AEA (Section 21) permits removal only where noncitizens alleged to be

"alien enemies" "refuse or neglect to depart" from the United States. 50 U.S.C. § 21. The AEA

(Section 22) also requires the government to afford noncitizens alleged to be "alien enemies"

sufficient time to settle their affairs and to depart the United States. *See* 50 U.S.C. § 22.

72.    However, Petitioners are being subject to forced removal without being afforded

the privilege of voluntary departure, let alone any notice or an opportunity to respond to the

designation of alien enemy.

---

[3] Insofar as cause of action seeks to enjoin Respondents, Petitioners do not seek such relief
against the President.

73.     The application of the AEA Process to Petitioners is therefore ultra vires.

## SECOND CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1101, *et seq.*
### (All Respondents)

74.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

75.     The INA, 8 U.S.C. § 1101, *et seq.*, sets out the sole mechanisms established by Congress for the removal of noncitizens.

76.     The INA provides that a removal proceeding before an immigration judge under 8 U.S.C. § 1229a is "the sole and exclusive procedure" by which the government may determine whether to remove an individual, "[u]nless otherwise specified" in the INA.  8 U.S.C. § 1229a(a)(3).

77.     The AEA Process creates an alternative removal mechanism outside of the immigration laws set forth by Congress in Title 8.

78.     The INA's "exclusive procedure" and statutory protections apply to any removal of a noncitizen from the United States, including removals authorized by the AEA.  Because the AEA Process provides for the removal of Petitioners without the procedures specified in the INA, it violates 8 U.S.C. § 1229a and the INA.

79.     As a result, the application of the AEA to Petitioners, which will result in their removal from the United States, is contrary to law.

## THIRD CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1158, Asylum
### (All Respondents)

80.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

81.    The INA provides, with certain exceptions, that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title."  8 U.S.C. § 1158(a)(1).

82.    Respondents' application of the AEA Process to Petitioners prevents them from applying for asylum in accordance with 8 U.S.C. § 1158(a)(1), and is therefore contrary to law.

### FOURTH CLAIM FOR RELIEF

### Violation of 8 U.S.C. § 1231(b)(3), Withholding of Removal
### (All Respondents)

83.    All of the foregoing allegations are repeated and realleged as if fully set forth herein.

84.    The "withholding of removal" statute, INA § 241(b)(3), *codified at* 8 U.S.C. § 1231(b)(3), bars the removal of noncitizens to a country where it is more likely than not that they would face persecution.

85.    Respondents' AEA Process violates the withholding of removal statute because it does not provide adequate safeguards to ensure that Petitioners are not returned to a country where it is more likely than not that they would face persecution.  As a result, Respondents' actions against Petitioners are contrary to law.

### FIFTH CLAIM FOR RELIEF

### Violation of the Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA"),

**codified at 8 U.S.C. § 1231 note**
**(All Respondents)**

86.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

87.     FARRA prohibits the government from returning a noncitizen to a country where it is more likely than not that he would face torture.

88.     Respondents' AEA Process violates FARRA because it does not provide adequate safeguards to ensure that Petitioners are not returned to a country where it is more likely than not that they would face torture.  As a result, Respondents' actions against Petitioners are contrary to law.

**SIXTH CLAIM FOR RELIEF**

***Ultra Vires*, Violation of 50 U.S.C. § 22**
**(All Respondents)**

89.     All of the foregoing allegations are repeated and realleged as if fully set forth herein.

90.     The AEA requires that noncitizens whose removal is authorized by the AEA, unless "chargeable with actual hostility, or other crime against the public safety," be allowed the full time stipulated by treaty to depart or a reasonable time in which to settle their affairs before departing.  *See* 50 U.S.C. § 22.  The Proclamation on its face denies Petitioners any time under Section 22 to settle their affairs, because it declares everyone subject to the Proclamation to be "chargeable with actual hostility" and to be a "danger to public safety."

91.     The AEA Process thus contravenes 50 U.S.C. § 22 and is *ultra vires.*

92.     The application of the AEA Process to Petitioners is contrary to law.

**SEVENTH CLAIM FOR RELIEF**

19

**Violation of Due Process Under the Fifth Amendment**
**(All Respondents)**

93.     All of the foregoing allegations are repeated and realleged as if fully set forth

herein.

94.     The Due Process Clause of the Fifth Amendment provides in relevant part that:

"No person shall be deprived of life, liberty, or property, without due process of law." U.S.

Const. amend. V.

95.     In denying Petitioners meaningful procedural protections to challenge their

removal, the Proclamation violates due process.

96.     The Proclamation on its face also denies Petitioners any time to settle their affairs

before departing and thus violates due process.

**EIGHTH CLAIM FOR RELIEF**

**Violation of Habeas Corpus**
**(All Respondents)**

97.     Detainees have the right to file petitions for habeas corpus to challenge the

legality of their detention or raise other claims related to their detention or to the basis for their

removal.

98.     The detention of Petitioners under the Alien Enemies Act has violated and

continues to violate their right to habeas corpus. See 28 U.S.C. § 2241; U.S. Const. art. I, § 9, cl.

2 (Suspension Clause).

**PRAYER FOR RELIEF**

WHEREFORE, Petitioners respectfully pray this Court to:

a.  Assume jurisdiction over this matter;

b.  Certify this action as a class action on behalf of the proposed Petitioner Class, appoint the Petitioners as class representatives, and appoint the undersigned counsel as class counsel;

c.  Grant a temporary restraining order to preserve the status quo pending further proceedings;

d.  Enjoin Respondents from transferring Petitioners out of this district during the pendency of this litigation without advance notice to counsel;

e.  Grant a writ of habeas corpus to Petitioners that enjoins Respondents from removing them pursuant to the Proclamation;

f.  Enjoin Respondents from removing Petitioners pursuant to the Proclamation;

g.  Declare unlawful the Proclamation;

h.  Enjoin Respondents from applying the Proclamation to Petitioners without providing 30-day notice and an opportunity to respond to the designation prior to the removal date;

i.  Award Petitioners' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

j.  Grant such further relief as the Court deems just, equitable, and appropriate.

Dated: April 8, 2025

Respectfully submitted,

Lee Gelernt*
Daniel Galindo*
Ashley Gorski*
Patrick Toomey*
Sidra Mahfooz*
Omar Jadwat*
Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org

*/s/ Adriana Piñon*
Adriana Piñon
TX State Bar No:  24089768; SDTX No.
1829959
Savannah Kumar
TX State Bar No.:  24120098; SDTX
admission pending
Charelle Lett
TX State Bar No.: 24139900; SDTX No.
3908204
Thomas Buser-Clancy
TX State Bar No:  24078344; SDTX No.
1671940
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306,
Houston, TX 77288
(713) 942-8146
apinon@aclutx.org
skumar@aclutx.org
clett@aclutx.org
tbuser-clancy@aclutx.org

*Attorneys for Petitioners-Plaintiffs*
*\*Pro hac vice application forthcoming*