**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

J.A.V. *et al.*,

*Petitioners–Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

*Respondents–Defendants.*

CIVIL ACTION NO. <u>1:25-cv-0072</u>

**PETITIONERS'-PLAINTIFFS'
MEMORANDUM OF LAW IN SUPPORT
OF A TEMPORARY RESTRAING
ORDER**

## PETITIONERS'-PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF A TEMPORARY RESTRAING ORDER

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

LEGAL AND FACTUAL BACKGROUND....................................................................3

    I.      The Alien Enemies Act.................................................................................3

    II.     Congress's Comprehensive Reform of Immigration Law.............................3

    III.    The AEA Proclamation and the Unlawful Removals....................................4

    IV.    Petitioners ....................................................................................................8

    V.     The *J.G.G.* Litigation..................................................................................9

LEGAL STANDARD.........................................................................................................10

ARGUMENT.......................................................................................................................10

    I.      Petitioners Are Likely to Succeed on the Merits. ........................................10

          A.     The Proclamation Does Not Satisfy the AEA.................................10

          B.     The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection. ...................................... 16

          C.     The Proclamation Violates the Procedural Requirements of the INA........... 18

    II.     Petitioners Face Imminent Irreparable Harm................................................19

    III.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Temporary Restraining Order.......................................................................20

    IV.    The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings.................................................................................................21

    V.     The Court Should Not Require Petitioners to Provide Security.................................21

CONCLUSION.................................................................................................... 22

i

# TABLE OF AUTHORITIES

## Cases

*Abrego Garcia v. Noem*,
No. 25-1345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025) ...................................... 2, 6

*Adams v. United States*,
317 U.S. 269 (1942) ................................................................................................ 21

*Aliyev v. Mukasey*,
549 F.3d 111 (2d Cir. 2008) .................................................................................... 4

*California v. M&P Inv.*,
46 F. App'x 876 (9th Cir. 2002) .............................................................................. 21

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
636 F.2d 1084 (5th Cir. 1981) ................................................................................ 22

*Clark v. Prichard*,
812 F.2d 991 (5th Cir. 1987) .................................................................................. 10

*F.T.C. v. Dean Foods Co.*,
384 U.S. 597 (1966) ................................................................................................ 21

*Holmes v. Jennison*,
39 U.S. 540 (1840) .................................................................................................. 14

*Huisha-Huisha v. Mayorkas*,
560 F. Supp. 3d 146 (D.D.C. 2021) ........................................................................ 20

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022) ........................................................................... 16, 19

*INS v. Aguirre-Aguirre*,
526 U.S. 415 (1999) .................................................................................................. 4

*INS v. Cardoza-Fonseca*,
480 U.S, 421 (1987) .................................................................................................. 4

*ITT Cmty. Dev. Corp. v. Barton*,
569 F.2d 1351 (5th Cir. 1978) ................................................................................ 21

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ............................... passim

*J.G.G. v. Trump*,
  No. 25-cv-766-JEB, 2025 WL 890401 (D.D.C. Mar. 24, 2025) ...................................... passim

*Jarecki v. G.D. Searle & Co.*,
  367 U.S. 303 (1961) ................................................................................................. 12

*Jones v. Hendrix*,
  599 U.S. 465 (2023) ................................................................................................. 17

*Kaepa, Inc. v. Achilles Corp.*,
  76 F.3d 624 (5th Cir. 1996) ..................................................................................... 21

*Ludecke v. Watkins*,
  335 U.S. 160 (1948) ................................................................................................. 11

*Medellin v. Texas*,
  552 U.S. 491 (2008) ................................................................................................. 14

*Michael v. INS*,
  48 F.3d 657 (2d Cir. 1995) ....................................................................................... 21

*Miles v. Apex Marine Corp.*,
  498 U.S. 19 (1990) ................................................................................................... 18

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................. 20

*Nunez v. Boldin*,
  537 F. Supp. 578 (S.D. Tex. 1982) .......................................................................... 20

*Steward v. West*,
  449 F.2d 324 (5th Cir. 1971) ................................................................................... 22

*Tesfamichael v. Gonzales*,
  411 F.3d 169 (5th Cir. 2005) ................................................................................... 19

*Trump v. J.G.G.*,
  No. 24A931, 2025 WL 102409 (Apr. 7, 2025).................................................... passim

*United States ex rel. Dorfler v. Watkins*,
  171 F.2d 431 (2d Cir. 1948)........................................................................................ 3

*United States v. Tinoso*,
  327 F.3d 864 (9th Cir. 2003) ................................................................................... 18

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302 (2014)................................................................................................. 11

iii

*Wages & White Lion Inv., L.L.C. v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ........................................................................ 20

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7, 20 (2008) ........................................................................................ 10

**Statutes**

28 U.S.C. § 1651(a) ............................................................................................ 21

42 U.S.C. § 265 ................................................................................................... 16

50 U.S.C. § 21 ............................................................................................... passim

50 U.S.C. § 22 ................................................................................................. 3, 14

8 U.S.C. § 1158 ............................................................................................ 4, 5, 17

8 U.S.C. § 1158(a)(1) .......................................................................................... 17

8 U.S.C. § 1229a(a)(3) ..................................................................................... 4, 18

8 U.S.C. § 1231 note ........................................................................................... 16

8 U.S.C. § 1231(b)(3) .................................................................................. 4, 5, 16

8 U.S.C. § 1231(b)(3)(A) ................................................................................... 17

8 U.S.C. § 1531 ............................................................................................. 17, 18

8 U.S.C. § 1532(a) .............................................................................................. 17

8 U.S.C. § 1532(b) .............................................................................................. 17

8 U.S.C. § 1532(c)(1)-(2) ................................................................................... 17

8 U.S.C. § 1533(a)(1) .......................................................................................... 17

Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ...................................... 16

Act of July 7, 1798, ch. 67, 1 Stat. 578 ............................................................. 11

Act of July 9, 1798, ch. 68, 1 Stat. 578 ............................................................. 10

Act of May 28, 1798, ch. 47, 1 Stat. 558 ........................................................... 11

**Other Authorities**

5 Annals of Cong. 1453 (Apr. 1798) .................................................................. 13

7 Annals of Cong. 58 (May 1797) ................................................................ 10

*J.G.G. v. Trump*,
No. 1:25-cv-766-JEB, ECF No. 44-3 (Goebertus Decl.) ................................. 7

*J.G.G. v. Trump*,
No. 1:25-cv-766-JEB, ECF No. 67-12 (Dudley Decl.) ............................ 7, 13

*J.G.G. v. Trump*,
No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exh. 1) .......... 6, 7, 13

*J.G.G. v. Trump,*
No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ........................... 7, 13, 19

*J.G.G. v. Trump*,
No. 1:25-cv-766-JEB, ECF No. 67-4 (Antillano Decl.) ......................... 7, 13

*J.G.G. v. Trump*,

25-5067 (D.C. Cir. 2025), March 24 Transcript .................................. 19

*J.G.G. v. Trump*, No.
1:25-cv-766-JEB (D.D.C. Mar. 18, 2025), ECF No. 28-1 (Cerna Decl.) ................ 4

*J.G.G. v. Trump*,
No. 1:25-cv-766-JEB, ECF No. 44-4 (Bishop Decl.) ............................. 7

*J.G.G. v. Trump*,
No. 1:25-cv-766-JEB, ECF No. 67-15 (Caro-Cruz Decl.) ....................... 6

*J.G.G. v. Trump*,
No. 1:25-cv-766-JEB, ECF No. 67-9 (Smyth Decl.) ............................. 6

*J.G.G. v. Trump,*
No. 1:25-cv-766-JEB, ECF No. 67-14 (Thierry Decl.) ........................... 6

Jennifer K. Elsea & Matthew C. Weed, Cong. Rsch. Serv., RL3113, Declarations of War and Authorizations for the Use of Military Force (2014) ................................ 13

John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, Civil Liberty in War Time (Jan. 17, 1919) ................................................................ 13

Nayib Bukele, X.com post (Mar. 16, 2025, 5:13AM ET) ........................... 7

Ryan Goodman, Bluesky (Mar. 26, 2025) ....................................... 12

Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997) ................................................................ 17

*Trump v. J.G.G.*,
  No. 24A931, 2025 WL 1024097 (U.S. Apr. 2, 2025), Reply in Support of Application to
  Vacate .................................................................................................................................. 6

Webster's Dictionary (1828) ................................................................................................. 9, 10

**Rules**

C.F.R. §§ 208.16-.18 ............................................................................................................. 16

Fed. R. Civ. P. 65 .................................................................................................................. 21

## INTRODUCTION

Petitioners-Plaintiffs ("Petitioners") respectfully request immediate action by this Court through a Temporary Restraining Order ("TRO") to avoid irreparable harm to Petitioners and to the proposed class—and to ensure that this Court is not potentially deprived of jurisdiction.

In a Proclamation signed on March 14 and published on March 15, the President invoked a war power, the Alien Enemies Act of 1798 ("AEA"), to summarily remove noncitizens from the U.S. and bypass the immigration laws Congress has enacted. *See* Invocation of the Alien Enemies Act (Mar. 15, 2025)[1] ("Proclamation"). The Proclamation targets Venezuelan noncitizens accused of being part of Tren de Aragua ("TdA"), a criminal gang. The evening of March 15, Petitioners, on behalf of a provisionally certified nationwide class, secured a court order from the district court in D.C. temporarily pausing removals under the Proclamation. That order was immediately appealed by the government, but the court of appeals denied a stay. On April 7, in a 5-4 decision, the Supreme Court granted the government's application to stay the order on the basis that Petitioners had to proceed through habeas. This case followed.[2]

As several judges have already found, **Petitioners are likely to succeed in the merits of their challenge and are at imminent risk of removal to El Salvador**, where they potentially face lifetime incommunicado sentences in one of the most notorious prisons in the world. Numerous accounts, both in declarations and public news reporting, have raised serious questions about the validity of the government's designations of people as "alien enemies," with no process

---

[1] https://perma.cc/ZS8M-ZQHJ.

[2] On April 8, 2025, Petitioners G.F.F. and J.G.O.—two of the five original plaintiffs to the action—filed a habeas petition and a motion for a temporary restraining order in the Southern District of New York, the district of their custody. Hours later, the court ordered that "Petitioners shall neither be removed from the United States, nor transferred out of this District, unless and until the Court orders otherwise," and scheduled a hearing for April 9, 2025. *G.F.F. v. Trump*, No. 25-2886 (S.D.N.Y. Apr. 8, 2025), ECF No. 6.

provided for anyone to contest those designations.  A TRO is needed because there may not be sufficient time for this Court to intervene before people are put on planes to remove Petitioners from the United States.

Petitioners contend that the Proclamation is invalid under the AEA for several reasons. First, TdA is not a "foreign nation or government."  Second, TdA is not engaged in an "invasion" or "predatory incursions" within the meaning of the AEA, because criminal activity does not meet the longstanding definitions of those statutory requirements.  Thus, the government's attempt to summarily remove Venezuelan noncitizens exceeds the wartime authority that Congress delegated in the AEA.  Moreover, despite judicial consensus, *see Trump v. J.G.G.*, No. 24A931, 2025 WL 102409, at *2 (U.S. Apr. 7, 2025), the government has provided no notice, process, or meaningful opportunity for individuals to challenge their designation as alien enemies, contrary to the AEA and due process.  Removals under the Proclamation also violate the process and protections that Congress has prescribed for the removal of noncitizens in the immigration laws.

**Accordingly, Petitioners move the Court for a TRO barring their summary removal under the AEA and barring Respondents from relocating them outside of this District without advance notice to counsel.[3] Petitioners also request 30-day notice of any intent to remove Petitioners and the opportunity to contest an alien enemy designation, as well as advance notice of transfer of Petitioners out of this District.**

---

[3] Petitioners do not object to a transfer out of this District to a different part of the U.S. if it is to bring them back to where they were originally detained and closer to their individual immigration counsel.  However, Petitioners seek advance notice of the transfer to ensure that they are aware of where class members are detained and, more importantly, the government is not seeking to bring them closer to a removal staging facility.  As already demonstrated, in its rush to transfer individuals to stage AEA removals, the government mistakenly sent several individuals to El Salvador.  *See Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *6 (4th Cir. Apr. 7, 2025) (Wilkinson, J., concurring); *J.G.G. v. Trump*, 1:25-cv-766-JEB, ECF Nos. 55-1, 55-2, 67-11.

## LEGAL AND FACTUAL BACKGROUND

### I.    The Alien Enemies Act

The AEA is a wartime authority that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens.  Passed in 1798 in anticipation of a war with France, the AEA, as codified today at 50 U.S.C. § 21, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

This Act has only ever been used three times in the country's history and each time in a period of war—the War of 1812, World War I, and World War II.

The Act provides that, generally, individuals designated as enemy aliens will have time to "settle affairs" before removal and the option to voluntarily "depart."[4]  *See, e.g.*, *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the [AG] can lawfully remove him against his will.").

### II.    Congress's Comprehensive Reform of Immigration Law

Following World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA").  The INA, and its subsequent amendments, provide a comprehensive system of procedures that the government must follow

---

[4] 50 U.S.C. § 21 (providing for removal of only those "alien enemies" who "refuse or neglect to depart" from the U.S.); *id*. § 22 (granting time for departure in accordance with treaty stipulation or "where no such treaty exists, or is in force," a "reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality").

before removing a noncitizen from the U.S.  *See* 8 U.S.C. § 1229a(a)(3) (INA provides "sole and exclusive procedure" for determining whether noncitizen may be removed).

As part of that reform and other subsequent amendments, Congress prescribed safeguards for noncitizens seeking protection from persecution and torture.  These protections codify the humanitarian framework adopted by the United Nations in response to the humanitarian failures of World War II.  *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987); *Aliyev v. Mukasey*, 549 F.3d 111, 118 n.8 (2d Cir. 2008) ("It is no accident that many of our asylum laws sprang forth as a result of events in 1930s Europe.").  First, the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen in the U.S. has a right to apply for asylum.  Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that noncitizens "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground.  *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999) (withholding is mandatory upon meeting statutory criteria).  Third, protections under the Convention Against Torture ("CAT") prohibit returning noncitizens to a country where it is more likely than not that they would face torture.  *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18.

## III.  The AEA Proclamation and the Unlawful Removals[5]

On March 14, the President signed the AEA Proclamation at issue here.  It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable

---

[5] The facts underlying this lawsuit are laid out in more detail in the D.C. district court's order denying the motion to vacate the TRO and the D.C. Circuit's panel opinions on Respondents' application for a stay of the TROs. *J.G.G.*, No. 25-766, 2025 WL 890401, at *3-5 (D.D.C. Mar. 24, 2025); *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *2 (D.C. Cir. Mar. 26, 2025); *id.* at *16-19.

to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Proclamation. Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the administration did not make the invocation public until around 3:53 p.m. EDT on March 15, despite making extensive preparations to remove class members under the Act. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB (D.D.C. Mar. 18, 2025), ECF No. 28-1 (Cerna Decl.) ¶ 5.

And the Proclamation does not provide any process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. Nor does it provide individuals with the statutory grace period in which they can both seek judicial review or arrange their affairs and leave voluntarily. Instead, the Proclamation invokes the statutory exception to the "reasonable notice" requirement by claiming that all the individuals subject to the Proclamation are "chargeable with actual hostility," and pose "a public safety risk." The Proclamation also claims to supplant the removal process under the congressionally enacted immigration laws, which, among other things, provide a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3), 1231 note.

To implement the Proclamation, the government began moving detained people with pending immigration proceedings from detention facilities around the country to detention centers in Texas in early March, disrupting court hearings where individuals were seeking humanitarian protections. *See J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *17 (D.C. Cir. Mar. 26, 2025); *J.G.G.*, 2025 WL 890401, at *3. On March 15, by the time the secret Proclamation was made public, these men, three of whom are named Petitioners here, had been shackled, driven to an airport and told they would be put on a plane, despite having no order permitting ICE to remove them. *Id.* Fortunately, named Petitioners' immigration counsel were able to contact undersigned counsel, who filed a class action in the District of Columbia. *Id.* A TRO for the named Petitioners

and others issued the morning of March 15, leading Petitioners to be pulled off the planes. *Id.* Although the district court granted a TRO against removal for the provisionally certified class that evening, the government summarily removed well over 100 people—many with pending removal proceedings—to El Salvador pursuant to the Proclamation. *Id.* at *3-5. Also removed was a Salvadoran man granted withholding of removal whom the government admits was removed by mistake. *See Abrego Garcia*, 2025 WL 1021113, at *6.

The government has suggested it provides individuals with notice of their status as alien enemies. *See* Reply ISO App. to Vacate, *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *8 (U.S. Apr. 2, 2025). But, upon information and belief, that form asserts the men are alien enemies and pointedly states that they are "not entitled to a hearing, appeal, or judicial review of this notice and warrant of apprehension and removal." *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exh. 1). Moreover, Petitioners and other members of the previously provisionally certified class never received advance notice of the basis for removal. *See Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *4 (U.S. Apr. 2, 2025); Exh. A (Smyth Decl.) ¶ 10; Exh. B (Quintero Decl.) ¶ 13; Exh. C (Lauterback Decl.) ¶ 7. They were never given any paperwork, nor did officers inform them that they were headed to El Salvador. *See* Exh. A (Smyth Decl.) ¶ 10; Exh. B (Quintero Decl.) ¶ 13; Exh. C (Lauterback Decl.) ¶ 7. Nor were their immigration attorneys informed or notified of their impending deportation or the basis for the removal. *See, e.g.*, Exh. A (Smyth Decl.) ¶ 10; Exh. B (Quintero Decl.) ¶ 15; Exh. C (Lauterback Decl.) ¶ 7; *see also J.G.G.*, 2025 WL 1024097, at *6 (Sotomayor, J., dissenting).

Whether most (or perhaps all) of the class lacks ties to TdA remains to be seen, because Respondents secretly rushed the men out of the country and has have provided Petitioners with no information about the class. But evidence since the flights on March 15 increasingly shows that

many class members removed to El Salvador are not "members" of TdA; many have no ties to TdA at all. *See J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exhs. 4-20) (media reports regarding evidence contradicting gang allegations). These false accusations are particularly devastating given Petitioners strong claims for relief under our immigration laws. Exh. A (Smyth Decl.) ¶ 4; Exh. B (Quintero Decl.) ¶ 3; Exh. C (Lauterback Decl.) ¶ 2.

The government's errors are unsurprising, given the methods it is employing to identify members of TdA. The "Alien Enemy Validation Guide" that, upon information and belief, the government is using to ascertain alien enemy status, requires ICE officers to tally points for different categories of alleged TdA membership characteristics. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exh. 1). This relies heavily on physical attributes like "tattoos denoting membership/loyalty to TDA" and hand gestures, symbols, logos, graffiti, or manner of dress. But experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members. *Id.* at 67-3 (Hanson Decl.) ¶¶ 22-24, 27; *id.* at 67-4 (Antillano Decl.) ¶ 14; *id.* at 67-12 (Dudley Decl.) ¶ 25.

Experts on El Salvador have explained how those removed there face harm and threatening conditions at the Terrorism Confinement Center ("CECOT"), including electric shocks, beating, waterboarding, and use of implements of torture on detainees' fingers. *See J.G.G.*, 2025 WL 1024097, at *9 (U.S. Apr. 7, 2025) (Sotomayor, J., dissenting); *see also J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-4 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; *id.* at 44-3 (Goebertus Decl.) ¶¶ 8, 10, 17. These abusive conditions are life threatening, as demonstrated by the hundreds of people who have died in Salvadoran prisons. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-3 (Goebertus Decl.) ¶ 5; *id.* at 44-4 (Bishop Decl.) ¶¶ 43–50. Worse, those removed and detained at CECOT face indefinite detention. *Id.* at 44-3 (Goebertus Decl.) ¶ 3 (quoting the Salvadorean government that

people held in CECOT "will never leave"); Nayib Bukele, X.com post (Mar. 16, 2025, 5:13AM ET)[6] (detainees "were immediately transferred to CECOT . . . for a period of one year (renewable)").

## IV.    Petitioners

Petitioners are noncitizens in custody who face a substantial risk of imminent removal under the President's AEA Proclamation.

Petitioner J.A.V. is a 32-year-old Venezuelan national detained at the El Valle Detention Facility ("El Valle"), and who, upon information and belief, is at imminent risk of removal under the Proclamation.  Exh. A (Smyth Decl.) ¶ 2. J.A.V. was detained at his asylum interview and interrogated because his tattoos, according to ICE, suggested a connection to TdA.  *Id.* ¶ 6.  His tattoos have no connection whatsoever to TdA.  *Id.*  On March 15, J.A.V. was brought to the airport and nearly removed but for the *J.G.G.* order.  *Id.* ¶ 9.  J.A.V. fears being removed because he risks persecution based on his sexuality and HIV-positive status.  *Id.*  ¶ 4.

Petitioner J.G.G. is a 30-year-old Venezuelan national who is detained at El Valle, and who, upon information and belief, is at imminent risk of removal under the Proclamation.  Exh. B (Quintero Decl.) ¶ 2.  J.G.G. fled Venezuela after the police tortured, arbitrarily imprisoned, and beat him because of his political opinion. *Id.* ¶ 3.  On October 3, 2024, ICE detained J.G.G. during an office interview because they erroneously suspected that he was a TdA member on account of his tattoos.  *Id.* ¶ 5.  J.G.G. is a tattoo artist and none of his tattoos are associated with TdA.  *Id.* On March 15, J.G.G. was brought to the airport and nearly removed but for the *J.G.G.* order.  *Id.* ¶¶ 8-10.

---

[6] https://perma.cc/52PT-DWMR.

Petitioner W.G.H. is a 29-year-old Venezuelan detained at El Valle and who is likewise at imminent risk of removal under the Proclamation.  Exh. C (Lauterback Decl.) ¶¶ 1-2.  W.G.H. fled Venezuela because he was extorted and threatened by multiple criminal groups, including TdA. *Id.* ¶ 2.  On February 20, 2025, ICE arrested W.G.H., and ICE filed a Form I-213 stating that W.G.H. "has been identified as a Tren de Aragua gang associate."  *Id.* ¶¶ 2-3.  He is not a member of TdA.  *Id.* ¶ 3.  On March 15, W.G.H. was brought to the airport and nearly removed but for the *J.G.G.* order.  *Id.* ¶ 6.

The government has said that they wish to remove individuals under the AEA as quickly as possible.  As Judge Millett of the D.C. Circuit noted regarding the government's position at oral argument: "The government's position at oral argument was that, the moment the district court TROs are lifted, it can immediately resume removal flights without affording Plaintiffs notice of the grounds for their removal or any opportunity to call a lawyer, let alone to file a writ of habeas corpus or obtain any review of their legal challenges to removal."  *J.G.G.*, 2025 WL 914682, at *30.

## V.    The *J.G.G.* Litigation

Petitioners originally filed a class action seeking a TRO in the District of Columbia before Judge Boasberg.  *J.G.G.*, No. 1:25-cv-766-JEB, ECF Nos. 1, 3, 4.  Judge Boasberg provisionally certified a class of individuals in detention who were subject to removal under the AEA Proclamation.  *Id.* at Minute Order (Mar. 15, 2025).  He then issued a class TRO on the ground that class members had not been given notice of their designation as alien enemies under the Proclamation and had a right to meaningful notice so they could seek judicial review.  *Id.* at Minute Order (Mar. 15, 2025).  He did not rule on whether the Proclamation was unlawful under the AEA, or specifically whether the Proclamation satisfied the Act's requirement that there be an ongoing

or threatened declared war, invasion or predatory incursion by a foreign nation against U.S. territory. *Id.* The government sought a stay, and in a 2-1 decision, the D.C Circuit denied the stay. *J.G.G.*, 2025 WL 914682, at *1. Judge Henderson voted to deny the stay, stressing that a gang's criminal activities did not constitute an "invasion or predatory incursion" under the AEA and the Act was a wartime authority meant to address "military" attacks. *Id.* at *1-13. Judge Millett likewise voted to deny the stay and found that notice must be provided but did not reach the statutory issues. *Id.* at *13-31. Judge Walker, dissenting, held only that the claims should be brought in habeas. *Id.* at *31-40.

The Supreme Court, 5-4, vacated the TRO, but solely on the ground that the claims should be brought in habeas. *J.G.G.*, 2025 WL 1024097, at *1-2. The Court did not reach the question addressed by Judge Henderson; whether a gang's criminal activities during peacetime fell within the AEA, but all nine Justices were clear that, contrary to the government's position, individuals subject to the Proclamation have due process rights and must be given "notice and the opportunity to challenge their removal." *Id.* at *2.

## LEGAL STANDARD

To obtain a TRO, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987).

## ARGUMENT

## I.    Petitioners Are Likely to Succeed on the Merits.

### A.    The Proclamation Does Not Satisfy the AEA.

The Proclamation is unprecedented, exceeding the President's statutory authority in three critical respects: there is no invasion or predatory incursion; no foreign government or nation; and no process to contest whether an individual falls within the Proclamation. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism is well warranted here.

### 1. There Is No "Invasion" or "Predatory Incursion" upon the United States.

The Proclamation fails on an essential statutory requirement: that there be an "invasion or predatory incursion" directed "against the territory of the United States." The text and history of the AEA make clear that it uses these terms to refer to military actions indicative of an actual or impending war. At the time of enactment, an "invasion" was a large-scale military action by an army intent on territorial conquest. *See* Webster's Dict., Invasion (1828) ("invasion" is a "hostile entrance into the possession of another; particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force"); *see also J.G.G.*, 2025 WL 914682, at *20 (in the Constitution, "invasion" "is used in a military sense" "*in every instance*"). And "predatory incursion" referred to smaller-scale military raids aimed to destroy military structures or supplies, or to otherwise sabotage the enemy, often as a precursor to invasion and war. *See* Webster's Dict., *Incursion* (1828) ("incursion . . . applies to the expeditions of small parties or detachments of an enemy's army, entering a territory for attack, plunder, or destruction of a post or magazine"); *J.G.G.*, 2025 WL 914682, at *10 ("predatory incursion" is "a form of hostilities against the United States by another nation-state, a form of attack short of war"). The interpretive canon of *noscitur a sociis* confirms that the AEA's powers extended beyond an existing war only when war was imminent. *Ludecke*, 335 U.S. at 169 n.13 ("the life of [the AEA]

11

is defined by the existence of a war").  Reading "invasion" and "predatory incursion" in light of the neighboring term, "declared war," highlights the express military nature of their usage here. *See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).

The historical context in which the AEA was passed reinforces what Congress meant by "predatory incursion" and "invasion."  At the time of passage, French ships were already attacking U.S. merchant ships in U.S.  *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by French ships while recognizing that distance from Europe lessened the chance of "invasion"); Act of July 9, 1798, ch. 68, 1 Stat. 578, 578 (authorizing US ships to seize "any armed French vessel" "found within the jurisdictional limits of the United States").  Congress worried that these attacks against the territory of U.S. were the precursor to all-out war with France.  *J.G.G.*, 2025 WL 914682, at *1 ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France.").  This "predatory violence" by a sovereign nation led, in part, to the AEA.  *See* Act of July 7, 1798, ch. 67, 1 Stat. 578, 578 ("[W]hereas, under authority of the French government, there is yet pursued against the United States, a system of predatory violence").[7]

"Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries.  On its face, the Proclamation makes no findings that TdA is acting as an army or military force.  Nor does the Proclamation assert that TdA is acting with an

---

[7] At the same time, the 1798 Congress authorized the President to raise troops "in the event of a declaration of war against the U.S., or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion."  Act of May 28, 1798, ch. 47, 1 Stat. 558.  As Judge Henderson noted, "[t]his language bears more than a passing resemblance to the language of the AEA, which Congress enacted a mere thirty-nine days later.  *J.G.G.*, 2025 WL 914682, at *9. As such, the historical context makes plain that Congress was concerned about *military* incursions by the armed forces of a foreign nation that constitute or imminently precede acts of war.

intent to gain a territorial foothold in the U.S. for military purposes.  And the Proclamation makes no suggestion that the U.S. will imminently be at war with Venezuela.  The oblique references to the TdA's ongoing "irregular warfare" within the U.S. do not suffice because the Proclamation makes clear that it refers to "mass illegal migration" and "crimes"—neither of which constitute war within the Founding Era understanding.  It asserts that TdA "commits brutal crimes" with the goal of "harming United States citizens, undermining public safety, and . . . destabilizing democratic nations."  But these actions are not "against the territory" of the U.S.  Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," then virtually any group, hailing from any country, could be deemed enemy aliens.

## 2.  The Purported Invasion Is Not by a "Foreign Nation or Government."

The Proclamation fails to assert that any "foreign nation or government" within the meaning of the Act is invading the United States.  Put simply, the Proclamation never finds that TdA is a foreign "nation" or "government."  Instead, the Proclamation asserts that "[o]ver the years," the Venezuelan government has "ceded ever-greater control over their territories to transnational criminal organizations."  But the Proclamation notably does *not* say that TdA operates as a government in those regions.[8]  In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela.

Moreover, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects."  50 U.S.C. § 21. *Countries* have "natives, citizens, denizens, or subjects."  By contrast, criminal organizations, in the government's own view, have "members."  Proclamation § 1 ("members of TdA").  And it

---

[8] Guantanamo Bay provides an analogy.  There, the U.S. control of the naval base does not somehow render it the "government" of Cuba.

13

designates TdA "members" as subject to AEA enforcement—but "members" are not "natives, citizens, denizens, or subjects." That glaring mismatch underscores that Respondents are attempting not only to use the AEA in an unprecedented way, but also in a way that Congress never permitted—as a mechanism to address, in the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but TdA (not Venezuela) is designated under the Proclamation.[9] Even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States. And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the U.S. is at war with or being invaded by Venezuela. Ryan Goodman, Bluesky (Mar. 26, 2025).[10] The AEA requires the President to identify a "foreign nation or government" that is invading or engaging in an invasion or incursion. Because it does not, the Proclamation fails on its face.

Instead, the Proclamation half-heartedly attempts to link TdA to Venezuela by suggesting that TdA is "supporting," "closely aligned with," or "has infiltrated" the Maduro regime. *See* Proclamation. But experts are in accord that it is "absolutely implausible that the Maduro regime controls TdA or that the Maduro government and TdA are intertwined." *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶17; *id.* at 67-4 (Antillano Decl.) ¶ 13; *id.* at 67-12 (Dudley Decl.) ¶¶ 2, 21. As one expert who has done numerous projects for the U.S. government, including on the topic of TdA, explained, the Proclamation's characterization of the relationship between the

---

[9] Moreover, the AEA presumes that a designated nation possesses treaty-making powers. *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government"). Nations—not criminal organizations—are the entities that enter into treaties. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers"); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar).

[10] https://bsky.app/profile/rgoodlaw.bsky.social/post/3llc4wzbkr22k (Q: "Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?" A: "We have no assessment that says that.").

Venezuelan state and TdA with respect to TdA's activities in the United States is "simply incorrect." *Id.* at 67-12 (Dudley Decl.) ¶¶ 5, 17-18. The President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See id.* at 67-21 (Sarabia Roman Decl., Exh. 19) ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

Further, the AEA's historical record confirms that it was intended to address conflicts with foreign sovereigns, not criminal gangs like TdA. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly be involved in war[.]"); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, Civil Liberty in War Time, at 8 (Jan. 17, 1919) ("The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent."); Jennifer K. Elsea & Matthew C. Weed, Cong. Rsch. Serv., RL3113, Declarations of War and Authorizations for the Use of Military Force 1 (2014) (Congress has never issued a declaration of war against a nonstate actor). If Respondents were allowed to designate any group with ties to officials as a foreign government, and courts were powerless to review that designation, any group could be deemed a government, leading to an untenable and overbroad application of the AEA.

### 3. Summary Removals Without Notice, a Meaningful Opportunity to Challenge "Alien Enemy" Designations, or the Right of Voluntary Departure Violate the AEA and Due Process.

As the Supreme Court has now made clear, the government must provide Petitioners notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals under the Proclamation. *J.G.G.*, 2025 WL 102409, at *2 ("detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal.").

Because Respondents have been providing no notice, process, or opportunity to contest a designation (and it is unclear whether or how they will comply with the Supreme Court's recent order), a TRO is warranted to ensure that the government provides the Court with protocol for how it will provide notice. *See J.G.G.*, 2025 WL 102409, at *2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings.").

As during World War II, that notice must be at least 30 days in advance of any attempted removal. It must also be in a language that the detainee understands, and be provided to undersigned counsel.

### B.  The Proclamation Violates the Specific Protections that Congress Established for Noncitizens Seeking Humanitarian Protection.

The Proclamation is unlawful for an independent reason: it overrides statutory protections for noncitizens seeking relief from torture by subjecting them to removal without meaningful consideration of their claims. Congress codified the U.N. Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT") to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* 8 U.S.C. § 1231 note; C.F.R. §§ 208.16-.18. CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. 8 U.S.C. §1231 note. CAT applies regardless of the mechanism for removal. The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*, reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's protections. 27 F.4th 718 (D.C. Cir. 2022). Because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, the court held no conflict existed. *Id.* Both statutes could—and therefore must—be given effect. *Id.* at 721, 731-32. This case is on all fours with *Huisha-Huisha,* because the AEA and CAT must be harmonized by applying CAT's protections to AEA removals.

Despite this clear statutory framework, Respondents prevented both named Petitioners from asserting their rights under CAT (and undoubtedly have done the same to other members of the class).  *See* Exh. A (Smyth Decl.) ¶ 4; Exh. B (Quintero Decl.) ¶ 3; Exh. C (Lauterback Decl.) ¶ 2.  Moreover, even if Petitioners had been permitted to apply, their opportunity would have been meaningless because Respondents deliberately withheld information about the country to which they were being removed.

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding.  *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal).  Congress has unequivocally declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum."  8 U.S.C. § 1158(a)(1).  Similarly, the withholding of removal explicitly bars returning a noncitizen to a country where their "life or freedom" would be threatened based on a protected ground.  *Id.* § 1231(b)(3)(A).  "In understanding this statutory text, 'a page of history is worth a volume of logic.'"  *Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (citation omitted).  These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture.  Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997).[11]  A President invoking the AEA cannot simply sweep away these protections.

---

[11] https://perma.cc/X5YF-K6EU.

**C.      The Proclamation Violates the Procedural Requirements of the INA**

Since the last invocation of the AEA more than 80 years ago, Congress has carefully specified the procedures by which noncitizens may be removed.  The INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute.  It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States."  8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA.").  Indeed, Congress intended for the INA to "supersede all previous laws with regard to deportability."  S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[12]

Congress was aware that alien enemies were subject to removal in times of war or invasion when it enacted the INA.  *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law).  Indeed, the AEA was invoked just a few years before passage of the 1952 INA.  With this awareness, Congress provided that the INA contains the "sole and exclusive" procedures for removal and declined to carve out AEA removals from standard immigration procedures, even as it expressly excepted other groups of noncitizens, including those who pose security risks.  *See, e.g.*, 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks).

---

[12] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.*  The Attorney General may opt to use this when she has classified information that a noncitizen is an "alien terrorist."  *Id.* § 1533(a)(1).  But even that process requires notice, a public hearing, provision of counsel for indigents, opportunity to present evidence, and individualized review by an Article III judge.  *Id.* §§ 1532(a), 1534(a)(2), (b), (c)(1)-(2).

Ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, Respondents bypass the mandated congressional scheme to formulate an entirely separate procedure for removal and usurp Congress's Article I power in the process.

## II.    Petitioners Face Imminent Irreparable Harm.

In the absence of a TRO, Petitioners will be summarily removed to places, such as El Salvador, where they face life-threatening conditions, persecution, and torture. *See supra*; *J.G.G.*, 2025 WL 1024097, at \*5 ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"). That easily constitutes irreparable harm. *See Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005) ("irreparable harm" where petitioners face "forced separation and likely persecution" "if deported"); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *see also J.G.G.*, 2025 WL 890401, at \*16 ("[T]he risk of torture, beatings, and even death clearly and unequivocally supports a finding of irreparable harm."). And Petitioners may never get out of these prisons. *See J.G.G.*, 2025 WL 1024097, at \*5; *see also supra*.

Even if the government instead removes Petitioners to Venezuela, they face serious harm there, too. In fact, many petitioners fled Venezuela for the very purpose of escaping persecution there, and have pending asylum cases on that basis. For example, J.G.G. has already been tortured, arbitrarily imprisoned, and beaten in the past based on his political opinion and fears persecution if returned. Exh. B (Quintero Decl.) ¶ 3. And returning to Venezuela labeled as a gang member by the U.S. government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶ 28.

19

Not only do Petitioners face grave harm, thus far the government has tried to execute their removals without any due process. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"). Although the Supreme Court has now made clear that meaningful notice is required under the AEA, *J.G.G.*, 2025 WL 102409, at *2, Respondents have yet to concede that they will provide meaningful notice, much less any sense of when that notice will be provided to individuals or what form it will take. As such, there remains an unacceptably high risk that the government will deport class members who are not in fact members of TdA.

## III. The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Temporary Restraining Order.

The balance of equities and public interest merge in cases against the government. *See Nken v. Holder*, 556 U.S. 418, 436 (2009). Here, the balance overwhelmingly favors Petitioners. The public has a critical interest in preventing wrongful removals, especially where it could mean a lifetime sentence in a notorious foreign prison. *See id.*; *see also Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (protecting people who face persecution abroad "goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded"). Conversely, the government can make no comparable claim to harm from an injunction. *See Wages & White Lion Inv., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("There is generally no public interest in the perpetuation of unlawful agency action.").

Petitioners, moreover, do not contest Respondents' ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under existing statutory guidelines. At bottom, law enforcement and immigration enforcement officials lose no authority or ability to *lawfully* detain such individuals, even if the AEA Proclamation is enjoined. *See J.G.G.*, 2025 WL 914682, at *30

("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA[.]").

## IV.    The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings.

In addition to this Court's equitable powers, this is a textbook case for use of the All Writs Act ("AWA"), which provides courts a powerful tool to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966); 28 U.S.C. § 1651(a); *California v. M&P Inv.*, 46 F. App'x 876, 878 (9th Cir. 2002) (finding Act should be broadly construed to "achieve all rational ends of law") (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)).  If Petitioners are illegally sent to a foreign country, and El Salvador assumes jurisdiction, the government will argue, as it already has, that this Court will no longer has jurisdiction to remedy the unlawful use of the AEA.

Whereas a traditional TRO requires a party to state a claim, an injunction based on the AWA requires only that a party identify a threat to the integrity of an ongoing or prospective proceeding, or of a past order or judgment.  *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (court may enjoin "conduct which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion").  Courts have explicitly relied upon the AWA in order to prevent even a risk that a respondent's actions will diminish the court's capacity to adjudicate claims before it.  *See Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (staying an order of deportation "in order to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by the petitioner).

## V.    The Court Should Not Require Petitioners to Provide Security.

The Court should not require a bond under Fed. R. Civ. P. 65.  That "is a matter for the discretion of the trial court," and a district court "may elect to require no security at all."  *Kaepa,*

*Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). The Fifth Circuit has approved the exercise of this discretion to require no security in cases brought by indigent people and/or public-interest litigation. *See, e.g.*, *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981); *Steward v. West*, 449 F.2d 324, 325 (5th Cir. 1971). Alternatively, the Court should impose a nominal bond of $1.

## CONCLUSION

The Court should grant a TRO as to the named Petitioners and the class.

Dated: April 9, 2025

Respectfully submitted,

Lee Gelernt*
Daniel Galindo*
Ashley Gorski*
Patrick Toomey*
Sidra Mahfooz*
Omar Jadwat*
Hina Shamsi*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

Noelle Smith*
Oscar Sarabia Roman*
My Khanh Ngo*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770

*/s/ Adriana Piñon*
Adriana Piñon
TX State Bar No: 24089768; SDTX No.
1829959
Savannah Kumar
TX State Bar No.: 24120098; SDTX
admission pending
Charelle Lett
TX State Bar No.: 24139900; SDTX No.
3908204
Thomas Buser-Clancy
TX State Bar No: 24078344; SDTX No.
1671940
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306,
Houston, TX 77288
(713) 942-8146
apinon@aclutx.org
skumar@aclutx.org
clett@aclutx.org
tbuser-clancy@aclutx.org

*Attorneys for Plaintiffs-Petitioners*
*\*Pro hac vice application forthcoming*

nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org

**CERTIFICATE OF SERVICE**

I certify that on April 9, 2025, a true and correct copy of the foregoing document was

electronically filed via the Court's CM/ECF system which sends notice of electronic filing to all

counsel of record.

*/s/ Adriana Piñon*
Adriana Piñon, Texas Bar No. 24089768
SDTX Federal Bar. No. 1829959
ACLU FOUNDATION OF TEXAS
P.O. Box 8306
Houston, TX, 77002
Tel: 713-942-8146
Fax: 713-942-8966
apinon@aclutx.org