**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS**

J.A.V. *et al.*,

*Petitioners–Plaintiffs*,

v.

DONALD J. TRUMP, in his official capacity
as President of the United States, *et al.*,

*Respondents–Defendants.*

CIVIL ACTION NO. 1:25-cv-00072

**PETITIONERS–PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

LEGAL AND FACTUAL BACKGROUND ........................................................... 1

LEGAL STANDARD ............................................................................................... 6

ARGUMENT ............................................................................................................. 6

   II.      Petitioners' Claims Are Justiciable. ............................................................ 7

   III.    Petitioners Are Likely to Succeed on the Merits. ..................................... 10

    A.   The Proclamation Violates the AEA and the Constitution. ......................... 10

      1.     Summary Removals Without Notice and a Meaningful Opportunity to Challenge "Alien Enemy" Designations Violate the AEA and Due Process. ................................... 11

      2.     The Proclamation Does Not Fall within the Statutory Bounds of the AEA. ............ 13

    B.   The Proclamation Violates the Specific Protections that Congress Established under the INA for Noncitizens Seeking Humanitarian Protection. ................................. 21

   IV.    The Administration's Abuse of the Alien Enemies Act Has Caused and Will Continue to Cause Petitioners Irreparable Harm. ................................................................. 24

   V.    The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order. .............................................................................. 26

   VI.    Class Certification Is Proper. ................................................................... 27

   VII.   The Court Should Reserve the Issue of the Proper Habeas Procedures. ...................... 31

   VIII.  The Court Should Not Require Petitioners to Provide Security Prior to the Preliminary Injunction Order. ............................................................................................... 32

CONCLUSION ........................................................................................................ 33

## TABLE OF AUTHORITIES

**Cases**

*Abrego Garcia v. Noem*,
  No. 251345, 2025 WL 1021113 (4th Cir. Apr. 7, 2025)............................................................ 4

*Abrego-Garcia v. Noem*,
  No. 8:25-cv-951-Px (D. Md. Apr. 15, 2025)..................................................................... 4

*Aguilar-Ayala v. Ruiz*,
  973 F.2d 411 (5th Cir. 1992)........................................................................................ 28

*Al-Alwi v. Trump*,
  901 F.3d 294 (D.C. Cir. 2018) ....................................................................................... 9

*Baker v. Carr*,
  369 U.S. 186, 210 (1962) ............................................................................................. 10

*Bartenwerfer v. Buckley*,
  598 U.S. 69 (2023) ....................................................................................................... 14

*Bauer v. Watkins*,
  171 F.2d 492 (2d Cir. 1948)........................................................................................... 8

*Bijeol v. Benson*,
  513 F.2d 965 (7th Cir. 1975)........................................................................................ 27

*Boumediene v. Bush*,
  553 U.S. 723 (2008) ..................................................................................... 22, 26, 31

*Cherokee Nation v. Georgia*,
  30 U.S. (5 Pet.) 1 (1831) ............................................................................................. 14

*Citizens Protective League v. Clark*,
  155 F.2d 290 (D.C. Cir. 1946) ........................................................................... 8, 13, 14

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*,
  636 F.2d 1084 (5th Cir. 1981) ..................................................................................... 32

*Corrigan Dispatch Co. v. Casa Guzman, S. A.*,
  569 F.2d 300 (5th Cir. 1978) ....................................................................................... 32

*Demjanjuk v. Holder*,
  563 F.3d 565 (6th Cir. 2009)................................................................................... 25, 33

*El-Shifa Pharm. Indus. Co. v. United States*,
  607 F.3d 836 (D.C. Cir. 2010) ..................................................................................... 10

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ........................................................................................ 23, 29

*Ex parte Bollman*,
    8 U.S. (4 Cranch) 75 (1807) ..................................................................................... 16

*Ex Parte Milligan*,
    71 U.S. 2 (1866) ........................................................................................... 22, 27

*Garcia v. Jones*,
    910 F.3d 188 (5th Cir. 2018) ........................................................................... 5

*G.F.F. v. Trump*,
    No. 1:25-cv-2886, ECF No. 41 (S.D.N.Y. Apr. 15, 2025)........................................... 25

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ................................................................... 10, 11, 21, 22

*Hamdi v. Rumsfeld*,
    542 U.S. 507 (2004) ................................................................................ 9, 22

*Harris v. Nelson*,
    394 U.S. 286 (1969) .......................................................................................... 27

*Holmes v. Jennison*,
    39 U.S. 540 (1840) ........................................................................................... 18

*Huidekoper's Lessee v. Douglass*,
    7 U.S. (3 Cranch) 1 (1805) ............................................................................ 14

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ........................................................ 23, 25, 26

*Huisha-Huisha v. Mayorkas*,
    560 F. Supp. 3d 146 (D.D.C. 2021) .................................................................. 33

*In re Class Action Application for Habeas Corpus on Behalf of All Material Witnesses in W.
Dist. of Texas*,
    612 F. Supp. 940 (W.D. Tex. 1985)................................................................... 28

*INS v. Chadha*,
    462 U.S. 919 (1983) ................................................................... 16, 21, 26

*J.G.G. v. Trump*,
    No. 1:25-cv-766, 2025 WL 825116 (D.D.C Mar. 15, 2025) ..................................... 2

*J.G.G. v. Trump*,
    No. 1:25-cv-766, 2025 WL 890401 (D.D.C Mar. 24, 2025) ....................... 13, 23, 25

iii

*J.G.G. v. Trump,*
  No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025) ............................................ passim

*Jarecki v. G.D. Searle & Co.,*
  367 U.S. 303 (1961) ........................................................................................................ 15

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) ........................................................................................................ 28

*Johnson v. Eisentrager,*
  339 U.S. 763 (1950) .................................................................................................. 15, 18

*Johnson v. Guzman Chavez,*
  594 U.S. 523 (2021) ........................................................................................................ 27

*Jones v. Hendrix,*
  599 U.S. 465 (2023) ........................................................................................................ 23

*St. Jules v. Savage,*
  512 F.2d 881 (5th Cir. 1975) .......................................................................................... 28

*League of Women Voters v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) ............................................................................................ 26

*Leiva-Perez v. Holder,*
  640 F.3d 962 (9th Cir. 2011) .......................................................................................... 25

*LoBue v. Christopher*
  82 F.3d 1081 (D.C. Cir. 1996) ..................................................................................... 9, 27

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) ........................................................................................................ 15

*Ludecke v. Watkins,*
  *335 U.S. 160 (1948)* ............................................................................................. 7, 8, 9, 10

*Luokung Tech. Corp. v. Dep't of Def.,*
  538 F. Supp. 3d 174, 195 (D.D.C. 2021) ........................................................................ 34

*Mead v. Parker,*
  464 F.2d 1108 (9th Cir. 1972) ........................................................................................ 27

*Medellin v. Texas,*
  552 U.S. 491 (2008) ........................................................................................................ 18

*Miles v. Apex Marine Corp.,*
  498 U.S. 19 (1990) .......................................................................................................... 24

*Napier v. Gertrude*

iv

542 F.2d 825 (10th Cir. 1976) ................................................................. 27

*Nat'l Treasury Emps. Union v. Nixon*,
   492 F.2d 587 (D.C. Cir. 1974) ........................................................ 11

*New York Trust Co. v. Eisner*,
   256 U.S. 345 (1921) ....................................................................... 23

*Nielsen v. Preap*,
   586 U.S. 392 (2019) ....................................................................... 27

*Nishikawa v. Dulles*,
   356 U.S. 129 (1958) ........................................................................31

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................................. 25, 26

*NLRB v. SW Gen., Inc.*,
   580 U.S. 288 (2017) ....................................................................... 24

*Nunez v. Boldin*,
   537 F. Supp. 578 (S.D. Tex. 1982) .............................................. 26, 27

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
   758 F.3d 296 (D.C. Cir. 2014) ........................................................ 12

*Sessions v. Dimaya*,
   584 U.S. 148 (2018) ................................................................. 21, 22

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014) ......................................................................... 6

*Tesfamichael v. Gonzales*,
   411 F.3d 169 (5th Cir. 2005) ..................................................... 25, 26

*Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*,
   602 U.S. 268 (2024) ....................................................................... 16

*Trump v. J.G.G.*,
   604 U.S. ---, 2025 WL 1024097 (2025) ................................... passim

*U.S. ex rel. D'Esquiva v. Uhl*,
   137 F.2d 903 (2d Cir. 1943) ........................................................ 8, 9

*U.S. ex rel. Gregoire v. Watkins*,
   164 F.2d 137 (2d Cir. 1947) ............................................................ 8

*U.S. ex rel. Hoehn v. Shaughnessy,*
   175 F.2d 116 (2d Cir. 1949) .................................................................... 9

*U.S. ex rel. Jaegeler v. Carusi,*
   342 U.S. 347 (1952) ............................................................................. 8

*U.S. ex rel. Kessler v. Watkins,*
   163 F.2d 140 (2d Cir. 1947) ............................................................... 8, 9

*U.S. ex rel. Ludwig v. Watkins,*
   164 F.2d 456 (2d Cir. 1947) ............................................................. 8, 13

*U.S. ex rel. Sero v. Preiser,*
   506 F.2d 1115 (2d Cir. 1974) ......................................................... 26, 27

*U.S. ex rel. Schwarzkopf v. Uhl,*
   137 F.2d 898 (2d Cir. 1943) .................................................................. 8

*U.S. ex rel. Von Heymann v. Watkins,*
   159 F.2d 650 (2d Cir. 1947) ............................................................. 8, 13

*U.S. ex rel. Zdunic v. Uhl,*
   137 F.2d 858 (2d Cir. 1943) ........................................................ 8, 9, 31

*United States ex rel. Dorfler v. Watkins,*
   171 F.2d 431 (2d Cir. 1948) ................................................................ 13

*United States v. Tinoso,*
   327 F.3d 864 (9th Cir. 2003) ............................................................... 24

*Util. Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) ........................................................................... 11

*Wages & White Lion Inv., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) .............................................................. 26

*Wiborg v. United States,*
   163 U.S. 632 (1896) ........................................................................... 16

*Williams v. Richardson,*
   481 F.2d 358 (8th Cir. 1973) ............................................................... 27

*Worcester v. Georgia,*
   31 U.S. (6 Pet.) 515 (1832) ................................................................. 15

*Yates v. United States,*
   574 U.S. 528 (2015) ........................................................................... 15

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ................................................................................................ 11, 21

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
  566 U.S. 189 (2012) ................................................................................................ 10

## Statutes and Regulations

8 C.F.R. § 208.16 .......................................................................................................... 23

8 C.F.R. § 208.17 .......................................................................................................... 23

8 C.F.R. § 208.18 .......................................................................................................... 23

8 U.S.C. § 1229a ........................................................................................................... 24

8 U.S.C. § 1531 ....................................................................................................... 24, 35

8 U.S.C. § 1532 ............................................................................................................. 24

8 U.S.C. § 1533 ............................................................................................................. 24

8 U.S.C. § 1534 ............................................................................................................. 24

8 U.S.C. § 1158 ....................................................................................................... 23, 30

8 U.S.C. §1231 .................................................................................................. 23, 29, 30

42 U.S.C. § 265 ..................................................................................................... 23, 29

50 U.S.C. § 21 .......................................................................................... 12, 13, 16, 18

50 U.S.C. § 22 .................................................................................................. 12, 13, 18

Act of July 7, 1798, ch. 67, 1 Stat. 578 ........................................................................ 16

Act of May 28, 1798, ch. 48, 1 Stat. 561 ...................................................................... 15

An Act Concerning Aliens § 1, 1 Stat. 571 .................................................................... 20

Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-277, Div. G.
  Title XXI, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 notes) ..................... 23

Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) ................................. 23

## Other Authorities

5 Annals of Cong. 1453 (Apr. 1798) .......................................................................... 25

7 Annals of Cong. 58 (May 1797) ............................................................................. 16

Federal Rules of Civil Procedure 23(a) .................................................................... 26

Federal Rules of Civil Procedure 23(b)(2) ............................................................... 26

Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de
    Aragua (Mar. 15, 2025) ................................................................................... passim

John Jay, Con't Cong., Draft of an Address of the Convention of the Representatives of the State
    of New York to Their Constituents (Dec. 23, 1776) ................................................. 14

John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual
    Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) ........................................ 25

Johnson's Dictionary (1773) ............................................................................ 14, 17

Letter from George Washington to Nathanael Greene (Jan. 29, 1783) ........................................ 14

Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) .......................................... 14

Letter from Timothy Pickering, Sec'y of State, to Alexander Hamilton (June 9, 1798) .............. 14

National Security and Intelligence Officials Testify on Global Threats, C-SPAN (Mar. 26,
    2025) ......................................................................................................... 19

Nayib Bukele, X.com, (Mar. 16, 2025, 5:13AM ET), https://perma.cc/52PT-DWMR
    .............................................................................................................. 19

Office of Legislative Affairs, Proposed Amendment to AEA (Aug. 27, 1980) ......................... 15

Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum
    (Apr. 30, 1997) ............................................................................................. 24

S. Rep. No. 82-1137 (Jan. 29, 1952) ......................................................................... 24

U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or
    Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20 (1988) ...................... 22

Webster's Dictionary (1828) ............................................................................ 14, 17

## INTRODUCTION

The unprecedented Proclamation at the heart of this case is unlawful because the Alien Enemies Act is a wartime measure that cannot be used where, as here, there is neither an "invasion or predatory incursion" nor such an act perpetrated by a "foreign nation or government." And even if it could be used against a non-military criminal "gang" during peacetime, targeted individuals must be provided with a meaningful chance to contest that they fall within the Proclamation's scope. That is particularly so given the increasing number of class members who dispute the government's allegations of gang affiliation. And the Supreme Court has already ruled that due process requires reasonable notice and the opportunity to obtain judicial review. For these and other reasons, Petitioners–Plaintiffs ("Petitioners") are likely to succeed on the merits. The remaining factors also decidedly tip in Petitioners' favor. In the absence of an injunction, the government will be free to send hundreds more individuals, including Petitioners, to the notorious Salvadoran prison where they may be held incommunicado for the rest of their lives. The harm is only magnified by the government's position that mistakes cannot be remedied, and once an individual is in a foreign prison, they are stuck there. The government will suffer no comparable harm given that the injunction would not prevent it from prosecuting anyone who commits a criminal offense, detaining anyone, or removing anyone under the immigration laws. A preliminary injunction is warranted to preserve the status quo.

## LEGAL AND FACTUAL BACKGROUND

On March 14, the President signed a Proclamation announcing that Tren de Aragua ("TdA"), a Venezuelan gang, is "perpetrating, attempting, and threatening an invasion or predatory incursion" against the United States. *See* Invocation of the Alien Enemies Act Regarding the

1

Invasion of the United States by Tren de Aragua (Mar. 15, 2025)[1] ("Proclamation"). Since that time, Respondents have used the Southern District of Texas as a hub for staging and effectuating removals under the AEA. Respondents transferred hundreds of individuals there leading up to the Proclamation and quickly deported the vast majority from an airfield in this District. ECF No. 3-1 at 5-6. Indeed, Respondents have repeatedly told courts that this case is properly brought in Texas. *See, e.g.*, *J.G.G. v. Trump,* No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025), Oral Arg. 1:47:25 - 1:47:35, ("they need to . . . file in Texas");[2] Reply of Applicants, *Trump v. J.G.G.*, 604 U.S. --- (2025), (No. 24A931), 2025 WL 1024097 at *7 ("The government's whole point is that there *is* a process for reviewing AEA designations: habeas in Texas."); *J.G.G.*, 2025 WL 914682 at *1 ("Defendants argued that only the Southern District of Texas . . . had jurisdiction over their claims."). Respondents have identified hundreds more alleged TdA members—all of whom may pass through the Southern District of Texas en route to removal. *J.G.G. v. Trump*, No. 1:25-cv-766 (D.D.C. Mar. 18 2025), ECF No. 28-1 (listing 258 more people subject to AEA).

Individuals "must receive notice," the Supreme Court has held, "that they are subject to removal under the Act," and such "notice must be afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *J.G.G.*, 2025 WL 1024097 at *2. Respondents maintain that they can comply with this ruling by providing notice 24 hours or less before removal. *See* Apr. 11 Oral Arg.[3] Respondents do not explain how pro se detained individuals, who often do not speak English, might file a habeas

---

[1] https://perma.cc/ZS8M-ZQHJ.

[2] https://www.youtube.com/watch?v=4DoTLGECQSU&ab_channel=UnitedStatesCourtofAppeals fortheDCCircuit.

[3] Petitioners understand that due to audio quality issues, a transcript is not yet available for the hearing held on April 11. *See* Docket Entry for April 14 (noting transcript expected available April 17).

petition in under 24 hours.

Without a meaningful opportunity to contest their designation, Petitioners are at grave risk of erroneous removal. All of the named Petitioners vehemently contest their membership in TdA. *See* ECF No. 3-2 (Smyth Decl.) ¶¶ 5-6; ECF No. 3-3 (Quintero Decl.) ¶¶ 4-5; ECF No. 3-4 (Lauterback Decl.) ¶¶ 2-3. And evidence since the March 15 flights increasingly shows that many individuals previously removed under the AEA have no ties to TdA at all. In one instance, a professional makeup artist was designated solely on the basis of two crown tattoos, which accompany the words "Mom" and "Dad." *See* Exh. F (Reyes Decl.) ¶¶ 4-7, 21-23. A professional soccer player was sent to the Salvadoran prison based on a tattoo of a soccer ball with a crown—similar to the logo of his favorite soccer team, Real Madrid—and a social media post where he made a gesture that means "I love you" in sign language. Exh. G (Tobin Decl.) ¶ 7. And another man who was removed had a tattoo of the autism awareness ribbon with the name of his brother, who is autistic, on it. Exh. H (Sarabia Roman Decl.), at Exh. 17.

These errors are unsurprising given that Respondents are relying on dubious evidence—if any evidence at all—to support their allegations. Respondents often point to an individual's tattoos as evidence of TdA membership. ECF No. 3-2 (Smyth Decl.) ¶ 6; ECF No. 3-3 (Quintero Decl.) ¶¶ 4-5. But experts who have spent decades studying TdA explain that the gang "has never had . . . identity marks such as tattoos that identify its members." Exh. B (Antillano Decl.) ¶ 14; Exh. A (Hanson Decl.) ¶¶ 22, 24 ("Tattoos are not a reliable way to identify members of the group."); Exh. C (Dudley Decl.) ¶ 25 (tattoos are not a "reliable means" of identifying TdA).[4] Other

---

[4] Documents from the government demonstrate the patent absurdity of using tattoos and dress as an identifier for TdA. For example, the Chicago Homeland Security Investigations office identified wearing a Chicago Bulls jersey, specifically a Michael Jordan jersey, as a TdA marker—never mind that the Bulls are the home team in Chicago and Michael Jordan remains one of Chicago's biggest stars. Exh. H (Sarabia Roman Decl.), at Exh. 2; *see also id.* at Exh. 20

characteristics that the government relies upon, such as written or electronic communications with TdA members (like random likes on social media posts), are equally likely to sweep in a broad swath of individuals with no substantial connection to TdA. *See* Exh. H (Sarabia Roman Decl.), at Exh. 1.

If Petitioners are illegally sent to a foreign country, and El Salvador assumes jurisdiction, the government will argue, as it already has, that this Court no longer has jurisdiction to remedy their unlawful use of the AEA. Indeed, Respondents have taken that precise position in *Abrego Garcia v. Noem*, a case brought by a Maryland father who was, as the government has admitted, mistakenly deported to El Salvador despite having withholding of removal as to that country. *See* ECF No. 34 (citing *Abrego Garcia v. Noem*, No. 25-1345, 2025 WL 1021113, at *4 (4th Cir. Apr. 7, 2025) (Thacker, J., concurring)); *see also Abrego-Garcia v. Noem*, No. 8:25-cv-951-Px (D. Md. Apr. 15, 2025), ECF No. 77 ¶ 7 ("DHS does not have authority to forcibly extract an alien from the domestic custody of a foreign sovereign nation."); *id.* at ECF No. 77-1 ("That's up to El Salvador if they want to return him, that's not up to us." (quoting Attorney General Bondi)). And the President of El Salvador said that it was "preposterous" to suggest that he would return Mr. Abrego Garcia to the United States, and that he would not release him from CECOT. *Id.* at ECF No. 77-1 ("I'm not releasing [him] . . . That's not going to happen."). The same fate awaits this class absent a preliminary injunction.

While these errors would be troublesome in any case, they are particularly devastating here, where Petitioners have strong claims for relief under our immigration laws and could end up in

---

("The idea that a Jordan tattoo or jersey would be used to link someone with Tren de Aragua is close to laughable."); Exh. A (Hanson Decl.) ¶ 24 (same). In fact, the government's own intelligence is internally contradictory. *See, e.g.*, Exh. H (Sarabia Roman Decl.), at Exh. 3 ("EPT-HUMINT-Gang Unit collections determined that the Chicago Bulls attire, clocks, and rose tattoos are typically related to the Venezuelan culture and not a definite indicator of being a member or associate of the TDA.").

one of the worst prisons in the world. For example, J.A.V. is gay and suffered verbal and physical violence and harassment on account of his sexual orientation in Venezuela. ECF No. 3-2 (Smyth Decl.) ¶ 4. He is HIV positive and fears severe illness or death without access to his daily medications and regular medical care. *Id.* And J.G.G. has been tortured, arbitrarily imprisoned, and beaten in the past by the Venezuelan police because of his familial connection to a known political dissident. ECF No. 3-3 (Quintero Decl.) ¶ 3. The conditions Petitioners would face in El Salvador are horrific. *See* Exh. D (Bishop Decl.); Exh E (Goebertus Decl.).

Finally, experts who have spent over a decade studying policing, violence, migration, prisons, and organized crime in Venezuela—and TdA in particular—submit declarations with this motion that provide a more accurate, comprehensive picture of TdA and its activities. TdA is a loose, decentralized group without a clear hierarchy or membership. Exh. A (Hanson Decl.) ¶¶ 1, 27; Exh. B (Antillano Decl.) ¶ 10. TdA does not act as the de facto government in any region of Venezuela. Exh. A (Hanson Decl.) ¶¶ 13-16. Nor is there evidence of direct and stable links between the Maduro regime and TdA or that the gang is intertwined with the Maduro regime. Exh. A (Hanson Decl.) ¶¶ 1, 14, 17; Exh. B (Antillano Decl.) ¶ 13; Exh. C (Dudley Decl.) ¶¶ 2, 21, 23. Experts have also explained that TdA does not have a significant presence in the United States and that its activities here are not widespread or coordinated. Exh. A (Hanson Decl.) ¶¶ 19, 27; Exh. B (Antillano Decl.) ¶ 12; Exh. C (Dudley Decl.) ¶¶ 2, 24. There is no evidence to indicate that the Venezuelan government has directed TdA to enter the United States or that it controls TdA's activities within the United States. Exh. A (Hanson Decl.) ¶¶ 17, 20; Exh. B (Antillano Decl.) ¶13; Exh. C (Dudley Decl.) ¶¶ 2, 23-24. In fact, the government's own intelligence agencies circulated findings in February 2025 that contradict the assertions in the Proclamation. Exh. H (Sarabia Roman Decl.), at Exh. 19 (intelligence community assessment concluded that TdA "was not

directed by Venezuela's government or committing crimes in the United States on its orders").

## LEGAL STANDARD

"To obtain a preliminary injunction, a movant must establish: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018).

## ARGUMENT

The Proclamation is unlawful for a host of substantive and procedural reasons. The Alien Enemies Act can only be used during military hostilities, against a nation-state actor. Neither of those conditions is met here. And even if the Act could be used against a criminal gang, Defendants' attempt to summarily remove people violates due process and the AEA itself, which both require notice and a meaningful opportunity to contest one's designation as an alien enemy. Defendants also may not remove people without following the INA's procedural requirements and obeying the INA's bar against removal to countries where a person faces persecution or torture. These claims are all justiciable, as the Supreme Court recognized.

## I.    Petitioners Have Standing.

Petitioners have standing because Defendants sought to remove them from the United States alongside scores of other noncitizens summarily deported to El Salvador under the AEA Proclamation on March 15, 2025, and Petitioners remain at substantial risk of imminent removal. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Defendants have wrongly accused each of the Petitioners of membership in or association with TdA. ECF No. 3-2 (Smyth Decl.); ECF No. 3-3 (Quintero Decl.); ECF No. 3-4 (Lauterback Decl.). Moreover, as described in

Petitioners' TRO application, each of the Petitioners was brought to the airport on March 15, 2025, and nearly removed but for the *J.G.G.* order. ECF No. 3-1 at 8–9. Defendants' allegations of TdA membership or association subject Petitioners to a substantial risk of imminent removal under the AEA Proclamation. Although Defendants vaguely indicated at the April 11, 2025 TRO Hearing that they were "redesignating" individuals following the Supreme Court's ruling that adequate notice and a meaningful opportunity to seek judicial review are required by due process, they did not claim that Petitioners—or anyone else—had been "undesignated." *See* Apr. 11 Oral Arg. At the same hearing, Defendants expressly refused to rule out the possibility that they would seek to remove individuals within 24 hours of providing notice. That would violate the Supreme Court's due process ruling, but it reinforces the substantial threat of imminent removal that Petitioners face.

## II.    Petitioners' Claims Are Justiciable.

The Court can resolve all of Petitioners' claims in this case. As the Supreme Court recently confirmed, courts can review not only whether an individual "'is, in fact, an alien enemy'" under the AEA, but also "'questions of interpretation and constitutionality' of the Act." *J.G.G.*, 2025 WL 1024097, at *2 (quoting *Ludecke v. Watkins*, 335 U.S. 160, 163, 172 n.17 (1948)). Thus, Petitioners' claims that the AEA's statutory predicates have not been met—because TdA is not a "nation or government," and is not engaged in an "invasion" or "predatory incursion"—are fully within this Court's jurisdiction.[5]

*Ludecke* itself reached the merits of the statutory question presented there: whether a "declared war" no longer existed within the meaning of the Act when "actual hostilities" had

---

[5] The Supreme Court also held that noncitizens subject to the AEA must receive certain procedural protections. *J.G.G.*, 2025 WL 1024097, at *1–2 (addressing plaintiffs' "due process rights"). Petitioners' substantive and procedural claims are therefore all justiciable.

ceased—*i.e.*, the "shooting war" had ended. 335 U.S. at 166–70. The Court concluded, on the merits, that the statutory term "declared war" did not mean "actual hostilities," and that once Congress declares war, the war continues for purposes of the AEA until the political branches declare it over. *Id.* at 170 & n.15. The "political judgment" that *Ludecke* declined to revisit, *id.* at 170, was simply the decision of Congress and the President not to formally declare the war over, *id.* at 169. Nowhere did *Ludecke* suggest that questions of statutory interpretation are beyond the courts' competence. Indeed, four years later, the Court reversed a government World War II removal decision because "[t]he statutory power of the Attorney General to remove petitioner as an enemy alien ended when Congress terminated the war." *U.S. ex rel. Jaegeler v. Carusi*, 342 U.S. 347, 348 (1952).

Consistent with *Ludecke*'s recognition (twice in the opinion) that questions about the "construction," "interpretation," and "validity" of the AEA are justiciable, 335 U.S. at 163, 171, courts have reviewed a range of issues concerning the meaning and application of the AEA's terms. *See, e.g.*, *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 143 (2d Cir. 1947) (interpreting the meaning of "foreign nation or government"); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860–61 (2d Cir. 1943) ("[t]he meaning of [native, citizen, denizen, or subject] as used in the statute . . . presents a question of law"; interpreting meaning of "denizen" and remanding for hearing on disputed facts); *U.S. ex rel. Gregoire v. Watkins*, 164 F.2d 137, 138 (2d Cir. 1947)(interpreting the meaning of "native"; discussing alternatives to attain a "logically consistent construction of the statute"); *U.S. ex rel. D'Esquiva v. Uhl*, 137 F.2d 903, 905–07 (2d Cir. 1943) (interpreting the meaning of "native" and reviewing executive branch's position on legal status of Austria); *U.S. ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 903 (2d Cir. 1943) (interpreting the meaning of "citizen" and legal effects of Germany's annexation of Austria); *Bauer v. Watkins*, 171 F.2d 492, 493 (2d Cir.

1948) (holding that the government bears the burden of proof of establishing the citizenship of "alien enemy"); *Citizens Protective League v. Clark*, 155 F.2d 290, 292, 295 (D.C. Cir. 1946) (reviewing whether Proclamation was within "the precise terms" of the AEA, and whether AEA was impliedly repealed); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947) (interpreting "within the United States"; requiring executive branch to show that the petitioner "refuse[d] or neglect[ed] to depart" under Section 21); *U.S. ex rel. Ludwig v. Watkins*, 164 F.2d 456, 457 (2d Cir. 1947) (interpreting "refuse or neglect to depart" in Section 21 as creating a "right of voluntary departure" that functions as a "statutory condition precedent" to the government's right to deport enemy aliens); *U.S. ex rel. Hoehn v. Shaughnessy*, 175 F.2d 116, 117–18 (2d Cir. 1949) (interpreting "reasonable time" to depart under Section 22). These kinds of questions— concerning the "construction" and "interpretation" of the AEA, *Ludecke*, 335 U.S. at 163, 171— are squarely at issue here.

Nor does the "political question" doctrine pose any barrier to this Court interpreting the statutory terms of the AEA. The Supreme Court foreclosed that possibility in *J.G.G.* and *Ludecke*, by instructing courts to resolve questions of the AEA's "construction and validity" and "interpretation and constitutionality." *Ludecke*, 335 U.S. at 163, 171; *J.G.G.*, 2025 WL 1024097, at *2; *see also, e.g.*, *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *6–8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring) (rejecting government's political-question arguments).

More generally, the political question doctrine is a "narrow exception" to courts' jurisdiction, *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012), and exists primarily to reinforce the separation of powers, *Baker v. Carr*, 369 U.S. 186, 210 (1962). But applying the doctrine here would undermine Congress's constitutional authority, because it would render the limits that Congress wrote into the statute unenforceable. Petitioners are not aware of any Supreme

Court decision that has found a statutory claim non-justiciable. *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 855–56 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring) ("The Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations."). Here, judicial review of Petitioners' challenge *preserves* the separation of powers by ensuring that the President does not exceed the specific authority Congress delegated in the AEA. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (Jackson, J., concurring). Indeed, the AEA the states that the President has the power to detain and remove alien enemies when there "is" a declared war or where there "is" an invasion or predatory incursion, thereby making clear that the President cannot simply *find* or *deem* there to be a war, invasion, or incursion. *Compare* 8 U.S.C. § 1182(f) (allowing the President to suspend entry of noncitizens into the country where *he* "finds" it not in the "interests of the United States").[6]

### III.    Petitioners Are Likely to Succeed on the Merits.

### A.    The Proclamation Violates the AEA and the Constitution.

The Proclamation is unprecedented, violating the AEA and the Constitution in three critical respects: there is no notice or process to contest whether an individual falls within the Proclamation; there is no invasion or predatory incursion; and there is no foreign government or nation within the meaning of the statute. When the government asserts "an unheralded power" in a "long-extant statute," courts "greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014). That skepticism is well warranted here.

---

[6] As noted at the TRO hearing, Petitioners do not seek to enjoin the President, but he remains a proper defendant because, at a minimum, Petitioners may obtain declaratory relief against him. *See, e.g.*, *Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (concluding that court had jurisdiction to issue writ of mandamus against the President but "opt[ing] instead" to issue declaration).

1.      **Summary Removals Without Notice and a Meaningful Opportunity to Challenge "Alien Enemy" Designations Violate the AEA and Due Process.**

As the Supreme Court has now made clear, both the AEA and Due Process require Respondents to provide Petitioners with notice and a meaningful opportunity to challenge their designation as alien enemies before removal is permissible under the Proclamation. *See Trump v. J.G.G.*, 604 U.S. ---, 2025 WL 1024097, at *3 (Apr. 7, 2025) ("The notice must be afforded within a reasonable time and in such a manner as will allow [AEA detainees] to actually seek habeas relief in the proper venue before such removal occurs."); *see also J.G.G.*, 2025 WL 914682, at *14–15 (Millett, J., concurring) ("At its most basic, due process requires notice of adverse governmental action, an opportunity to be heard, and the right to an unbiased decisionmaker.").

But Respondents have yet to explain how they intend to comply with the Supreme Court's order—and have refused to rule out removing class members after giving them only 24 hours' notice. That is patently insufficient. As during World War II, Defendants must provide notice to individuals at least 30 days before any attempt to remove them under the AEA. Notice must also be provided in a language that the individual understands, must state that they may seek judicial review, and must simultaneously be provided to undersigned class counsel. The notice must additionally include the factual basis for the individual's alien enemy designation. *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 318 (D.C. Cir. 2014) ("Both the Supreme Court and this Court have recognized that the right to know the factual basis for [government] action and the opportunity to rebut the evidence supporting that action are essential components of due process."). Especially given the possibility that Defendants may seek to remove individuals with as little as 24 hours' notice, a preliminary injunction is warranted to ensure that Defendants do not remove individuals before they receive *adequate* notice and a *reasonable* opportunity to obtain

11

judicial review, consistent with due process. *J.G.G.*, 2025 WL 102409, at *2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings.").

The notice requirement flows not only from due process but from the AEA itself. That is clear from the Supreme Court's understanding of the AEA in *Ludecke*, which recognized that individuals would have the opportunity to seek court review of their designation under the Act. *See, e.g.*, 335 U.S. at 171 n.17. And it is clear from the statute, which affords individuals designated as alien enemies an opportunity to voluntarily depart the United States and to settle their affairs. *See* 50 U.S.C. §§ 21–22. Among other things, the President may lawfully remove noncitizens under the AEA only when those designated noncitizens "refuse or neglect to depart" voluntarily. *See J.G.G.*, 2025 WL 89040130, at *14 (citing 50 U.S.C. § 21). Indeed, even during World War II, courts interpreting the AEA consistently recognized that "alien enemies" retained the right to voluntary departure. *See U.S. ex rel. Ludwig*, 164 F.2d at 457 (Section 21 establishes a "right of voluntary departure"); *U.S. ex rel. Von Heymann v. Watkins*, 159 F.2d 650, 653 (2d Cir. 1947); *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the Attorney General can lawfully remove him against his will."). Under Section 21, there is no exception to the general right of voluntary departure; it is a "statutory condition precedent" to removal. *U.S. ex rel. Ludwig*, 164 F.2d at 457. Section 22 establishes separate rights concerning the particular conditions for departure, with an exception for those "chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. However, that exception cannot be invoked categorically. It instead requires individualized assessments: each noncitizen must specifically be "chargeable" to lose eligibility for the rights described in Section 22. Defendants have made no such individualized assessments

12

here—much less provided any opportunity to contest such findings.

2. **The Proclamation Does Not Fall within the Statutory Bounds of the AEA.**

The AEA has only ever been invoked in times of declared war: the War of 1812, World War I, and World War II. The government seeks to invoke this limited wartime authority to execute removals wholly untethered to any actual or imminent war or to the specific conditions Congress placed in the statute.

*First*, as Judge Henderson explained, *J.G.G.*, 2025 WL 914682, at *8-10, there is no "invasion" or "predatory incursion" upon the United States. Starting with contemporaneous dictionary definitions, as Judge Henderson did, *id.* at *8, it is clear that Congress understood those terms to mean a military intrusion into the territory of the United States. *See Bartenwerfer v. Buckley*, 598 U.S. 69, 74 (2023) ("We start where we always do: with the text of the statute."); *see also* Webster's Dictionary, Invasion (1828) (underscoring that "invasion" is "particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force"); Johnson's Dictionary, *Invasion* (1773) ("invasion" is a "[h]ostile entrance upon the right or possession of another; hostile encroachment" such as when "William the Conqueror invaded England"); Webster's Dictionary, *Predatory* (1828) ("predatory" underscores that the purpose of a military party's "incursion" was "plundering" or "pillaging"); Johnson's Dictionary, *Incursion* (1773) ("[a]ttack" or "[i]nvasion without conquest").

Other contemporary founding era usages of the terms are in accord. The Founders frequently used both "invasion" and "predatory incursion" in the military sense. *See, e.g.*, Letter from Timothy Pickering to Alexander Hamilton (June 9, 1798) (reporting that "predatory incursions of the French" might result in "great destruction of property" but that militia could repel

13

them);[7] Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) (describing a British raid that destroyed military supplies and infrastructure in Richmond as a "predatory incursion");[8] Letter from George Washington to Nathanael Greene (Jan. 29, 1783) ("predatory incursions" by the British could be managed with limited cavalry troops);[9] John Jay, Con't Cong., Draft of an Address of the Convention of the Representatives of the State of New York to Their Constituents (Dec. 23, 1776) (describing the goal of British invasion as "the conquest of America").[10]  Courts did the same.  *Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 11 (1805) ("predatory incursions" by Native American nation led to "an Indian war"); *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 10 (1831) ("incursions" by Native American nations led to retaliatory "war of extermination"); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 545 (1832) (explaining that Pennsylvania's royal charter included "the power of war" to repel "incursions" by "barbarous nations").  And "*in every instance*" that the term "invasion" or "invade" appears in the Constitution, it "is used in the military sense." *J.G.G.*, 2025 WL 914682, at *20 (Henderson, J., concurring).

The interpretive canon of *noscitur a sociis* confirms Petitioners' interpretation.  That canon "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."  *Yates v. United States*, 574 U.S. 528, 543 (2015) (internal quotation marks omitted).  Courts thus look to "[t]he words immediately surrounding" the language to be interpreted to ascertain the "more precise content" of that language. *Id.* (internal quotation marks omitted). Accordingly, in this case, "invasion" and "predatory incursion" should be read in light of the immediately neighboring term, "declared war."

---

[7] https://perma.cc/H2UY-XTTK.
[8] https://perma.cc/6UBY-6PRB.
[9] https://perma.cc/TY8Y-MTMA.
[10] https://perma.cc/K4SX-4KYB.

*See Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961).  Doing so highlights the express military nature of their usage here—they are more specific than just any hostile entrance.  *Cf.* Office of Legislative Affairs, Proposed Amendment to AEA, at 2 n.1 (Aug. 27, 1980)) (AEA contemplates use by the President only "in situations where war is imminent"). This also comports with the common law understanding of the term "alien enemy" as subject of a foreign state at war with the United States. *See Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (collecting cases).

Indeed, the same Congress that passed the AEA also passed another law with strikingly similar statutory bounds.  In response to concerns about impending war with France, the 1798 Congress authorized the President to raise troops "in the event of a declaration of war against the United States, or of an actual invasion of their territory, by a foreign power, or of imminent danger of such invasion."  Act of May 28, 1798, ch. 47, 1 Stat. 558.  This language, which, as Judge Henderson noted, "bears more than a passing resemblance to the language of the AEA," *J.G.G.*, 2025 WL 914682, at *9, makes plain that Congress was concerned about military incursions by the armed forces of a foreign nation.

Tellingly, the AEA requires that the predicate invasion or predatory incursion be "against the territory of the United States."  50 U.S.C. § 21.  And at the time of founding, actions "against the territory of the United States" were expressly understood to be military in nature.  *See Ex parte Bollman*, 8 U.S. (4 Cranch) 75, 131 (1807) (describing levying war against the United States as "a military enterprize [sic] . . . against any of the territories of the United States"); *Wiborg v. United States*, 163 U.S. 632, 633 (1896) (explaining that a group of seamen were charged with preparing for a "military expedition . . . against the territory and dominions of a foreign prince").

If any doubt were left about the military nature of the terms, the historical context dispels it.  *See Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 279 (2024) (considering the

15

"historical context" of statute for purposes of interpretation).  At the time of passage, the United States was preparing for possible war with France and already under attack in naval skirmishes. French ships were attacking U.S. merchant ships in United States waters.  *See, e.g.*, 7 Annals of Cong. 58 (May 1797) (promoting creation of a Navy to "diminish the probability of . . . predatory incursions" by France while recognizing that distance from Europe lessened the chance of "invasion").  Congress worried that these attacks against the territory of the United States were the precursor to all-out war with France. *J.G.G.*, 2025 WL 914682, at *1 (Henderson, J., concurring) ("In 1798, our fledgling Republic was consumed with fear . . . of external war with France."). This "predatory violence" by a sovereign nation led, in part, to the AEA.  *See* Act of July 7, 1798, ch. 67, 1 Stat. 578, 578 ("[W]hereas, under authority of the French government, there is yet pursued against the United States, a system of predatory violence").

Under the statutory text, canons of construction, and historical context, then, "invasion" or "predatory incursion" are military actions by foreign governments that constitute or imminently precede acts of war. "Mass illegal migration" or criminal activities, as described in the Proclamation, plainly do not fall within the statutory boundaries. On its face, the Proclamation makes no findings that TdA is acting as an army or military force. Nor does the Proclamation assert that TdA is acting with an intent to gain a territorial foothold in the United States for military purposes. And the Proclamation makes no suggestion that the United States will imminently be at war with Venezuela. The oblique references to the TdA's ongoing "irregular warfare" within the United States do not suffice because the Proclamation makes clear that it is referring to "mass illegal migration" and "crimes"—neither of which constitute war within the founding era understanding. The Proclamation asserts that TdA "commits brutal crimes" with the goal of "harming United States citizens, undermining public safety, and . . . destabilizing democratic

nations." But these military actions are simply not "against the territory" of the United States. Indeed, if mass migration or criminal activities by some members of a particular nationality could qualify as an "invasion," then virtually any group, hailing from virtually any country, could be deemed enemy aliens.

*Second*, by no stretch of the statutory language can TdA be deemed a "foreign nation or government." Those terms refer to an entity that is defined by its possession of territory and legal authority. *See* Johnson's Dictionary, *Nation* (1773) ("A people distinguished from another people; generally by their language, original, or government."); Webster's Dictionary, *Nation* (1828) ("A body of people inhabiting the same country or united under the same sovereign government; as the English nation"); Johnson's Dictionary, *Government* (1773) ("An established state of legal authority."). Applying the whole-text canon again, *see supra*, confirms that Congress had in mind state actors. First, the AEA presumes that a designated nation possesses treaty-making powers. *See* 50 U.S.C. § 22 ("stipulated by any treaty . . . between the United States and the hostile nation or government"). Nations—not criminal organizations—are the entities that enter into treaties. *See, e.g.*, *Medellin v. Texas*, 552 U.S. 491, 505, 508 (2008) (treaty is "a compact between independent nations" and "agreement among sovereign powers") (internal quotation marks omitted); *Holmes v. Jennison*, 39 U.S. 540, 570-72 (1840) (similar). Second, when a "nation or government" is designated under the AEA, the statute unlocks power over that nation or government's "natives, citizens, denizens, or subjects." 50 U.S.C. § 21. *Countries* have "natives, citizens, denizens, or subjects." By contrast, criminal organizations, in the government's own view, have "members." Proclamation § 1 ("members of TdA").

Historical context also reflects Congress's intent to address conflicts with foreign sovereigns, not criminal gangs. *See* 5 Annals of Cong. 1453 (Apr. 1798) ("[W]e may very shortly

be involved in war . . .”); John Lord O'Brian, Special Ass't to the Att'y Gen. for War Work, N.Y. State Bar Ass'n Annual Meeting: Civil Liberty in War Time, at 8 (Jan. 17, 1919) (“The [AEA] was passed by Congress . . . at a time when it was supposed that war with France was imminent.”). This comports with the founding-era, common law understanding of the term “alien enemy” as subject of a foreign state at war with the United States. *See Johnson v. Eisentrager*, 339 U.S. 763, 769 n.2 (1950) (collecting cases).

On this statutory element, the Proclamation again fails on its face. It never asserts that TdA is a foreign “nation” or “government.” For good reason. As a criminal gang, TdA possesses neither a defined territory nor any legal authority. Exh. A (Hanson Decl.) ¶¶ 13, 16; Exh. B (Antillano Decl.) ¶¶ 11, 13; Exh. C (Dudley Decl.) ¶ 22. The Proclamation asserts that “[o]ver the years,” the Venezuelan government has “ceded ever-greater control over their territories to transnational criminal organizations.”   But the Proclamation notably does *not* say that TdA operates as a government in those regions. In fact, the Proclamation does not even specify that TdA currently controls *any* territory in Venezuela. And even as the Proclamation singles out certain Venezuelan nationals, it does not claim that *Venezuela* is invading the United States.[11]

Moreover, the Proclamation designates TdA “members” as subject to AEA enforcement— but “members” are not “natives, citizens, denizens, or subjects” within the meaning of the statute. That glaring mismatch underscores that Defendants are attempting not only to use the AEA in an unprecedented way, but in a way that Congress never permitted—as a mechanism to address, in

---

[11] And, as the President's own CIA Director recently testified, the intelligence community has no assessment that says the U.S. is at war with or being invaded by Venezuela. *See National Security and Intelligence Officials Testify on Global Threats* at 57:59–58:10, C-SPAN (Mar. 26, 2025), https://www.cspan.org/program/house-committee/national-security-and-intelligence-officials-testify-on-globalthreats/657380 (Q: “Does the intelligence community assess that we are currently at war or being invaded by the nation of Venezuela?” A: “We have no assessment that says that.”); *also available at* https://www.cspan.org/program/house-committee/national-security-and-intelligence-officials-testify-on-globalthreats/657380.

the government's own words, a *non*-state actor. *Venezuela* has natives, citizens, and subjects, but

TdA (not Venezuela) is designated under the proclamation. No amount of wordplay can avoid the

obvious fact that *Venezuela* is the relevant country for statutory purposes here—and TdA is a non-

state criminal organization.

The Court need go no further than finding that the Proclamation fails on its face. But even

if this Court were going to look at the Proclamation's conclusory "findings," those findings cannot

survive even the most minimally searching inquiry because they are simply incorrect as a factual

matter.[12] Experts who have spent years studying TdA are in accord that Venezuela is not directing,

controlling, or otherwise influencing TdA's actions in the United States.  Exh. A (Hanson Decl.)

¶ 17 ("absolutely implausible" that Maduro regime controls TdA or that the two are intertwined);

Exh. B (Antillano Decl.) ¶ 13 (no evidence that TdA "maintains stable connections with the

Venezuelan state or that the Maduro regime directs its actions toward the United States"); Exh. C

(Dudley Decl.) ¶¶ 23 ("no evidence that the Maduro regime has directed Tren de Aragua to migrate

to the United States or to commit any crimes within the United States"). As one expert who has

done numerous projects for the U.S. government, including on the topic of TdA, explained, the

Proclamation's characterization of the relationship between the Venezuelan state and TdA with

respect to TdA's activities in the United States is "simply incorrect." *Id.* ¶¶ 5, 17-18. The

---

[12] Where necessary, courts during World War II routinely examined the facts to ensure that the AEA's statutory limits on presidential power were observed. *See, e.g.*, *U.S. ex rel. Kessler*, 163 F.2d at 143 (reviewing petitioner's factual contention that the German government had ceased to exist after it surrendered and thus was no longer a "foreign nation or government" under the AEA); *United States ex rel. D'Esquiva*, 137 F.3d at 905–07 (reviewing the U.S. government's full course of conduct to ascertain whether and when it had officially recognized Austria's annexation by Germany; remanding for additional factfinding); *U.S. ex rel. Zdunic*, 137 F.2d at 860–61 (remanding for factfinding on statutory predicate; *cf. Al-Alwi v. Trump*, 901 F.3d 294, 298–300 (D.C. Cir. 2018) (evaluating whether "active hostilities" continued under the AUMF after 9-11; concluding that "[t]he record so manifests here").

President's own intelligence agencies reached that same conclusion prior to his invocation of the AEA. *See* Exh. H (Sarabia Roman Decl.), at Exh. 19 ("shared judgment of the nation's spy agencies" is "that [TdA] was not controlled by the Venezuelan government").

The courts' role in enforcing the bounds of congressional statutory predicates, like "predatory invasion" and "incursion" is critical. Congress passed the AEA within weeks of the Alien Friends Act ("AFA"). That second law gave the President broader discretion to deport any noncitizen who he considered "dangerous to the peace and safety of the United States," regardless of whether an invasion or war had occurred. An Act Concerning Aliens § 1, 1 Stat. 571. As such, the 1798 Congress clearly meant to grant the President two distinct powers—the power to remove the nationals of foreign enemy sovereign countries in times of a war or imminent war, and the power to remove particular dangerous noncitizens in times of war or peace. The government's preferred interpretation of the AEA—where the President can remove allegedly dangerous people by deciding that virtually anything qualifies as a predatory incursion or invasion and any entity qualifies as a foreign nation or government, and no court can review those determinations— conflates the different statutory powers Congress conferred separately in the AEA and the AFA. But it would have made little sense for Congress to pass two laws within weeks of each other, unless those laws were meaningfully different. And the critical difference is, of course, the statutory limitations on when the President can use the AEA—it is a particular tool for a particular situation, namely the presence of nationals of a belligerent country during wartime, which simply does not apply to present circumstances. Moreover, treating the AEA like the AFA is especially untenable given that the AFA was "widely condemned as unconstitutional by Madison and many others" and quickly allowed to lapse. *Sessions v. Dimaya*, 584 U.S. 148, 185 (2018) (Gorsuch, J., concurring) (the AFA "is one of the most notorious laws in our country's history"); *see also J.G.G.*,

2025 WL 914682, at *1 (Henderson, J., concurring) (AFA was "widely derided as unconstitutional").

Finally, the government cannot elide these statutory bounds by pointing to the President's inherent Article II power. The President has no constitutional power to unilaterally remove people. Under Article I, Congress holds plenary power over immigration, *INS v. Chadha*, 462 U.S. 919, 940 (1983). The AEA operates as a specific delegation of authority from Congress to the President, a delegation that Congress limited to instances of war or imminent war by a foreign nation or government. *Cf. Youngstown*, 343 U.S. at 635–38. The President is not at liberty to exceed those statutory powers.

Under Justice Jackson's *Youngstown* framework, the President is taking measures incompatible with the expressed will of Congress, and accordingly, he is acting as his "lowest ebb" of power. *Youngstown*, 343 U.S. at 637. Because he has no inherent constitutional power to unilaterally remove people, Congress's powers prevail. Courts "can sustain exclusive Presidential control in such a case only by disabling the Congress from acting upon the subject." *Id*. at 637–38. But there is simply no ground for ignoring the statutory constraints that Congress has established, nor for disabling Congress's constitutional authority to legislate with respect to immigration and its own war powers. *See Chadha*, 462 U.S. at 940; *Hamdan v. Rumsfeld*, 548 U.S. 557, 591 (2006) (discussing Congress's distinct war powers).

**B.     The Proclamation Violates the Specific Protections that Congress Established under the INA for Noncitizens Seeking Humanitarian Protection.**

Summary removal under the AEA is unlawful for an additional independent reason: it fails to provide designated individuals with an opportunity to seek protection from persecution and torture. Congress enacted the Foreign Affairs Reform and Restructuring Act ("FARRA") to codify the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment

21

or Punishment ("CAT") and to ensure that noncitizens have meaningful opportunities to seek protection from torture. *See* U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, S. Treaty Doc. No. 100-20, at 20 (1988); Foreign Affairs Reform and Restructuring Act of 1998 § 2242(a), Pub. L. No. 105-277, Div. G. Title XXI, 112 Stat. 2681 (1998) (codified at 8 U.S.C. § 1231 notes) (implementing CAT); C.F.R. §§ 208.16 to 208.18 (FARRA procedure). CAT categorically prohibits returning a noncitizen to any country where they would more likely than not face torture. *See* 8 U.S.C. §1231 note. These protections apply regardless of the mechanism for removal.

The D.C. Circuit recently addressed a similar issue in *Huisha-Huisha v. Mayorkas*, reconciling the Executive's authority under a public-health statute, 42 U.S.C. § 265, with CAT's anti-torture protections. 27 F.4th 718 (D.C. Cir. 2022). That case is "on all fours" with this one. *J.G.G.*, 2025 WL 890401, at *14. The D.C. Circuit held that because § 265 was silent about where noncitizens could be expelled, and CAT explicitly addressed that question, no conflict existed. Both statutes could—and therefore must—be given effect. 27 F.4th at 721, 731-32 (citing *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When . . . confronted with two Acts of Congress allegedly touching on the same topic," a court "must strive to give effect to both.") (cleaned up)).

The AEA can similarly be harmonized with other subsequently enacted statutes specifically designed to protect noncitizens seeking asylum and withholding because of feared persecution. *See* Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 (1980) (asylum and withholding); 8 U.S.C. §§ 1158 (asylum), 1231(b)(3) (withholding of removal). Congress has unequivocally declared that "[a]ny alien who is physically present in the United States or who arrives in the United States . . . irrespective of such alien's status, may apply for asylum." 8 U.S.C. § 1158(a)(1). Similarly, the withholding of removal explicitly bars returning a noncitizen to a country where

their "life or freedom" would be threatened based on a protected ground. *Id.* § 1231(b)(3)(A). "In understanding this statutory text, 'a page of history is worth a volume of logic.'" *Jones v. Hendrix*, 599 U.S. 465, 472 (2023) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921)). These humanitarian protections were enacted in the aftermath of World War II, when the United States joined other countries in committing to never again turn our backs on people fleeing persecution and torture. Sadako Ogata, U.N. High Comm'r for Refugees, Address at the Holocaust Memorial Museum (Apr. 30, 1997).[13] A President invoking the AEA cannot simply sweep away these protections.

Indeed, the AEA *must* be read in the context of the INA. Since the last invocation of the AEA more than eighty years ago, Congress carefully specified the procedures by which noncitizens may be removed from the United States. And the INA leaves little doubt that its procedures must apply to every removal, unless otherwise specified by that statute. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017) ("specific governs the general" in statutory construction). It directs: "Unless otherwise specified in this chapter," the INA's comprehensive scheme provides "the sole and exclusive procedure for determining whether an alien may be admitted to the United States, or if the alien has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). This language makes clear that Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[14]

---

[13] https://perma.cc/X5YF-K6EU.

[14] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use these proceedings when he or she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, the opportunity to

Congress enacted these procedures with the full awareness that alien enemies were subject to removal in times of war or invasion—in fact, the AEA had been invoked just a few years prior to passage of the 1952 INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). But Congress declined to carve out AEA removals as an exception from standard immigration procedures, even as it expressly provided exceptions for other groups of noncitizens, including noncitizens who pose security risks. *See, e.g.*, 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks).

Ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, Respondents have refused to commit to providing class members— many of whom have strong claims—with an opportunity to assert their rights under any humanitarian statute, as required under the INA. *See, e.g.*, *G.F.F. v. Trump*, No. 1:25-cv-2886, ECF No. 41 at *1 ("Petitioners are not entitled to seek asylum, statutory withholding of removal, or voluntary departure, and this Court cannot review a determination that removal will not violate the Convention Against Torture."). And even if Petitioners could apply, the opportunity is meaningless insofar as Respondents withhold information about the country to which they will be removed. *See J.G.G.*, 2025 WL 890401, at *15. But summary removals to the horrific conditions in Salvadoran prisons are precisely what Congress enacted these protections to prevent.

## IV.    The Administration's Abuse of the Alien Enemies Act Has Caused and Will Continue to Cause Petitioners Irreparable Harm.

In the absence of preliminary relief, Petitioners can be summarily removed to places, such

---

present evidence, and individualized review by an Article III judge. *Id.* § 1532(a), 1534(a)(2), (b), (c)(1)-(2). And the government bears the burden of proving, by a preponderance of the evidence, that the noncitizen is subject to removal as an "alien terrorist." *Id.* § 1534(g).

as El Salvador, where they face life-threatening conditions, persecution and torture. *J.G.G.*, 2025 WL 1024097, at \*5 (Sotomayor, J., dissenting) ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"). And while removal does not by itself necessarily constitute irreparable harm, *Nken v. Holder*, 556 U.S. 418, 435 (2009), these are hardly run-of-the-mill removals. Petitioners' removals constitute grave and immediate irreparable harm because of what awaits them in a Salvadoran prison. *See generally* Exh. D (Bishop Decl.); Exh. E (Goebertus Decl.). Prison conditions in El Salvador are "harsh and life threatening." Bishop Decl. ¶ 21; *see also* Exh. E (Goebertus Decl.) ¶ 4. Prison officials there engage in widespread physical abuse, including waterboarding, electric shocks, using implements of torture on detainees' fingers, forcing detainees into ice water for hours, and hitting or kicking detainees so severely that it causes broken bones or ruptured organs. Exh. D (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; Exh. E (Goebertus Decl.) ¶¶ 8, 10, 17.

People in detention in El Salvador also face psychological harm, including solitary confinement in pitch dark cells or being forced to stay in a cell with the body of a fellow prisoner who was recently beaten to death. Exh. E (Goebertus Decl.) ¶ 3; Exh. D (Bishop Decl.) ¶ 39. In fact, El Salvador creates these horrific conditions intentionally to terrify people. Exh. D (Bishop Decl.) ¶ 22; See also *Tesfamichael v. Gonzales*, 411 F.3d 169, 178 (5th Cir. 2005); ("irreparable harm" where petitioners face "forced separation and likely persecution" "if deported"); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured"); *Leiva-Perez v. Holder*, 640 F.3d 962, 969 (9th Cir. 2011) (holding that removal to a country where one faces harm constitutes irreparable injury); *Demjanjuk v. Holder*, 563 F.3d 565, 565 (6th Cir. 2009) (granting stay for noncitizen who asserted removal would violate CAT). And Petitioners may never get out of these prisons. *See* Nayib Bukele, X.com,

(Mar. 16, 2025, 5:13AM ET);[15] *see also* Exh. E (Goebertus Decl.) ¶ 3 (quoting the Salvadorean government that people held in CECOT "will never leave"); *id.* ("Human Rights Watch is not aware of any detainees who have been released from that prison.").

And even if the government instead removes Petitioners to Venezuela, they face serious harm there, too. In fact, many Petitioners fled Venezuela for the very purpose of escaping the persecution they faced in Venezuela and have pending asylum cases on that basis. For example, J.G.G. has already suffered arbitrary detention, torture and abuse by the Venezuelan police for his political views and fears being killed if returned. Exh. H (Quintero Decl.) ¶ 3. And returning to Venezuela labeled as a gang member by the United States government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA. Exh. A (Hanson Decl.) ¶ 28.

**V.     The Balance of Equities and Public Interest Weigh Decidedly in Favor of a Preliminary Injunction Order.**

The balance of equities and the public interest factors merge in cases against the government. *Nken*, 556 U.S. at 435. Here, the balance of hardships overwhelmingly favors Petitioners. The public has a critical interest in preventing wrongful removals to places where individuals will face persecution and torture. *Id.* at 436 (describing the "public interest in preventing aliens from being wrongfully removed, particularly to countries where they are likely to face substantial harm"); *Nunez v. Boldin*, 537 F. Supp. 578, 587 (S.D. Tex. 1982) (protecting people who face persecution abroad "goes to the very heart of the principles and moral precepts upon which this country and its Constitution were founded"). Conversely, the government can make no comparable claim to harm from an injunction. *Wages & White Lion Inv., L.L.C. v. FDA*, 16 F.4th 1130, 1143 (5th Cir. 2021) ("There is generally no public interest in the perpetuation of

---

[15] https://perma.cc/52PT-DWMR.

unlawful agency action."); *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (describing the "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations" (citation omitted)). Defendants, moreover, will retain the ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under existing statutory immigration laws.

## VI. Class Certification Is Proper.

For all the reasons stated in the Petitioners' Motion for Class Certification, the putative class meets the requirements for certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2). Alternatively, the Court can use Rule 23 as a guidepost to certify a class under the All Writs Act and principles of habeas jurisdiction and equity.

Every circuit that has addressed the issue has found that a class habeas action may be maintained. *See, e.g.*, *U.S. ex rel. Sero v. Preiser*, 506 F.2d 1115, 1125–26 (2d Cir. 1974); *Bijeol v. Benson*, 513 F.2d 965, 967 (7th Cir. 1975); *Williams v. Richardson*, 481 F.2d 358, 361 (8th Cir. 1973); *Mead v. Parker*, 464 F.2d 1108, 1112–13 (9th Cir. 1972); *Napier v. Gertrude*, 542 F.2d 825, 827 & n.5 (10th Cir. 1976); *LoBue v. Christopher*, 82 F.3d 1081, 1085 (D.C. Cir. 1996). For instance, in *Sero*, the Second Circuit relied on the Supreme Court's decision in *Harris v. Nelson*, 394 U.S. 286 (1969), to "confirm[] the power of the judiciary, under the All Writs Act . . . to fashion for habeas actions 'appropriate modes of procedure, by analogy to existing rules or otherwise in conformity with judicial usage,'" and held that "unusual circumstances" provided "compelling justification for allowing a multi-party proceeding similar to the class action authorized by the Rules of Civil Procedure." 506 F.2d at 1125 (citing *Harris*, 394 U.S. at 299). Adopting a similar approach in *Bijeol*, the Seventh Circuit found a class habeas appropriate where all prisoners raised an "identical" issue of law and the number of prisoners was "too great for joinder of all to be practical." 513 F.2d at 968. Likewise, the Eighth and Ninth Circuits reversed

27

district court decisions, holding that a habeas corpus petition may seek relief for an appropriate class. *See Mead*, 464 F.2d at 1113 ("where the relief sought can be of immediate benefit to a large and amorphous group . . . a class action may be appropriate"); *Williams*, 481 F.2d at 361 (agreeing with *Mead*); *see also Napier*, 542 F.2d at 827 & n.5 (Tenth Circuit noting "class treatment" could be available by the court "apply[ing] an analogous procedure by reference to Rule 23"); *LoBue*, 82 F.3d at 1085 (noting that "courts have in fact developed such equivalents" of "class actions in habeas").

Although it has not addressed the availability of class habeas, the Supreme Court has ruled on the merits in multiple class habeas cases, including several recent ones involving immigration detention. *See*, *e.g., Johnson v. Guzman Chavez*, 594 U.S. 523, 532 (2021) (class of noncitizens detained in Virginia); *Nielsen v. Preap*, 586 U.S. 392, 400 (2019) (two classes of noncitizens, one detained in California and the other in the Western District of Washington); *Jennings v. Rodriguez*, 583 U.S. 281, 290 (2018) (class of noncitizens in the Central District of California, with subclasses for different detention authorities). The Fifth Circuit also has not addressed this issue, but courts in the Fifth Circuit have considered class habeas cases on the merits. *See, e.g.*, *Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 421 (5th Cir. 1992) (habeas class of noncitizen witnesses challenging government practice of detention over ten days, where government has opposed certification based on mootness and lack of typicality); *St. Jules v. Savage*, 512 F.2d 881, 882 (5th Cir. 1975) (reversing dismissal and remanding where district court held that each petitioner's challenge had to be "considering individually" because those inmates "present a single constitutional challenge"); *In re Class Action Application for Habeas Corpus on Behalf of All Material Witnesses in W. Dist. of Texas*, 612 F. Supp. 940, 948 (W.D. Tex. 1985) (granting summary judgment to class of individuals detained as material witnesses in the Western District of Texas).

The reasoning of these cases confirms why class treatment is not only appropriate but preferred here. Even though the government has yet to disclose the identities or locations of people designated as alien enemies pursuant to the Proclamation—whether through notice directly to the designated individuals or their counsel—the government acknowledges that it had at some point detained well over 100 people in the Southern District of Texas before summarily removing them pursuant to the Alien Enemies Act on March 15. *See J.G.G. v. Trump*, No. CV 25-766 (JEB), 2025 WL 1119481, at *3 (D.D.C. Apr. 16, 2025) (citing article with White House official statements). The government has estimated the number of alien enemies to be in the "hundreds." *See* Cerna Decl., *J.G.G. v. Trump*, No. 25-cv-766-JEB (D.D.C. Mar. 17, 2025), ECF No. 26-1, ¶ 8. On April 15, 2025, the government disclosed to Petitioners' counsel via email that they have identified four noncitizens in the Southern District of Texas "that were previously designated alien enemies under the Proclamation," the named Petitioners here and petitioner in *Zacarias Matos* (Case No. 1:25-cv-57) pending before this Court. However, this does not include the number of people *currently* designated under the Proclamation nor, of course, the number of people who will be designated in the future—all individuals who would be class members if transferred into this District or already detained in the district. *See* ECF No. 4.

The Fifth Circuit has recognized that Rule 23(a)'s numerosity requirements should not be strictly applied in cases like this, where the class includes not only currently identified class members but future ones as well. *See Pederson v. Louisiana State Univ.*, 213 F.3d 858, 868 (5th Cir. 2000) (numerosity met where class included current and future students); *Jack v. American Linen Supply Co.,* 498 F.2d 122, 124 (5th Cir. 1974) ("joinder of unknown individuals is certainly impracticable" and weighs in favor of certification where class included "unnamed, unknown future" members). Relatedly, the Fifth Circuit has found joinder impracticable, and thus class

certification favorable, where the composition of the class is fluid. *See Jones v. Diamond*, 519 F.2d 1090, 1097 (5th Cir. 1975) (describing how class based on pretrial detention "is by nature temporary"); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 623 (5th Cir. 1999) ("Owing to the transient nature of employment . . . , it was likely that some of the putative class members were geographically dispersed and unavailable for joinder."). And most importantly, the Fifth Circuit relaxes Rule 23(a)'s numerosity requirements in civil rights cases like this one, seeking injunctive and declaratory relief. *See Jones*, 519 F.2d at 1100 ("The general rule encouraging liberal construction of civil rights class actions applies with equal force to the numerosity requirement of Rule 23(a)(1)."); *see also Pederson*, 213 F.3d at 868 (Title IX challenge by female students); *Jack*, 498 F.2d at 124 (class affected by discriminatory policies).

Considering that over 100 people subject to the Proclamation were already detained in this District, Petitioners have cleared the bar to show numerosity. *See Mullen*, 186 F.3d at 624 (more than 40 class members "raise[s] a presumption that joinder is impracticable" (citing 1 Newberg on Class Actions § 3.05, at 3–25 (3d ed. 1992)). But even looking solely to the present and future, the Court should also find numerosity because of the sheer number of ICE detention facilities in the District, *see* Cerna Decl. ¶ 2, *J.G.G. v. Trump*, No. 25-cv-766 (D.D.C. Mar. 20, 2025), ECF No.49-1 (noting 3,790 beds for six of the ten detention facilities in District)[16]; the proximity of these facilities to staging areas for removal, *id*. ¶ 5 (describing flights on March 15); and, as discussed

---

[16] Government data estimates that the ten facilities in the District have a total average daily population of around 5,460 on a given day in 2025 thus far. *See* U.S. Immigr. & Customs Enf't, FY 2025 ICE Statistics: Detention FY 2025 YTD (data source Mar. 17, 2025), https://www.ice.gov/detain/detention-management (download spreadsheet, select "Facilities FY25" tab, and add numbers for all male and female average daily population (FY ADP) for the following facilities: El Valle Detention Center, Webb County Detention Center, Joe Corley Processing Center, Montgomery Processing Center, Port Isabel SPC, Rio Grande Detention Center, Houston Contract Detention Facility, East Hidalgo Denter Center, Laredo Processing Center, and Coastal Bend Detention Facility).

above, the government's intent to keep identifying and designating new alien enemies, and transferring them for summary removals. Moreover, because class members are by definition detained and likely have limited financial resources and limited English proficiency preventing them from bringing their own individual cases, both judicial economy and the equity reasons driving Rule 23(b)(2) class actions underscore the need for class certification here. *See* William B. Rubenstein, *Newberg on Class Actions* § 3.12 (5th ed. 2017); *see also Jones*, 519 F.2d at 1099; *Cervantes v. Whitfield*, 613 F. Supp. 1439, 1443–44 (N.D. Tex. 1985) (approving monetary relief class settlement for 20 Hispanic individuals subject to unlawful stops).

### VII.    The Court Should Reserve the Issue of the Proper Habeas Procedures.

At this early stage, the Court need not decide what standard it should apply in determining whether Petitioners are members of TdA nor what procedural protections should apply to the forthcoming evidentiary hearings for Petitioners. The threshold fundamental questions common to the class that are appropriately resolved in advance include (1) whether the Proclamation can be used in this peacetime context against a criminal organization; (2) whether the Proclamation can wipe away the protections of the INA; and (3) whether the government must provide at least 30 days' notice before seeking to remove someone under the AEA.

If the Court then wishes to reach questions regarding the procedures and evidentiary standards in individual habeas actions in which an individual contests their membership in the TdA, Petitioners would respectfully request further briefing before the Court reaches those important questions. To the extent that the Court considers those questions now, Petitioners urge the Court to apply a "clear, unequivocal, and convincing evidence" standard to determine whether the government has borne its burden to establish removability. That standard is appropriate under due process principles—particularly where Respondents have provided no meaningful procedure

31

to safeguard against error. *See Trump v. J.G.G.*, 604 U.S. ---, 2025 WL 1024097, at \*2 (2025) (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)) (due process doctrine governs AEA removals); *see also Woodby v. INS*, 385 U.S. 276, 277 (1966) (requiring "clear, unequivocal, and convincing" evidence in deportation proceedings) *Schneiderman v. United States*, 320 U.S. 118, 125 (1943) (same in denaturalization proceedings); *Nishikawa v. Dulles*, 356 U.S. 129, 137–38 (1958) (same in expatriation case).

The Court should also apply the Federal Rules of Evidence to these proceedings, both because they are the default rules absent an explicit alternative, Fed. R. Evid. 1101(b), and because of the profound stakes of any habeas hearings, *Boumediene*, 553 U.S. at 783 ("Where a person is detained by executive order, rather than . . . after being tried and convicted in a court, the need for collateral review is most pressing."), and particularly those here. Indeed, during prior invocations of the AEA, habeas courts utilized trial-like procedures, including allowing individuals to present evidence such as testimony and permitting arguments. *See, e.g.*, *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860 (2d Cir. 1943).

## VIII.  The Court Should Not Require Petitioners to Provide Security Prior to the Preliminary Injunction Order.

The Court should not require a bond under Federal Rule of Civil Procedure 65(c). "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978). Requiring no security is particularly appropriate where petitioners are "engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement." *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981).

## CONCLUSION

The motion for a preliminary injunction should be granted.

Dated: April 16, 2025

Adriana Piñon
TX State Bar No:  24089768; SDTX No.
1829959
Savannah Kumar
TX State Bar No.:  24120098; SDTX
admission pending
Charelle Lett
TX State Bar No.: 24139900; SDTX No.
3908204
Thomas Buser-Clancy
TX State Bar No:  24078344; SDTX No.
1671940
ACLU FOUNDATION OF TEXAS, INC.
P.O. Box 8306,
Houston, TX 77288
(713) 942-8146
apinon@aclutx.org
skumar@aclutx.org
clett@aclutx.org
tbuser-clancy@aclutx.org

Noelle Smith
Oscar Sarabia Roman
My Khanh Ngo
Cody Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
(415) 343-0770
nsmith@aclu.org
osarabia@aclu.org
mngo@aclu.org
cwofsy@aclu.org

Respectfully submitted,

*/s/ Lee Gelernt*
Lee Gelernt
Daniel Galindo
Ashley Gorski
Patrick Toomey
Sidra Mahfooz
Omar Jadwat
Hina Shamsi
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org
dgalindo@aclu.org
agorski@aclu.org
ptoomey@aclu.org
smahfooz@aclu.org
ojadwat@aclu.org
hshamsi@aclu.org

*Attorneys for Plaintiffs-Petitioners*

*\*Pro hac vice application forthcoming*

## CERTIFICATE OF SERVICE

I certify that on April 16, 2025, a true and correct copy of the foregoing document was electronically filed via the Court's CM/ECF system which sends notice of electronic filing to all counsel of record.

*/s/ Lee Gelernt*
Lee Gelernt
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION,
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660
lgelernt@aclu.org