# Exhibit C

# DECLARATION OF STEVEN DUDLEY, CO-DIRECTOR OF INSIGHT CRIME

1. I, Steven Dudley, am the Co-Director of InSight Crime. If called to testify, I could and would do so as follows:

**Summary**

2. The Venezuelan gang Tren de Aragua is a dangerous transnational gang but has little substantial U.S. presence. In fact, the U.S. government has yet to share any evidence to show that the gang has a structured or operational presence inside the United States, or that it is operating in any coherent or collective fashion across the U.S. Nor have we seen evidence that the Maduro regime is communicating with or directing any Tren de Aragua leaders or any Tren de Aragua activity in the United States, much less that the regime is directing young Venezuelan men to migrate to the United States. Although the Venezuelan government operates as a criminal hybrid state (a term of art I explain below) with ties to many criminal organizations present there, Tren de Aragua, as currently constituted, does not have substantial connections with the Venezuelan state anywhere it operates.

**Qualifications**

3. I have been asked to provide an expert opinion on aspects of Tren de Aragua in the United States. I have read the Proclamation and the Cerna Declaration (ECF No. 26) submitted in this case. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me. The opinions in this declaration are my own.

4. Appendix A is a true and correct copy of my curriculum vitae.

5.	InSight Crime is a think tank with offices at American University in Washington, D.C., and Medellín, Colombia. We specialize in investigating and analyzing organized crime in the Americas and assessing State efforts to combat these organizations, offering a diverse set of perspective on these topics.[1] InSight Crime is the leading source for investigation, reporting, analysis, and training targeted to meet the needs of academics, researchers, policymakers and analysts, journalists, NGOs, and law enforcement and government officials tackling the problems posed by organized crime and drug trafficking throughout the region. InSight Crime has done numerous projects for the U.S. government, including several concerning Venezuela and its multiple non-state criminal groups such as Tren de Aragua. Our open-source reporting reaches between 300,000 and 400,000 readers every month, and our material is routinely cited, quoted, and reprinted in major media outlets. We have been doing this for 15 years. Our coverage has been recognized through awards including, most recently, a special citation by the Columbia Journalism School for coverage of Latin America, the Ortega & Gasset award for best investigative story, and two Simón Bolívar awards for investigative stories.

6.	I hold a master's degree in Latin American Studies from the University of Texas at Austin. I have a bachelor's degree in history from Cornell University in Ithaca, New York. I am a Senior Fellow at American University's Center for Latin American and Latino Studies and a former fellow at the Woodrow Wilson International Center for Scholars in Washington, D.C.

7.	I lived in Guatemala from 1991 to 1992, in Brazil in 1993 and in 1998, and in Colombia off-and-on for nearly ten years beginning in 1995 and ending in late 2007. I have

---

[1] For more information, *see* insightcrime.org.

2

traveled to many parts of Latin America during my 30 years as a journalist and investigator in the region, including to Venezuela on dozens of occasions. During that time period, I worked for media organizations like the *Miami Herald,* the *Washington Post*, National Public Radio, the *Economist*, and the British Broadcasting Corporation (BBC), among others. I am a member of the International Consortium of Investigative Journalists and was a Knight Fellow at Stanford University.

8. In addition to my work for media and InSight Crime, I wrote a book concerning the Revolutionary Armed Forces of Colombia (FARC) guerrillas that was published in English (*Walking Ghosts* - Routledge 2004) and Spanish (*Armas y urnas* - Grupo Planeta 2008), and a book on the MS-13 gang (*MS-13: The Making of America's Most Notorious Gang* – HarperCollins 2020), which won the Lucas Prize for book in progress. I have also published reports on drug trafficking and organized criminal networks in Central America and Mexico for policy groups such as the Woodrow Wilson International Center for Scholars, the International Crisis Group, and the Migration Policy Institute.

9. As part of my work at InSight Crime, I do regular trips to the region and am in nearly constant contact with government authorities, media partners, correspondents, academics, and other investigators throughout the region, including with our team of correspondents in Venezuela. In all, I have made more than 100 trips to the region since I became co-founded InSight Crime in 2010.

10. I focus a lot of this work on trying to understand how international criminal organizations operate, including prison gangs. In 2012-2013, for example, I went to Ciudad

Juárez, Mexico, to investigate and write about the prison gang known as Barrio Azteca.[2] The gang had operations inside and outside the prison system and had expanded across the US-Mexico border. They also worked with corrupt police.

11. In 2016, I directed a year-long investigative project on prisons in the region financed by the National Endowment for Democracy (NED).[3] For that project, we studied the way prison gangs operated in five countries.[4] We entered prisons in the countries I studied and spoke to those on the inside, including the heads of the gangs. Each of the prison gangs in question had operations inside and outside the prisons, including criminal enterprises that involved prison guards and police.

12. In 2014, I became the co-principal of a two-year project funded by the U.S. Department of Justice's National Institute for Justice on the MS-13.[5] Our goal was to study the gang through various academic instruments and field research in three different geographic areas: Washington, D.C., Los Angeles, and El Salvador. For this project, I traveled to El Salvador several times and met with active members of the MS-13 inside jails.

13. In 2018, I was the co-principal of a U.S. State Department-funded project that is focused on criminal dynamics in Brazil, Argentina, and Paraguay. As part of this project, I

---

[2] *See* Steven Dudley, "Barrio Azteca Gang Poised for Leap into International Drug Trade," InSight Crime (Feb. 13, 2013), https://insightcrime.org/investigations/barrio-azteca-gang-poised-leap/
[3] NED is a private foundation, funded mostly by the U.S. Congress, that finances projects worldwide that support democracy. See https://www.ned.org/about/.
[4] *See* "The Prison Dilemma," a special project financed by the National Endowment for Democracy, https://insightcrime.org/investigations/the-prison-dilemma-in-the-americas/.
[5] *See* description of project: https://www.american.edu/centers/latin-american-latino-studies/transnational-criminal-capacity-of-ms-13.cfm.

worked with experts and investigators in Brazil. I also traveled to Brazil, where I went inside several prisons. Our focus of the Brazil research is the Primeiro Comando da Capital (PCC), or First Capital Command, which is the region's largest prison gang.

14. Since 2018, I have assisted with InSight Crime's work on Venezuela, which is also funded by the U.S. State Department. The project has mapped the criminal ecosystem of that country. InSight Crime has worked with dozens of its correspondents, as well as independent investigators and civil society organizations, to provide the world's most comprehensive database and repository of organized crime groups in Venezuela.

15. I have been asked to provide an expert opinion on the threat of Tren de Aragua in the United States. I make this declaration based on my personal and professional knowledge, my skill, experience, training, and education, and facts and data regularly relied upon in my field that are currently available to me in large part because of the ongoing work we have in Venezuela.

**TREN DE ARAGUA**

16. I have studied organized crime in Venezuela for the last 25 years. I am very familiar with the origins of Tren de Aragua in Venezuela and its activities both there and in other parts of South America. I am also familiar with what is now the limited reach of Tren de Aragua in the United States, in part because we at InSight Crime have also reported on this extensively over the last year.

17. I have reviewed the March 15, 2025-Proclamation entitled Invocation of the Alien Enemies Act Regarding the Invasion of The United States by Tren De Aragua. In it, the President uses the term "hybrid criminal state" to describe the relationship between Venezuela and Tren de Aragua. The Proclamation indicates that the Venezuelan state has weaponized Tren

de Aragua to "invade, attempt to invade, and threaten to invade the [United States]," to "perpetrate[] irregular warfare within the [United States]," and to "use[] drug trafficking as a weapon against our citizens."

18. That characterization of the relationship between the Venezuelan state and Tren de Aragua as it relates to its activities in the United States is simply incorrect.

19. While InSight Crime has characterized the Venezuelan government as a "hybrid criminal state," we use that term to refer to how the Venezuelan government has, at times, worked with militia groups, Colombian guerrilla organizations, and organized crime groups inside Venezuela to further its own economic, political, and social agenda. In practice, for example, state security forces may permit a group to operate in a particular area; in exchange, the group maintains social and political control in a way that favors the government. In some instances, these arrangements may also include monetary or other economic exchanges between the sides. In other instances, it may just be a promise to control violence in return for free reign over the criminal economies in these areas. These arrangements are made most notably with more overtly political groups or guerrilla groups that have often veered into criminal activities, but sometimes they are made with criminal organizations or prison gangs.

20. Because the Maduro regime's power is fragmented and these criminal groups are broken into semi-independent factions, these arrangements are not uniform nor established for any set time periods. For example, they can take place with one bloc of the state even while another bloc actively opposes a criminal group. The agreements are also volatile and often contingent on personal and political affinities. When one side is no longer served by an agreement, for instance, it can devolve into open fighting between the group and Venezuelan

security forces. We have even identified instances in which one part of a criminal group is fighting with the government while another part of the same criminal group is working alongside it.

21. Currently, Tren de Aragua does not appear to be actively connected to the Venezuelan government in any sustained fashion. In fact, most of the Maduro regime's interaction and coordination occurs with militias, guerrilla groups, and criminal organizations aside from Tren de Aragua. A good comparative example of those other groups are the *colectivos* (collectives), which are a disparate network of grassroots, left-wing political militias that are trained, financed, and armed by the state and act as political shock troops. Unlike the colectivos, Tren de Aragua is not trained, financed, or armed by the state. And the state's interaction with Tren de Aragua is quite minimal as compared to those same colectivos.

22. Much of this can be traced back to 2023, when it emerged that the Venezuelan government had begun a corruption investigation into then-Oil Minister Tareck El Aissami. As noted in the Proclamation, El Aissami was the highest-level government patron of Tren de Aragua. The impact of the corruption investigation, however, was substantial. In March 2023, El Aissami resigned his ministry post. In September 2023, the Venezuelan government raided the Tocorón prison, during which Venezuelan military forces dismantled what was then Tren de Aragua's headquarters. Its leader fled the prison, most likely prior to the raid, and since 2023, the group has become more dispersed and holds less sway in the areas where it is present in Venezuela. And in April 2024, the government announced it had arrested El Aissami.

23. In our investigations over the period in which the prison gang has operated, we have never seen Tren de Aragua deployed by the Venezuelan government in a concerted or

military fashion. Tren de Aragua is not a militia or paramilitary group like the colectivos, nor is it a mercenary group associated with the Venezuelan government in the style of the once-vaunted Wagner group from Russia. In other words, it is not an arm of the Venezuelan government. And we have seen no evidence that the Maduro regime has directed Tren de Aragua to migrate to the United States or to commit any crimes within the United States. To be sure, in recent months the Venezuelan government has assisted in capturing members of Tren de Aragua in other countries, most notably in Colombia.

24. That is not to diminish the threat Tren de Aragua poses as a criminal gang operational in Venezuela and other parts of South America, which we have documented in numerous in-depth reports from Colombia, Peru, and Chile. However, although Tren de Aragua is undoubtedly a powerful criminal organization in Venezuela and some other parts of South America, there is no evidence of a structured or operational presence in the United States and no evidence of the Maduro regime communicating with it or any purported leaders, or directing it or any purported leaders to commit crimes in the U.S.

25. Finally, a word about identification of Tren de Aragua members. As noted, I have extensive experience studying street and prison gangs. Some of them do have tattoos that indicate gang affiliation. As of this writing, Tren de Aragua does not have any such tattoos. What's more, even gangs that once used tattoos to identify themselves have moved away from them precisely because they help law enforcement identify them. Therefore, using tattoos as a means of identifying Tren de Aragua members does not seem to me to be a reliable means of identifying them.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Steven Dudley
Co-director, InSight Crime
March 28, 2025