# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| J.A.V. et al.,<br><br>   *Petitioners*,<br><br>  v.<br><br>DONALD J. TRUMP, in his official capacity<br>as President of the United States, et al.,<br><br>   *Respondents*. | Civil Action No. 1:25-cv-00072<br><br><br>**RESPONDENTS' OPPOSITION TO<br>PETITIONERS' MOTIONS FOR A<br>PRELIMINARY INJUNCTION AND<br>FOR CLASS CERTIFICATION** |

## Table of Contents

Table of Authorities ............................................................................................. iii

Introduction ...................................................................................................... 1

Background ........................................................................................................ 2

    I.    Tren de Aragua's designation as a foreign terrorist organization and under the Alien Enemies Act ..................................................................... 2

    II.    The *J.G.G.* case ............................................................................... 4

    III.    This suit ............................................................................................ 6

    IV.    DHS's notice procedure .................................................................... 6

Legal Standard .................................................................................................. 6

Argument .......................................................................................................... 7

    I.    This Court lacks jurisdiction over all of Petitioners' claims except the limited habeas review of whether Petitioners are alien enemies. ........................... 7

        A.    Petitioners have not demonstrated the imminent threat of injury necessary for standing for preliminary injunctive relief. ........................... 7

        B.    There is no jurisdiction to review the President's Proclamation. ............. 10

        C.    This Court lacks jurisdiction to enjoin the transfer of Petitioners or putative class members outside this district. .............................................. 13

        D.    This Court lacks jurisdiction to consider CAT claims in habeas. ............. 14

    II.    Petitioners cannot succeed on the merits of their claims. .................................... 15

        A.    The Proclamation comports with the requirements of the statute. ............ 15

            1.    TdA's actions constitute an invasion or predatory incursion. ....... 15

            2.    Given its intimate connection to Venezuela, TdA is a foreign nation or government for purposes of 50 U.S.C. § 21. .................. 16

        B.    The AEA notice procedures comport with due process. ........................... 19

        C.    Any claim of insufficient notice is speculative. ........................................ 21

        D.    Petitioners are not entitled to a period of voluntary departure. ................. 22

E.    Title 8 is not the sole mechanism through which an alien may be removed............................................................................................ 23

F.    Petitioners are not entitled to seek relief or protection from removal under Title 8. ......................................................................................... 24

III.    The remaining equitable factors weigh strongly in the government's favor. ....... 26

A.    Petitioners have not established irreparable harm. .................................. 26

B.    The balance of equities and public interest favor denial of preliminary injunctive relief. .................................................................. 27

IV.    Class certification is improper. .......................................................................... 28

A.    This Court lacks jurisdiction in habeas over the putative class claims. ...................................................................................................... 28

B.    The putative class does not meet the requirements of Fed. R. Civ. P. 23............................................................................................................... 28

1.    Petitioners do not show commonality. .......................................... 29

2.    Petitioners do not show typicality. ............................................... 30

3.    The putative class does not satisfy Rule 23(b)(2). ....................... 31

C.    If class certification were proper, membership would have to be restricted to those detained in El Valle Detention Facility. ..................... 32

V.    Petitioners must provide security. .......................................................................... 33

Conclusion .................................................................................................................... 33

Exhibit A: Declaration of Deputy Assistant Director Selwyn Smith

Exhibit B: Declaration of Acting Assistant Director Marcos D. Charles

Exhibit C: Declaration of Michael G. Kozak

Exhibit D: Declaration of Assistant Field Office Director Carlos D. Cisneros Regarding the AEA Notice Procedures (filed under seal)

Exhibit E: Declaration of Assistant Field Office Director Carlos D. Cisneros Regarding the Named Petitioners

## Table of Authorities

**Cases**

*Abramski v. United States*,
573 U.S. 169 (2014) ........................................................................................... 18

*Adams v. Vance*,
570 F.2d 950 (D.C. Cir. 1978) ....................................................................... 7, 27

*Am. Immigr. Laws. Ass'n v. Reno*,
18 F. Supp. 2d 38 (D.D.C. 1998) ....................................................................... 20

*Am. Immigr. Laws. Ass'n v. Reno*,
199 F.3d 1352 (D.C. Cir. 2000) ......................................................................... 20

*Amaya v. Stanolind Oil & Gas Co.*,
62 F. Supp. 181 (S.D. Tex. 1945) ...................................................................... 16

*AMP Automotive, LLC v. BFT, LP*,
2018 WL 4028459 (E.D. La. 2018) .................................................................... 31

*Arar v. Ashcroft*,
585 F.3d 559 (2d Cir. 2009) ........................................................................ 25, 27

*Baker v. Carr*,
369 U.S. 186 (1962) ........................................................................................... 12

*Barber v. Bryant*,
860 F.3d 345 (5th Cir. 2017) ............................................................................... 8

*Barclays Bank PLC v. Franchise Tax Bd.*,
512 U.S. 298 (1994) ........................................................................................... 12

*Barr v. DOJ*,
819 F.2d 25 (2d Cir. 1987) ................................................................................. 27

*Bas v. Tingy*,
4 U.S. (4 Dall.) 37 (1800) .................................................................................. 16

*Benitez-Garay v. DHS*,
2019 WL 542035 (W.D. Tex. 2019) ................................................................... 15

*Biden v. Texas*,
597 U.S. 785 (2022) ........................................................................................... 27

*Bonitto v. ICE*,
547 F. Supp. 2d 747 (S.D. Tex. 2008) ................................................................ 33

*California v. Texas*,
593 U.S. 659 (2021) ............................................................................................. 9

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) ............................................................................ 12

*Carney v. Adams*,
    592 U.S. 53 (2020) .................................................................................. 8

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ................................................................. 29

*Chi. & S. Air Lines v. Waterman S.S. Corp.*,
    333 U.S. 103 (1948) ...................................................................... 13, 19

*Chmakov v. Blackman*,
    266 F.3d 210 (3d Cir. 2001) ................................................................ 14

*Citizens Protective League v. Clark*,
    155 F.2d 290 (D.C. Cir. 1946) ....................................................... 11, 25

*da Silva v. Nielsen*,
    2019 WL 13218461 (S.D. Tex. 2019) ................................................... 33

*Davrod Corp. v. Coates*,
    971 F.2d 778 (1st Cir. 1992) ............................................................... 16

*DHS v. Thuraissigiam*,
    591 U.S. 103 (2020) ........................................................................... 21

*Dominguez-Estrella v. INS*,
    71 F. Supp. 2d 578 (W.D. La.) ............................................................ 14

*El-Shifa Pharm. Indus. Co. v. United States*,
    607 F.3d 836 (D.C. Cir. 2010) ............................................................ 18

*Epic Sys. Corp. v. Lewis*,
    584 U.S. 497 (2018) ........................................................................... 24

*Ex parte Gilroy*,
    257 F. 110 (S.D.N.Y. 1919) ................................................................ 11

*Fiallo v. Bell*,
    430 U.S. 787 (1977) ........................................................................... 20

*Garland v. Aleman Gonzalez*,
    596 U.S. 543 (2022) ........................................................................... 15

*Gen. Tel. Co. v. Falcon*,
    457 U.S. 147 (1982) ........................................................................... 31

*Glushchenko v. DHS*,
    566 F. Supp. 3d 693 (W.D. Tex. 2021) ................................................ 14

*Harisiades v. Shaughnessy*,
    342 U.S. 580 (1952) ........................................................................... 12

*Harris v. Med. Transp. Mgmt., Inc.*,
    77 F.4th 746 (D.C. Cir. 2023) ............................................................. 28

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .......................................................................... 2, 27

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022) ........................................................................ 23, 26

*I.M. v. CBP,*
  67 F.4th 436 (D.C. Cir. 2023) ............................................................................. 21

*Indigenous Peoples of Coastal Blend v. U.S. Army Corps of Eng'rs,*
  2023 WL 6226387 (S.D. Tex. 2023) ..................................................................... 23

*J.G.G. v. Trump,*
  2025 WL 825115 (D.D.C. Mar. 15, 2025) ............................................................... 5

*J.G.G. v. Trump,*
  2025 WL 825116 (D.D.C. Mar. 15, 2025) .......................................................... 5, 13

*J.G.G. v. Trump,*
  No. 25-cv-00766 (D.D.C.) .................................................................................. 4

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) ...................................................................................... 30, 32

*Jimenez-Angeles v. Ashcroft,*
  291 F.3d 594 (9th Cir. 2002) .............................................................................. 14

*Kapoor v. DeMarco,*
  2025 WL 908234 (2d Cir. Mar. 26, 2025) ............................................................. 15

*Kiobel v. Royal Dutch Petroleum Co.,*
  569 U.S. 108 (2013) ......................................................................................... 27

*Kiyemba v. Obama,*
  561 F.3d 509 (D.C. Cir. 2009) ............................................................................ 25

*Kuwait Pearls Catering Co., WLL v. Kellog Brown & Root Servs., Inc.,*
  853 F.3d 173 (5th Cir. 2017) .............................................................................. 12

*Landon v. Plasencia,*
  459 U.S. 21 (1982) ........................................................................................... 22

*Liu v. INS,*
  293 F.3d 36 (2d Cir. 2002) ................................................................................. 14

*Ludecke v. Watkins,*
  335 U.S. 160 (1948) .................................................................................... 11, 21

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ................................................................................... 8, 9, 10

*Make the Rd. N.Y. v. Wolf,*
  962 F.3d 612 (D.C. Cir. 2020) ............................................................................ 20

*Maracich v. Spears,*
  570 U.S. 48 (2013) ........................................................................................... 18

*Marcus v. BMW of N. Am., LLC,*
  687 F.3d 583 (3d Cir. 2012) ............................................................................... 31

*Martin v. Mott*,
    25 U.S. 18 (1827) ................................................................................................ 13

*Mathews v. Diaz*,
    426 U.S. 67 (1976) .............................................................................................. 12

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) ............................................................................................ 30

*Mironescu v. Costner*,
    480 F.3d 664 (4th Cir. 2007) .............................................................................. 15

*Mississippi v. Johnson*,
    71 U.S. (4 Wall.) 475 (1867) .............................................................................. 10

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ............................................................................................ 24

*Morrissey v. Brewer*,
    408 U.S. 471 (1972) ...................................................................................... 19, 32

*Morton v. Mancari*,
    417 U.S. 535 (1974) ............................................................................................ 24

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) .............................................................................................. 6

*Munaf v. Geren*,
    553 U.S. 674 (2008) ...................................................................................... 25, 27

*Murthy v. Missouri*,
    603 U.S. 43 (2024) ................................................................................................ 8

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ......................................................................... 10

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................ 7, 26, 27, 28

*Omar v. McHugh*,
    646 F.3d 13 (D.C. Cir. 2011) ............................................................................. 15

*Plaquemines Parish v. Chevron USA, Inc.*,
    84 F.4th 362 (5th Cir. 2023) ................................................................................. 7

*Reid v. Donelan*,
    17 F.4th 1 (1st Cir. 2021) .................................................................................... 32

*Reno v. Am.-Arab Anti-Discrimination Comm.*,
    525 U.S. 471 (1999) ............................................................................................ 15

*Ruiz-Martinez v. Mukasey*,
    516 F.3d 102 (2d Cir. 2008) ............................................................................... 14

*Rumsfeld v. Padilla*,
    542 U.S. 426 (2004) ................................................................................... 5, 32, 33

*Sale v. Haitian Ctrs. Council, Inc.*,
    509 U.S. 155 (1993) ................................................................ 25, 26

*Sampson v. Murray*,
    415 U.S. 61 (1974) ....................................................................... 7

*Simon v. E. Ky. Welfare Rts. Org.*,
    426 U.S. 26 (1976) ..................................................................... 10

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..................................................................... 8

*Tercero v. Holder*,
    510 F. App'x 761 (10th Cir. 2013) .............................................. 14

*Trump v. J.G.G.*,
    2025 WL 1024097 (U.S. Apr. 7, 2025) ..................... 5, 6, 9, 21, 22, 26, 28

*Trump v. United States*,
    603 U.S. 593 (2024) ................................................................... 10

*Unger v. Amedisys Inc.*,
    401 F.3d 316 (5th Cir. 2005) ...................................................... 29

*United States ex rel. Knauff v. Shaughnessy*,
    338 U.S. 537 (1950) ................................................................... 21

*United States ex rel. Schlueter v. Watkins*,
    158 F.2d 853 (2d Cir. 1946) ................................................... 11, 21

*United States ex rel. Schlueter v. Watkins*,
    67 F. Supp. 556 (S.D.N.Y. 1946) ............................................... 11

*United States ex rel. Schwarzkopf v. Uhl*,
    137 F.2d 898 (2d Cir. 1943) ....................................................... 11

*United States ex rel. Von Kleczkowski v. Watkins*,
    71 F. Supp. 429 (S.D.N.Y. 1947) ............................................... 23

*United States v. Abbott*,
    1110 F.4th 700 (5th Cir. 2024) ................................................... 11

*United States v. Cortez*,
    449 U.S. 411 (1981) ................................................................... 27

*United States v. Curtiss-Wright Exp. Corp.*,
    299 U.S. 304 (1936) ................................................................... 19

*United States v. Texas*,
    719 F. Supp. 3d 640 (W.D. Tex. 2024) ...................................... 16

*United States v. Texas*,
    97 F.4th 268, 274 (5th Cir. 2024) ................................................. 7

*Vallario v. Vandehey*,
    554 F.3d 1259 (10th Cir. 2009) .................................................. 32

*Van Dinh v. Reno*,
   197 F.3d 427 (10th Cir. 1999) ................................................................ 14

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) .......................................................... 29, 30, 31

*White v. Carlucci*,
   862 F.3d 1209 (5th Cir. 1989) ................................................................ 7

*Winter v. Nat. Res. Def. Council*,
   555 U.S. 7 (2008) .......................................................................... 7, 8

*Zemel v. Rusk*,
   381 U.S. 1 (1965) ........................................................................... 19

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
   576 U.S. 1 (2015) ........................................................................... 12

## Constitutional Provisions

U.S. Const., art. IV, § 4 ................................................................... 11

## Statutes

50 U.S.C. § 21 ........................................................ 3, 4, 15, 18, 21, 22, 25
50 U.S.C. § 22 .................................................................. 3, 19, 23
8 U.S.C. § 1158 ..................................................................... 25
8 U.S.C. § 1182 ...................................................................... 4
8 U.S.C. § 1189 ...................................................................... 2
8 U.S.C. § 1225 ................................................................. 20, 21
8 U.S.C. § 1226 ..................................................................... 13
8 U.S.C. § 1227 ...................................................................... 4
8 U.S.C. § 1229a .................................................................. 9, 23
8 U.S.C. § 1231 ................................................. 9, 13, 14, 15, 25, 26
8 U.S.C. § 1252 ........................................................ 13, 14, 15, 21

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
   Pub. L. No. 104-208, 110 Stat. 3009-546 ........................................... 20

## Court Rules

Fed. R. Civ. P. 23 .......................................................... 29, 30, 31, 32
Fed. R. Civ. P. 65 ................................................................... 33
Fed. R. Evid. 201 .................................................................... 5

**Regulations**

8 C.F.R. § 1208.16 ...................................................................................... 25

8 C.F.R. § 1208.18 ...................................................................................... 25

**Executive Actions**

90 Fed. Reg. 10,030 (Feb. 20, 2025) ............................................................ 2

Exec. Order No. 14,157, 90 Fed. Reg. 8439, 8439 (Jan. 29, 2025) ............... 2

Proclamation No. 10,903, 90 Fed. Reg. 13,033 (Mar. 20, 2025) ...................... 3, 4, 16, 17, 18, 23

**Other Authorities**

1 John Ash, *The New and Complete Dictionary of the English Language* (1775) ...................... 16

7A Wright & Miller, *Federal Practice and Procedure* (3d ed. 2018) ......................................... 31

Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047 (2005) ........................................................... 18

*J.G.G. v. Trump*, No. 25-cv-00766 (D.D.C.), ECF No. 1 ..................................................................................... 5, 8

*J.G.G. v. Trump*, No. 25-cv-00766 (D.D.C.), ECF No. 3-2 ..................................................................................... 5

Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025) 2

Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ................... 18, 19

Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789) .................... 16

*Webster's Dictionary* (1828) .................................................................................. 17

**Introduction**

Petitioners' motion for a preliminary injunction should be denied. First, Petitioners have not shown that they will succeed on the merits. They have not established standing for injunctive relief. Nor does this Court have jurisdiction to review whether the preconditions to the AEA are satisfied or the President's findings that Tren de Aragua ("TdA") members are involved in, threatening, or attempting an "invasion" or "predatory incursion," that TdA has "infiltrated," and "acts at the direction" of the Venezuelan government based on TdA's hostile activities and intertwinement with the Maduro regime, as well as the significant territory controlled by TdA in which it acts as a government unto itself. And in any case, the President's findings satisfy the statutory preconditions. Moreover, the Immigration and Nationality Act ("INA") strips this Court of jurisdiction to enjoin transfers of aliens detained under Title 8 out of this district.

Second, Petitioners fail to show their remaining claims will succeed on the merits. They are receiving all process to which they are due. Further, the INA has not implicitly repealed the AEA and Petitioners are not entitled to seek asylum, statutory withholding of removal, or voluntary departure, and this Court cannot review a determination that removal will not violate the Convention Against Torture ("CAT").

Finally, Petitioners fail to satisfy the remaining requirements for preliminary injunctive relief. They cannot show irreparable harm because burdens attendant to removal are insufficient standing alone. Further, Petitioners have not shown that the balance of the equities and public interest lie with them. Individuals identified as members of a Foreign Terrorist Organization cannot credibly claim injury from the President's decision to expel them from the United States. Meanwhile, the President—and public—have an overwhelming interest in the security of the United States and in ensuring that the Executive's significant outlay of diplomatic capital for this mission is not wasted.

**Background**

I.    **Tren de Aragua's designation as a foreign terrorist organization and under the Alien Enemies Act**

Tren de Aragua is a transnational criminal organization that originated in Venezuela and has "conducted kidnappings, extorted businesses, bribed public officials, and authorized its members to attack and kill U.S. law enforcement." Office of the Spokesperson, Dep't of State, Designation of International Cartels (Feb. 20, 2025); *see also* Smith Decl., Ex. A, ¶¶ 6–7; Charles Decl., Ex. B. The President has found that TdA operates "both within and outside the United States" and that its "extraordinarily violent" campaign of terror presents "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States." Exec. Order No. 14,157, 90 Fed. Reg. 8439, 8439 (Jan. 29, 2025). On the first day of his term, the President declared a national emergency to respond to that threat. *Id*.

The threat is so severe that, on February 20, 2025, the Secretary of State designated TdA a Foreign Terrorist Organization. 90 Fed. Reg. 10,030 (Feb. 20, 2025). The immigration laws authorize such a designation when a foreign organization engages in "terrorist activity" or "retains the capability and intent" to do so, thereby threatening "the national security of the United States." 8 U.S.C. § 1189(a)(1), (d)(4); *see Holder v. Humanitarian Law Project*, 561 U.S. 1, 9 (2010). Because TdA poses a significant threat to national security, government officials have expended significant efforts engaging in delicate negotiations with foreign governments. As the Senior Bureau Official within the State Department's Bureau of Western Hemisphere Affairs has explained, high-level government officials have spent weeks negotiating at the highest levels with the Government of El Salvador and the Maduro regime to secure consent to the removal of Venezuelan nationals who are members of TdA. Kozak Decl., Ex. C, ¶ 2. Following those

"intensive and delicate negotiations," the United States reached arrangements "with these foreign interlocutors" to accept the removal of some number of TdA members. *Id*.

On March 14, 2025, the President signed a proclamation, invoking his authority under the Alien Enemies Act, 50 U.S.C. §§ 21–24, against TdA members. See Proclamation No. 10,903, 90 Fed. Reg. 13,033, 13,034 (Mar. 20, 2025) (the "Proclamation"). Originally enacted in 1798, the AEA grants the Executive broad power to remove enemy aliens. *See* 50 U.S.C. § 21. The AEA's remaining provisions outline procedures for implementing that broad authority. An "alien who becomes liable as an enemy" but who "is not chargeable with actual hostility, or other crime against the public safety," may be afforded time to settle affairs before departing. *Id*. § 22.

Here, the Proclamation outlines the President's findings that TdA members meet the statutory criteria for removal under the AEA. The President found that TdA, which "commits brutal crimes" including murder and kidnapping, is "conducting irregular warfare and undertaking hostile actions against the United States." *See* 90 Fed. Reg. at 13,033. The President further found that TdA has "engaged in and continues to engage in mass illegal migration" to further TdA's objectives: "harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." *Id*. And the President found that TdA works with the Maduro-sponsored Cártel de los Soles to use "illegal narcotics as a weapon to 'flood' the United States." *Id*.

The President additionally found that TdA has taken control over Venezuelan territory. *Id*. Moreover, TdA is "closely aligned with" Maduro's regime in Venezuela, and indeed has "infiltrated" the regime's "military and law enforcement apparatus." *Id*. The resulting "hybrid criminal state," "is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States," posing "a substantial danger." *Id*. at 13,033–34.

Based on those findings, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies" under 50 U.S.C. § 21. *Id*. at 13,034. Further, the President found "all such members of TdA . . . chargeable with actual hostility against the United States" and "a danger to the public peace or safety of the United States." *Id*.

The Proclamation adds that all such TdA members "are subject to immediate apprehension, detention, and removal." *Id*. To that end, the President directed the Attorney General and the Secretary of Homeland Security to, "*consistent with applicable law*, apprehend, restrain, secure, and remove every Alien Enemy described" above. *Id*. (emphasis added). Any such TdA member found within the United States is "subject to summary apprehension" under the Proclamation. *Id*. at 13,035. Alien enemies so apprehended may be detained until their removal to "any such location as may be directed" by the enforcing officers. *Id*.

TdA members remain deportable under other authorities, including Title 8, as members of a foreign terrorist organization or otherwise. *See id.* at 13,034 (permitting Secretary of Homeland Security "discretion to apprehend and remove any Alien Enemy under any separate authority"); *see also* 8 U.S.C. §§ 1182(b)(3)(B), 1227(a)(4)(B). But the Proclamation permits a particularly expeditious, statutorily authorized removal method for individuals found to present serious national-security threats under specified circumstances.

## II.    The *J.G.G.* case

On March 15, 2025, five aliens, nationals of Venezuela asserting fear of removal under the Proclamation (including the two named Petitioners here), filed a putative class-action complaint along with a motion for a temporary restraining order ("TRO"). *J.G.G. v. Trump*, No. 25-cv-00766 (D.D.C.). The aliens also sought to certify a class of all noncitizens who were, are, or will be

subject to the Alien Enemies Act Proclamation or its implementation. *J.G.G.*, Compl., ECF No. 1, ¶¶ 56–63.[1] The aliens sought relief in habeas and under the Administrative Procedure Act ("APA"), asking for an injunction barring enforcement of the Proclamation as contrary to the AEA, the INA, and other authorities. *Id.* ¶¶ 70–106. Finally, they asked for a TRO "barring their summary removal under the AEA." *J.G.G.*, ECF No. 3-2, at 2. Hours later, the district court granted a TRO as to the five aliens, *J.G.G.*, 2025 WL 825115 (D.D.C. Mar. 15, 2025), which the government immediately appealed.

At a hearing later that day, the aliens dismissed their habeas claims at the district court's suggestion. The district court then provisionally certified a class of "[a]ll noncitizens in U.S. custody who are subject to the March 15, 2025, Presidential Proclamation . . . and its implementation," and temporarily enjoined the government from removing class members not subject to removal under other authority. *J.G.G.*, 2025 WL 825116 (D.D.C. Mar. 15, 2025). The government immediately appealed that order.

After the D.C. Circuit denied the government's stay motions, the government applied to the Supreme Court to vacate the district court's TROs. The Court granted that application, holding that, because the aliens' claims "fall within the 'core' of the writ of habeas corpus and thus must be brought in habeas," "jurisdiction lies in only one district: the district of confinement." *Trump v. J.G.G.*, 604 U.S. ——, No. 29A931, 2025 WL 1024097, at *1 (Apr. 7, 2025) (per curiam) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)). The Court further held that the aliens are "entitled to notice and opportunity to be heard 'appropriate to the nature of the case,'" including notice "that they are subject to removal under" the AEA, "within a reasonable time and in such a manner as

---

[1] Respondents request this Court take judicial notice of the contents of this document for background purposes only. *See* Fed. R. Evid. 201(b)(2), (c)(2).

will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.*

at \*2 (quoting *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950)).

## III.    This suit

On April 9, Petitioners filed in this Court a petition for a writ of habeas corpus under

28 U.S.C. § 2241, ECF No. 1, an emergency TRO motion, ECF No. 3, and a class-certification

motion, ECF No. 4. That day, this Court issued a TRO enjoining Respondents from "transferring,

relocating, or removing" named Petitioners "or any other person that Respondents claim are

subject to removal under the Proclamation, from the El Valle Detention Center" and from

"transporting such persons outside of Willacy County or Cameron County, Texas" without an

order of this Court. ECF No. 12 at 3. After a hearing on April 11, this Court broadened the scope

of the TRO to include "any person that Respondents have previously claimed is subject to removal

under the Proclamation and who is detained within the Southern District of Texas." ECF No. 34,

at 3. This Court then ordered briefing on a motion for a preliminary injunction, *id.* at 4. Petitioners

have filed their motion and brief, which also addressed class certification. PI Mot., ECF No. 42.

## IV.    DHS's notice procedure

In accordance with the Supreme Court's decision in *J.G.G.*, the government has developed

procedures for aliens newly subject to the Proclamation. *See generally* Cisneros Notice Decl.,

Ex. D (filed under seal).

### Legal Standard

Emergency injunctive relief is "an extraordinary remedy that may only be awarded upon a

clear showing that the [petitioner] is entitled to such relief." *Winter v. Nat. Res. Def. Council*,

555 U.S. 7, 22 (2008). The danger of a mistaken ruling on an incomplete record is heightened

when, as here, the "requested immediate injunctive relief deeply intrudes into the core concerns of

the executive branch." *Adams v. Vance*, 570 F.2d 950, 954 (D.C. Cir. 1978); *Sampson v. Murray*,

415 U.S. 61, 83–84 (1974) (A court is "quite wrong in routinely applying . . . the traditional standards governing more orthodox 'stays'" in an area to which "the Government has traditionally been granted the widest latitude."); *see also White v. Carlucci*, 862 F.3d 1209, 1211–13 (5th Cir. 1989) (applying *Sampson* and its progeny).

Petitioners must establish that (1) they are "likely to succeed on the merits," (2) they are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter*, 555 U.S. at 20. The latter two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). This Court must ensure that each factor is satisfied before an injunction may issue. *United States v. Texas*, 97 F.4th 268, 274, 295–96 (5th Cir. 2024); *Plaquemines Parish v. Chevron USA, Inc.*, 84 F.4th 362, 373–78 (5th Cir. 2023) (emphasizing that the movant must establish that the balance of equities "weighs heavily" or in their favor).

### Argument

**I.     This Court lacks jurisdiction over all of Petitioners' claims except the limited habeas review of whether Petitioners are alien enemies.**

**A.     Petitioners have not demonstrated the imminent threat of injury necessary for standing for preliminary injunctive relief.**

Petitioners have not "b[orne] the burden of establishing standing" necessary for injunctive relief. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). Because they "must support each element of standing 'with the manner and degree of evidence required at the successive stages of the litigation,'" *id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)), "[a]t the preliminary injunction stage, then, [Petitioners] must make a 'clear showing' that [they are] 'likely' to establish each element of standing." *Id.* (quoting *Winter*, 555 U.S. at 22); *see also Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) ("[P]laintiffs must make a 'clear showing' that they have standing to maintain the preliminary injunction.").

But Petitioners have not shown that they are under an "actual and imminent" threat of suffering a "concrete and particularized" injury-in-fact. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). Indeed, it is not clear what injury Petitioners claim is actual and imminent. If it is a claim that they will not receive notice and a reasonable opportunity to respond to their designations as alien enemies under the Proclamation, then they have not shown that injury at all—this very proceeding refutes that claim. The three named Petitioners have been on notice of their designation as alien enemies for over a month. *See generally J.G.G.*, Compl., ECF No. 1. They have had ample time to prepare and file individual habeas petitions challenging their designations as alien enemies within the scope of the Proclamation. As such, they have *no* credible claim that they have been denied due process here. Similarly, in light of the multiple TROs in this case and throughout the country, any putative class member currently detained has had ample notice and opportunity to file their own individual habeas petition.

And if Petitioners' claim is that the removal itself is the claimed injury-in-fact, they have two potential problems. First, as to any putative class member who has a Title 8 removal order, there is no traceability of any removal to the putative class member's designation under the AEA. *California v. Texas*, 593 U.S. 659, 692–93 (2021) ("[T]raceability requires 'a casual connection between the injury and *the conduct complained of*'" such that the injury is "'fairly . . . traceable to *the challenged action of the defendant*'" (quoting *Lujan*, 504 U.S. at 560)). That is because the removal order itself is an independent authority under which the Executive may remove that putative class member. *Compare J.G.G.*, 2025 WL 1024097, at *1–2 (recognizing that aliens may be "subject to detention and removal under [the AEA]"); *with* 8 U.S.C. §§ 1229a (removal proceedings under the INA), *and* 1231(a) (requiring removal of aliens ordered removed under the INA). Since any removal would be authorized regardless of the validity of the AEA designation

8

with respect to that alien, there would be no standing for injunctive relief because of a lack of traceability.

And even as to named Petitioners and putative class members without Title 8 removal orders, there is still no showing of a clear likelihood that the Executive will remove those aliens without the due process that the government has already said those aliens will receive. *See J.G.G.*, 2025 WL 1024097, at *2 ("The Government expressly agrees that 'TdA members subject to removal under the Alien Enemies Act get judicial review" and, "in this context, AEA detainees must receive notice after the date of this order that they are subject to removal under the Act" that is" afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs"). Petitioners make conclusory assertions that they "can be summarily removed," with no citation or support from the record. PI Mot. 24. They further assert without support that seeking to remove an alien within 24 hours of providing notice to that alien "would violate the Supreme Court's due process ruling." *Id.* at 7; *but see infra* sections II.B–C. Conclusory assertions with no support cannot carry the day.

And if the harm they claim is alleged harm while in El Salvador or another country to which they may be removed, *see* PI Mot. 24–26, those allegations cannot suffice for purposes of standing in this proceeding. That is because "the injury has to be 'fairly . . . trace[able] to the challenged action of the *defendant*, and not . . . th[e] result [of] the independent action of some third party not before the court.'" *Lujan*, 504 U.S. at 560–61 (emphasis added) (alterations in original) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976)). Any harms that might befall Petitioners in a foreign country are alleged to be the result of independent actions of third parties not before this Court, *see generally* Bishop Decl., ECF No. 42-4; Goebertus Decl., ECF No. 42-5, and therefore cannot suffice to support standing for an injunction.

**B.    There is no jurisdiction to review the President's Proclamation.**

This Court lacks jurisdiction to review the Proclamation or enjoin the President's exercise of authority under Article II and the AEA. The Supreme Court has long recognized that courts cannot issue an injunction purporting to supervise the President's performance of his duties. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1867) (courts have "no jurisdiction . . . to enjoin the President in the performance of his official duties"); *Trump v. United States*, 603 U.S. 593, 607 (2024) (recounting that the President "has important foreign relations responsibilities: [including] . . . recognizing foreign governments . . . overseeing international diplomacy and intelligence gathering, and managing matters related to terrorism . . . and immigration"); *see also Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him.").

Consistent with that general rule, courts have held for over a century that the President's authority and discretion under the AEA is not a proper subject for judicial scrutiny: "The authority of the President to promulgate by proclamation or public act 'the manner and degree of the restraint to which they (alien enemies) shall be subject, and in what cases,' is, of course, *plenary and not reviewable*." *Ex parte Gilroy*, 257 F. 110, 112 (S.D.N.Y. 1919) (emphasis added); *see also id.* ("Once the person is an alien enemy, obviously the course to be pursued is essentially an executive function, to be exercised in the discretion of the President."); *see also, e.g., Ludecke v. Watkins*, 335 U.S. 160, 163–64 (1948) (reasoning, on appeal from "[d]enial of a writ of habeas corpus," that "some statutes 'preclude judicial review'" and "the Alien Enemy Act of 1798 is such a statute," as demonstrated by the clear text and "controlling contemporary construction"); *id.* at 164–65 (noting that "every judge before whom the question has since come has held that the statute barred judicial review"); *United States ex rel. Schlueter v. Watkins*, 67 F. Supp. 556, 565 (S.D.N.Y. 1946) (reviewing habeas petition challenging detention as an alien enemy and explaining "courts are

without power to review the action of the executive in ordering removal of an alien enemy . . .
except with respect to . . . whether the relator is an enemy alien"), *aff'd*, 158 F.2d 853 (2d Cir.
1946); *United States ex rel. Schwarzkopf v. Uhl*, 137 F.2d 898, 900 (2d Cir. 1943) (similar).

Ultimately, "[t]he very nature of the President's power to order the removal of all enemy
aliens rejects the notion that courts may pass judgment upon the exercise of his discretion."
*Ludecke*, 335 U.S. at 164. For that reason, it has long been established that "[u]nreviewable power
in the President . . . is the essence of the" AEA. *Citizens Protective League v. Clark*, 155 F.2d 290,
296 (D.C. Cir. 1946).

This Court lacks power to review the President's Proclamation for another reason as well:
Whether the AEA's preconditions are satisfied is a political question committed to the President's
discretion, no different from the President's determination to trigger the Constitution's Invasion
Clause (Article IV, section 4). *See United States v. Abbott*, 1110 F.4th 700, 728 (5th Cir. 2024)
(Ho, J., concurring) (observing that "[c]ourts across the country have held that determining
whether an invasion has occurred for purposes of Article IV, section 4 is a nonjusticiable political
question," and collecting cases); *see also California v. United States*, 104 F.3d 1086, 1091 (9th
Cir. 1997) (collecting cases). Any challenge to that determination is therefore foreclosed.

The Supreme Court has held that the political-question doctrine is "essentially a function
of the separation of powers." *Baker v. Carr*, 369 U.S. 186, 217 (1962). To guide courts, the
Supreme Court identified six factors that indicate a question has been committed to the political
branches. *See, e.g.*, *id.* at 217; *Kuwait Pearls Catering Co., WLL v. Kellog Brown & Root Servs.,
Inc.*, 853 F.3d 173, 178–79 (5th Cir. 2017). The President's determination under the AEA
implicates at least two independently sufficient factors.

*First*, the determination that an "invasion" or "predatory incursion" is being perpetrated sits at the intersection of two areas the Constitution commits to the political branches: (1) foreign affairs, *see Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 327–28 (1994); and (2) immigration policy, *see Mathews v. Diaz*, 426 U.S. 67, 81 (1976). Indeed, "any policy towards aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). Similarly, the power to recognize foreign states and governments "resides in the President alone." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015).

*Second*, even without the clear textual commitment to the Executive of the constitutional responsibilities undergirding issuance of the Proclamation, there are no manageable standards permitting courts to assess exactly when hostile entry and criminal and violent acts constitute an "invasion" or "predatory incursion" for AEA purposes. *See Martin v. Mott*, 25 U.S. 18, 31–32 (1827) (Story, J.). Thus there is no basis for second-guessing the Executive's policy judgment that such an "invasion" or "predatory incursion" is occurring. *See Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ for foreign affairs, has available intelligence services whose reports neither are nor ought to be published to the world. It would be intolerable that courts . . . should review and perhaps nullify actions of the Executive taken on information properly held secret.").

AEA proclamations are thus conclusive and preclusive. As for whether the Act's preconditions are satisfied, that is the President's call alone; the federal courts have no role to play.

**C.     This Court lacks jurisdiction to enjoin the transfer of Petitioners or putative class members outside this district.**

The government may detain aliens pending removal proceedings under 8 U.S.C. § 1226(a) and removable aliens under § 1231(a). And the government *must* detain aliens who are inadmissible or removable under certain provisions. *See id.* §§ 1226(c)(1), 1231(a)(2)(A). This Court's temporary restraining order is therefore overbroad insofar as it restrains the government from acting according to those authorities for aliens detained under Title 8, which provides separate sources of authority from the AEA for detention and removal. *See J.G.G.*, 2025 WL 825116.

Indeed, the INA bars this Court from entering injunctive relief with respect to transfers in three different ways. *First*, under 8 U.S.C. § 1231(g)(1), the Executive has great discretion in deciding where to detain Petitioners. The INA precludes review of "any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter to be in the discretion of the Attorney General . . . ." 8 U.S.C. § 1252(a)(2)(B)(ii). Therefore, § 1252(a)(2)(B)(ii) bars relief that would impact where and when to detain Petitioners. *Dominguez-Estrella v. INS*, 71 F. Supp. 2d 578, 582 (W.D. La.) ("Under the current immigration law, this court is specifically divested of jurisdiction to review discretionary decisions of the Attorney General."); *see also Van Dinh v. Reno*, 197 F.3d 427, 433–34 (10th Cir. 1999) (finding that judicial review of decision to transfer a detainee is inappropriate due to lack of jurisdiction). This Court's TRO thus improperly second-guessed the government's decision where to detain Petitioners—Congress has specifically barred such judicial intervention.

*Second*, § 1252(g) also bars enjoining transfers under Title 8. It prohibits district courts from hearing challenges to decisions and actions about whether, when, and where to commence removal proceedings. Reading the discretionary language in §§ 1231(g)(1) and 1252(g) together

confirms that Congress foreclosed piecemeal litigation over *where* a detainee may be placed into removal proceedings. *See Glushchenko v. DHS*, 566 F. Supp. 3d 693, 701–04 (W.D. Tex. 2021) (distinguishing between unreviewable discretionary detention determinations and statutory and constitutional challenges to immigration detention); *see also Liu v. INS*, 293 F.3d 36, 41 (2d Cir. 2002) (habeas petition "must not be construed to be 'seeking review of any discretionary decision'" (quoting *Chmakov v. Blackman*, 266 F.3d 210, 215 (3d Cir. 2001))), *superseded by statute on other grounds as recognized by Ruiz-Martinez v. Mukasey*, 516 F.3d 102, 113 (2d Cir. 2008); *Jimenez-Angeles v. Ashcroft*, 291 F.3d 594, 599 (9th Cir. 2002); *Tercero v. Holder*, 510 F. App'x 761, 766 (10th Cir. 2013) (Attorney General's discretionary decision to detain aliens is not reviewable by way of habeas.).

*And finally*, this Court lacks jurisdiction "to enjoin or restrain the operation of" 8 U.S.C. §§ 1221–32 "other than with respect to the application of such provisions to *an individual alien* against whom proceedings under such [provisions] have been initiated." 8 U.S.C. § 1252(f)(1) (emphasis added). Thus, this Court has no authority to prevent the transfer of any putative class member, not named in this action on an individual basis, to a place of its discretion under 8 U.S.C. § 1231(g). *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022) ("§ 1252(f)(1) 'prohibits federal courts from granting classwide injunctive relief' but 'does not extend to individual cases.'" (quoting *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481–82 (1999))).

**D.     This Court lacks jurisdiction to consider CAT claims in habeas.**

Petitioners' claims under the Convention Against Torture ("CAT"), as codified by the Foreign Affairs Reform and Restructuring Act ("FARRA"), *see* ECF No. 1, ¶¶ 86–88, are also barred. As several circuits have already held, under 8 U.S.C. § 1252(a)(4), federal courts lack jurisdiction in habeas to consider CAT claims. *See Kapoor v. DeMarco*, — F.4th ——, No. 22-2806, 2025 WL 908234, at *11 (2d Cir. Mar. 26, 2025); *Omar v. McHugh*, 646 F.3d 13, 18

(D.C. Cir. 2011); *Mironescu v. Costner*, 480 F.3d 664, 676–77 (4th Cir. 2007); *see also Benitez-Garay v. DHS*, No. SA-18-CA-422-XR, 2019 WL 542035, at *7 (W.D. Tex. 2019) ("[T]o the extent Petitioner contends that his removal would violate the CAT, section 1252(a)(4) expressly divests this Court of jurisdiction to review any cause or claim under the CAT.").

## II.    Petitioners cannot succeed on the merits of their claims.

### A.    The Proclamation comports with the requirements of the statute.

In all events, the Proclamation and its implementation are perfectly lawful. The AEA grants the President discretion to issue a proclamation directing the apprehension, restraint, and removal of alien enemies when two conditions are met. First, there either must be "a declared war," "invasion," or a "predatory incursion" that is "perpetrated," "attempted," or "threatened against the territory of the United States." 50 U.S.C. § 21. Second, that hostile action must be by a "foreign nation" or "government." *Id.* The Proclamation satisfies both conditions.

#### 1.    TdA's actions constitute an invasion or predatory incursion.

As to the first prerequisite, the President determined that TdA is perpetrating an invasion *or* a predatory incursion into the United States. Although the word "invasion" includes a military entry and occupation of a country, the accepted definition of that term is far broader, as definitions contemporaneous with the passage of the AEA make clear. "Invasion" was defined to include a "hostile entrance," *see, e.g.*, 1 John Ash, *The New and Complete Dictionary of the English Language* (1775), or a "hostile encroachment" on another's territory, *see* Thomas Sheridan, *A Complete Dictionary of the English Language* (2d ed. 1789). Nor is there any requirement that the purpose of the incursion be to possess or hold territory. *See, e.g.*, *United States v. Texas*, 719 F. Supp. 3d 640, 681 (W.D. Tex. 2024). Here, the actions of TdA fit accepted conceptions of an invasion. TdA's encroachment on U.S. territory is a hostile act contrary to the rights of citizens to be free from criminality and violence. *See* Smith Decl. ¶¶ 8–18.

15

At a minimum, the actions of TdA constitute a "predatory incursion" that justifies invocation of Section 21. The phrase "predatory incursion" encompasses (1) an entry into the United States (2) for purposes contrary to the interests of the United States. *See*, *e.g.*, *Amaya v. Stanolind Oil & Gas Co.*, 62 F. Supp. 181, 189–90 (S.D. Tex. 1945) (noting use of the phrase to describe raids during hostilities with Mexico falling well short of "invasion"); *see also Davrod Corp. v. Coates*, 971 F.2d 778, 785 (1st Cir. 1992) (using the phrase to refer to foreign fishing fleets unlawfully fishing in territorial waters); *Bas v. Tingy*, 4 U.S. (4 Dall.) 37 (1800) (broadly defining "enemy" and "war"). Here, there is no question that TdA members have effected entries into the United States and that those entries are contrary to both the interests and laws of this country: trafficking in substances and people, committing violent crimes, and conducting business with interests antithetical to those of the United States. *See* 90 Fed. Reg. at 13,034.

Petitioners' main contention is that "invasion" and "predatory incursion" both *necessarily* entail military actions by foreign governments or the opening salvo of war meant to displace a government or conquer territory. *See* PI Mot. 13–17. There is no question that both terms include military actions, but both unquestionably have broader meanings not foreclosed by any source Petitioners cite. In fact, many of the sources relied on by Petitioners contain definitions supporting the government's argument. *See Webster's Dictionary*, "Invasion" (1828) ("[a] hostile entrance into the possessions of another); *id.*, "Incursion" ("entering into a territory with hostile intention"). In short, both definitions *include* military action, but neither is *limited to* such action.

### 2.    Given its intimate connection to Venezuela, TdA is a foreign nation or government for purposes of 50 U.S.C. § 21.

The Proclamation makes clear that TdA qualifies as a "foreign nation or government" for at least two independent reasons. First, TdA's infiltration of key elements of the Venezuelan state, make it indistinguishable from Venezuela. *See* Proclamation. TdA's growth itself can be attributed

to promotion via the actions of former Governor of Aragua Tareck El Aissami, who was later appointed Vice President in the Maduro regime. 90 Fed. Reg. at 13,033. And Maduro's connections to the group, via the regime-sponsored narco-terrorism enterprise Cártel de los Soles, are also clear. *Id.* The Cártel de los Soles "coordinates with and relies on TdA . . . to carry out its objective of using illegal narcotics as a weapon to 'flood' the United States." *Id.* Given how significantly TdA is intertwined in the fabric of Venezuela's structures, it functions as a governing entity. And through those ties, TdA has become indistinguishable from the Venezuelan state.

Although Petitioners try to depict this invocation of the AEA as novel, the United States has a long history of using war powers against formally nonstate actors. Historically, the United States authorized the use of force against "slave traders, pirates, and Indian tribes." Curtis A. Bradley & Jack L. Goldsmith, *Congressional Authorization and the War on Terrorism*, 118 Harv. L. Rev. 2047, 2066 (2005). It has engaged militarily, during broader armed conflicts, with "opponents who had no formal connection to the state enemy," including during the Mexican–American and Spanish–American Wars. *Id.* at 2066–67. President Wilson famously sent U.S. troops into Mexico to pursue Pancho Villa, the leader of rebels opposed to the Mexican government. *Id.* at 2067. And more recently, President Clinton authorized missile strikes on al Qaeda targets in Africa and elsewhere. *See generally El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010).

This history is important because statutes must be read "but with reference to the statutory context, 'structure, history, and purpose.'" *Abramski v. United States*, 573 U.S. 169, 179 (2014) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). The AEA is a war powers statute and thus must be read in light of a robust history of employing war powers against nonstate actors.

In all events, TdA also acts as a governing authority in the areas where it operates. As the Proclamation recognizes, "Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA." 90 Fed. Reg. at 13,033. In those areas where it operates, TdA acts as a criminal governing entity, independent or in place of the normal civil society and government. *See id.* Given TdA's governance and organizational structure, as well as its *de facto* control over parts of Venezuela where it operates with impunity, it is well within the President's discretion to determine it constitutes a foreign "government" for purposes of invoking § 21.

Petitioners' contrary arguments lack merit. The government is not arguing that TdA is itself a "nation." But the control and authority TdA exercises in Venezuela is consistent with founding-era definitions of "government." *See* Thomas Dyche & William Pardon, *A New General English Dictionary* (1754) ("the power or authority that one person exercises over another"). Additionally, although the AEA references the possibility that a covered entity *may* be able to enter a treaty with the United States, the statute does not in any way establish treaty-making authority as a prerequisite to inclusion. *See* 50 U.S.C. § 22 (contemplating circumstances "where no such treaty exists"). Nor is there any reason that specific terminology used in the Proclamation should weigh against the President's determination, PI Mot. 18–19; members of TdA are clearly "subject" to the authority of that criminal organization and the governance it wields. *See* Dyche & Pardon, *supra*.

Fundamentally, Petitioners argue that other individuals do not agree with the President's determination that TdA and the state of Venezuela are sufficiently intertwined to justify invocation of the AEA. *See* PI Mot. 19–20. Yet the President is entitled to examine the available evidence, including intelligence not available to others, and make a final determination based on his *own* assessment. *See Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting "the changeable and explosive nature

of contemporary international relations, and the fact that the Executive is immediately privy to information" unavailable to others); *cf. United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319 (1936) ("[T]he President alone has the power to speak or listen as a representative of the nation."). It is not the role of this Court to second-guess those determinations based on a handful of declarations by individuals not involved with the assessment of evidence or decisionmaking culminating in the Proclamation. *See Chi. & S. Air Lines*, 333 U.S. at 111.

### B.    The AEA notice procedures comport with due process.

Even if Plaintiffs are entitled to some due process, what is owed is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). The government believes that, in most removals pursuant to the Alien Enemies Act, 24 hours will suffice to provide notice prior to removal. This amount of notice has been deemed sufficient in an analogous context.

Take expedited removal under the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, div. C, § 305(a)(3), 110 Stat. 3009-546, 602. The entire purpose of the Act was to "substantially shorten and speed up the removal process" for those "who [are] arriving in the United States[,]" or have not shown that they were "physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility." *Make the Rd. N.Y. v. Wolf*, 962 F.3d 612, 618–19 (D.C. Cir. 2020) (quoting 8 U.S.C. § 1225(b)(1)(A)(i), (iii)). If an immigration officer determines that an alien is inadmissible because they do not have valid entry documents, the "officer shall order the alien removed . . . without further hearing or review unless the alien indicates either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(i). Even if the individual claims asylum or a fear of persecution, the "process is scarcely more involved" because the immigration officer can quickly deny the claim. *Make the Rd. N.Y.*, 962 F.3d at 618–19 (citing

19

8 U.S.C. § 1225(b)(1)(B)(iii)(III)). In fact, Congress was explicit on how fast this process was supposed to be: "Review shall be concluded as expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later than 7 days after the date of the determination under subclause (I)." 8 U.S.C. § 1225(b)(1)(B)(iii)(III).

The D.C. Circuit has held that this suffices for due process. *See Am. Immigr. Laws. Ass'n v. Reno*, 18 F. Supp. 2d 38, 58 (D.D.C. 1998), *aff'd*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) (affirming "the dismissal of these claims substantially for the reasons stated in the court's thorough opinion"). This was because the Supreme Court has been clear that "the power to expel or exclude aliens is a fundamental sovereign attribute exercised by the Government's political departments, largely immune from judicial control." *Id*. (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)). That logic applies equally here: "[w]hatever the procedure authorized by Congress is, it is due process." *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quoting *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)) (holding that expedited removal does not violate the Suspension Clause for similar reasons). Indeed, much like with the AEA, the Executive has wide "sole and unreviewable discretion" to determine who is subject to the two-year period for expedited removal. 8 U.S.C. § 1225(b)(1)(A)(iii)(I). And like in this case, "'[j]udicial review' of expedited removal orders is only 'available in habeas corpus proceedings.'" *I.M. v. CBP*, 67 F.4th 436, 437–38 (D.C. Cir. 2023) (quoting 8 U.S.C. § 1252(e)(2)). So if 24 hours suffices to satisfy due process for someone who may have resided in the United States for two years, then surely it is sufficient for those who have been designated enemies of the nation by the Commander in Chief. It would be perverse to hold otherwise. So, if the government provides 24 hours of notice, there is no due process issue.

**C.**      **Any claim of insufficient notice is speculative.**

Petitioners' assertion that the government's notice procedure is inadequate is speculative. As an initial matter, the AEA permits absolute discretion to establish the conditions and processes the Executive will use to implement a Presidential Proclamation. *See* 50 U.S.C. § 21; *Schlueter*, 158 F.2d at 853 (the AEA authorizes "the making of an order of removal of an alien enemy without a court order and without a hearing of any kind"); *see also Ludecke*, 335 U.S. at 162–63 (noting the entirely administrative process established for determining whether an individual was an alien enemy). The only process due those deemed to fall within the scope of the Proclamation is notice and an opportunity to challenge that designation through habeas relief, where any "questions of interpretation and constitutionality" of the AEA must also be raised. *J.G.G.*, 2025 WL 1024097, at *2.

In any case, Petitioners are receiving all the process they are due: "notice . . . that they are subject to removal under" the AEA, "afforded within a reasonable time and in such a manner as will allow them to actually seek habeas relief in the proper venue before such removal occurs." *Id.* at *2; *see generally* Cisneros Notice Decl. The procedures established provide the reasonable notice the Supreme Court contemplated. The government is not required to provide procedures that a reviewing court or Petitioners find "preferable"; instead, a court "must evaluate the particular circumstances and determine what procedures would satisfy the minimum requirements of due process." *Landon v. Plasencia*, 459 U.S. 21, 35 (1982).

The Supreme Court has already made clear that immediate removals prior to notice and the opportunity for judicial review are illegal. Petitioners have pointed to no instances of the government's attempting to remove individuals under the AEA without sufficient notice or process after the Supreme Court entered its order and opinion in *J.G.G.*, and neither have they pointed to affirmative representations by the government that it will do so in the immediate future. Petitioners

have identified no basis to believe that the government is going to defy the Supreme Court's clear directives in *J.G.G.* or the government's representations to the Supreme Court or this Court. Thus, in light of *J.G.G.*, Petitioners' conjecture is too speculative to support the extraordinary remedy of preliminary injunctive relief.

### D.    Petitioners are not entitled to a period of voluntary departure.

Petitioners' contention that a period of voluntary departure is *required* is not defensible. To be sure, the AEA permits the President to "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom." 50 U.S.C. § 21. But it also broadly provides that alien enemies within the purview of a Proclamation "*shall be* . . . removed as alien enemies.*" Id.* (emphasis added). In this context, where the alien enemies are members of the hostile force itself, the President cannot be required to provide any period of voluntary departure prior to effectuating removal. The AEA's entire purpose would be undercut if active participants in hostilities must be asked to depart on their own terms.

For that reason, the Proclamation explains that TdA engaged in "mass illegal migration" with the objective of "harming United States citizens," and that this activity undermines public safety, while also enhancing the "Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States." 90 Fed. Reg. at 13,033. That finding negates Petitioners' assertion that a period of voluntary departure is statutorily required—the AEA makes clear that voluntary departure is available only if an alien enemy is "not chargeable with actual hostility, or other crime against public safety." 50 U.S.C. § 22. Here, all members of TdA have been so charged under the Proclamation and through their designation as members of a Foreign Terrorist Organization. 90 Fed. Reg. at 13,034.

Finally, Petitioners have not challenged the merits of that finding in the Proclamation, nor do they cite any authority for their conclusory assertion that 50 U.S.C. § 22 "cannot be invoked

categorically." PI Mot. 12. Those challenges are therefore forfeited. *See, e.g.*, *Indigenous Peoples of Coastal Blend v. U.S. Army Corps of Eng'rs*, 2023 WL 6226387, at *20 (S.D. Tex. 2023).

      **E.**      **Title 8 is not the sole mechanism through which an alien may be removed.**

Nor are Petitioners correct that the INA is the sole mechanism for removing an alien. The AEA does not require an "admissibility" or "deportability" determination of any alien, so there is no reason to believe that Title 8 and its "sole and exclusive" means for addressing *those* questions is implicated in this case. *See* 8 U.S.C. § 1229a(a)(3) (removal proceedings are "exclusive" only to the extent the government is determining admissibility or removability, as those terms are defined under Title 8). Rather, the INA and AEA are distinct mechanisms for effectuating the removal of certain aliens, just as Title 42 and the INA constitute different bases for *excluding* aliens. *See generally Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022).

In fact, the immigration laws and AEA have been read harmoniously for over 75 years. *See United States ex rel. Von Kleczkowski v. Watkins*, 71 F. Supp. 429, 437 (S.D.N.Y. 1947). Not all alien enemies will be subject to removal under Title 8 because the authority under Title 50 extends to aliens regardless of lawful status. And for aliens subject to both Title 8 and Title 50, the Executive has discretion in deciding how and whether to proceed under either or both statutes. *See id.* (recognizing this discretion under pre-INA immigration law). Thus, the AEA and INA coexist with some overlap that gives the Executive discretion to determine how, whether, or when to apply them. *See, e.g.*, *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) ("When confronted with two Acts of Congress allegedly touching on the same topic, this Court . . . must . . . strive to give effect to both." (cleaned up)).

Even if there *were* a conflict between the AEA and the INA, the AEA would control here. "[I]t is a commonplace of statutory construction that the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). Here, the AEA provides specific rules for

removing a subset of aliens—those designated alien enemies—against the more general provisions relating to removability provided by the INA. Thus, to the extent there may be any conflict, the AEA provides an exception to the more general applicability of the INA's removal provisions, and this is true regardless of the later enactment of the INA. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment.").

### F.    Petitioners are not entitled to seek relief or protection from removal under Title 8.

The Proclamation does not impermissibly prohibit aliens from seeking relief and protection from removal under federal law. As a threshold matter, as mentioned above, there is no jurisdiction to consider CAT claims in habeas. Moreover, there is no direct conflict between the United States' obligations under the CAT as codified by the FARRA and removals under the AEA. The United States continues to abide by its policy not to remove aliens to countries in which they are likely to be tortured. *See Munaf v. Geren*, 553 U.S. 674, 702 (2008). And "[s]eparation of powers principles . . . preclude the courts from second-guessing the Executive's assessment of the likelihood a detainee will be tortured by a foreign sovereign." *Arar v. Ashcroft*, 585 F.3d 559, 578 (2d Cir. 2009) (en banc) (ellipsis in original) (quoting *Kiyemba v. Obama*, 561 F.3d 509, 515 (D.C. Cir. 2009)). "Under *Munaf* . . . the district court may not question the Government's determination that a potential recipient country is not likely to torture a detainee." *Kiyemba*, 561 F.3d at 514.

Nor is there a colorable argument that enemy aliens *must* be permitted to seek relief or protection prior to removal. Such relief is generally permitted only in the exercise of Executive discretion. *See Citizens Protective League*, 155 F.2d at 294 (noting common-law rule that "alien enemies have no rights, no privileges, unless by the king's special favor"). Petitioners' asserted conflict between the INA and the AEA is illusory. The INA provides a system for determining

removability and any relief or protection from removal for aliens under the authority of Title 8, whereas the AEA provides its own mechanisms to implement procedures and regulations governing removal and detention. *See* 50 U.S.C. § 21.

With respect to asylum and statutory withholding of removal related to persecution claims, none of the cited provisions constrain the *President's* actions under Title 50. *See* 8 U.S.C. § 1158(b)(1)(A) (Attorney General or Secretary of Homeland Security); 8 U.S.C. § 1231(b)(3) (Attorney General); 8 C.F.R. §§ 1208.16, 1208.18 (immigration judges, via delegation from the Attorney General); *see also Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 172–73 (1993) (recognizing distinct grants of authority under the INA to the President and Attorney General among others). Nor are such constraints implicated just because the President has delegated certain authorities, including implementation of the Proclamation, to the Attorney General. *See id.* at 172 n.28 (in implementing Proclamation, Attorney General is "carrying out an executive, rather than a legislative, command, and therefore would not necessarily [be] bound" by provisions of the INA).

In any event, individuals subject to removal under Title 50 are barred from asylum and withholding of removal. Asylum is a discretionary form of relief, and eligibility for such relief may be foreclosed on a categorical basis. *See Huisha-Huisha*, 27 F.4th at 730–31. Here, the AEA disallows relief for covered enemy aliens, representing the categorical conclusion that such aliens are not entitled to relief in the exercise of discretion. Likewise, aliens subject to removal under the AEA would not be eligible for statutory withholding of removal because the President's invocation of the AEA suggests that "there are reasonable grounds to believe that [such aliens are] a danger to the security of the United States." 8 U.S.C. § 1231(b)(3)(B)(iv).

### III.    The remaining equitable factors weigh strongly in the government's favor.

#### A.    Petitioners have not established irreparable harm.

First, Petitioners' allegations of irreparable harm through "summary removals" carry no weight. PI Mot. 24. As explained above, the process provided to Petitioners is adequate to provide them notice and opportunity to meaningfully challenge their designation as an alien enemy or raise any questions of interpretation or constitutionality, which is precisely the judicial review available to Petitioners under the AEA. *J.G.G.*, 2025 WL 1024097, at *2. The constitutional adequacy of Petitioners' process completely refutes any allegation that they are receiving no due process. So Petitioners have made no such showing of irreparable harm.

Nor have Petitioners made a showing of likely irreparable harm from "life-threatening conditions, persecution and torture" if removed to El Salvador. PI Mot. 25–26. Correctly conceding that "removal does not by itself ordinarily constitute irreparable harm," *id.* (citing *Nken*, 556 U.S. at 435), Petitioners nevertheless emphasize conditions they fear they may face if removed. But, as explained above, the United States continues to abide by its policy not to remove aliens to countries where they are likely to be tortured. *See Munaf*, 553 U.S. at 702; *Arar*, 585 F.3d at 578. Nor have Petitioners demonstrated a likelihood of persecution in another country—their only evidence to that effect lies in one named Petitioner's secondhand, conclusory assertion of fear, with no supporting evidence, and the generalized speculation that Petitioners "will face heightened scrutiny" in Venezuela and "possibly even violence from rivals of TdA." PI Mot. 26.

Failing to make those showings, Petitioners' chief complaint is of a general "burden of removal." *See Nken*, 556 U.S. at 435. As the Supreme Court held, "it is accordingly plain that" such a burden "cannot constitute the requisite irreparable injury." *Id.*

### B.    The balance of equities and public interest favor denial of preliminary injunctive relief.

The balance of harms and the equities strongly favor the government here as an injunction irreparably harms the conduct of foreign policy. An injunction effectively usurps the President's statutory and constitutional authority to address what he has identified as an invasion or predatory incursion by a group undertaking hostile actions and conducting irregular warfare. Such an injunction "deeply intrudes into the core concerns of the executive branch," *Adams*, 570 F.2d at 954, and frustrates the "public interest in effective measures to prevent the entry of illegal aliens," *United States v. Cortez*, 449 U.S. 411, 421 n.4 (1981). The Executive's protection of these interests, including "sensitive and weighty interests of national security and foreign affairs" inherent to combating terrorist groups, warrants the utmost deference. *Humanitarian Law Project*, 561 U.S. at 33–35; *see also Barr v. DOJ*, 819 F.2d 25, 26 (2d Cir. 1987).

Additionally, the Supreme Court has warned of "the danger of unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 116 (2013); *Biden v. Texas*, 597 U.S. 785, 816 (2022) (Kavanaugh, J., concurring) ("Nothing in the relevant immigration statutes . . . suggests that Congress wanted the Federal Judiciary to improperly second-guess the President's Article II judgment with respect to American foreign policy and foreign relations."). An injunction does just that, impeding the Executive's ability to swiftly remove alien enemies under the Proclamation. *See, e.g.*, *Nken*, 556 U.S. at 436 (noting there "is always a public interest in prompt execution of removal orders" even where an alien asserts a risk of harm, and the interest "may be heightened" if "the alien is particularly dangerous").

An injunction also risks compromising the ability of the United States to negotiate in the future on key foreign-affairs and national-security issues, as foreign actors may "change their

minds regarding their willingness to accept" alien enemies or might otherwise seek to "leverage [any delay] as an ongoing issue." Kozak Decl. ¶¶ 3, 4.

Petitioners largely reiterate the same meritless arguments on these factors, assuming incorrectly that the government is acting unlawfully. PI Mot. 26–27. Because they have not shown the balance of the equities and public interest lie in their favor, they have not made this essential showing for injunctive relief.

## IV.    Class certification is improper.

### A.    This Court lacks jurisdiction in habeas over the putative class claims.

As previously explained, this Court's jurisdiction is limited to individual habeas claims of limited scope: whether an alien has been properly included in the category of alien enemies— necessarily individual determinations. *See supra* Part I. Thus, there is no basis to certify a class to resolve those claims. *See Harris v. Med. Transp. Mgmt., Inc.*, 77 F.4th 746, 753 (D.C. Cir. 2023) (class certification not appropriate where "questions of law or fact . . . affecting only individual members" predominate); ECF No. 1, ¶¶ 11–13 (setting out separate factual circumstances of each Petitioner); *see also J.G.G.*, 2025 WL 1024097, at *8 (Sotomayor, J., dissenting) (noting that the issue before the Court was "'which procedural vehicle is best situated for the Plaintiffs' injunctive and declaratory claims': *individual* habeas petitions filed in district courts across the country or a class action filed in the District of Columbia" (emphasis added)).

### B.    The putative class does not meet the requirements of Fed. R. Civ. P. 23.

Even if a class action could be brought in habeas, the putative class does not satisfy each of Fed. R. Civ. P. 23(a)'s four requirements: (1) numerosity; (2) typicality; (3) commonality; and (4) adequacy. Nor does the putative class "satisfy at least one of the three requirements listed in Rule 23(b)." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). (Here, Petitioners rely on Rule 23(b)(2), *see* PI Mot. 27, which requires that they show that "the party opposing the class has

acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.") "The plain text of Rule 23 requires the court to "find," not merely assume, the facts favoring class certification." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005). "District courts are required to take a 'close look' at the parties' claims and evidence in making its Rule 23 decision." *Id.* "[G]oing beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.* (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir. 1996)).

### 1.    Petitioners do not show commonality.

The "commonality" requirement mandates that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). However, the proposed class's "claims must depend upon a common contention." *Wal-Mart*, 564 U.S. at 350. Moreover, "[t]hat common contention . . . must be of such a nature that it is capable of class-wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* Although for purposes of Rule 23(a)(2) even a single common question will do, "[w]hat matters to class certification . . . is not the raising of common questions—even in droves—but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the class are what have the potential to impede the generation of common answers." *Id*. (citation omitted).

Petitioners cannot satisfy the commonality requirement because there are clear dissimilarities between the class and its representatives. Because the named representatives have had notice of the government's intention to designate and remove under the AEA since the issuance of the Proclamation on March 14, 2025, they would be entitled to significantly less notice

going forward than the ordinary class member, who will receive notice prior to removal in accordance with the developing procedures.

To the extent the common allegation is that class members have all suffered a violation of the Due Process Clause, that is insufficient to satisfy commonality. *Wal-Mart*, 564 U.S. at 350. The allegation is particularly deficient because "due process is flexible and calls for such procedural protections as the particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 321 (1976); *Jennings v. Rodriguez*, 583 U.S. 281, 314 (2018) (a class action may not be the proper vehicle to resolve due process claims because of the flexibility inherent in a Due Process analysis). Because due process is a flexible concept, the dissimilarities inherent to each individual case would require a court to delve into the specific facts of each alien's case, thereby rendering it impossible to dispose of the class-wide claims in an efficient manner.

### 2.    Petitioners do not show typicality.

Petitioners also fail to satisfy the requirement that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality requirement "derives its independent legal significance from its ability to screen out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 598 (3d Cir. 2012) (quoting 7A Wright & Miller, *Federal Practice and Procedure* § 1764 (3d ed. 2018)); *AMP Automotive, LLC v. BFT, LP*, 2018 WL 4028459, at *3 (E.D. La. 2018) (same). Thus, "a class representative must be part of the class and possess the same interest and suffer the same injury as the class member." *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 156 (1982).

Here, as explained previously, the named Petitioners have had notice of the government's intention to designate under the AEA since the issuance of the Proclamation on March 14, 2025,

and would therefore be entitled to significantly less notice going forward than the ordinary class member. As a result, the class representatives do *not* possess the same interest or suffer the same injury as the class members.

### 3. The putative class does not satisfy Rule 23(b)(2).

Petitioners further do not satisfy Rule 23(b)(2) (class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole"). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Wal-Mart*, 564 U.S. at 360 (internal quotations and citation omitted). "It does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Id.*

Here, Rule 23(b)(2) does not authorize class certification because each individual putative class member would be entitled to a different injunction or declaratory judgment against Respondents. Whether an alien is a member of TdA, whether he has been given sufficient process, whether he is removable under a different provision of law, and other such questions necessarily are individualized determinations unsuitable for class treatment.

And to whatever extent Petitioners are entitled to additional process, that process would be different for each depending on the underlying facts. As the Supreme Court has "stressed repeatedly," "due process is flexible" and "calls for such procedural protections as the particular situation demands." *Jennings*, 583 U.S. at 314 (quoting *Morrissey*, 408 U.S. at 481); *see also Vallario v. Vandehey*, 554 F.3d 1259, 1268 (10th Cir. 2009) ("Under Rule 23(b)(2), the injuries sustained by the class must be sufficiently similar that they can be addressed in a single injunction

that need not differentiate between class members."); *Reid v. Donelan*, 17 F.4th 1, 11 (1st Cir. 2021) (holding that a class of aliens seeking relief from mandatory detention in § 1226(c) could not be sustained under Rule 23(b)(2) because they were not all entitled to the same procedures). A Rule 23(b)(2) class action seeking additional procedures under the Due Process Clause "does not provide a vehicle for preemptively announcing such rules." *Id.* at 12. Instead, standards should arise in the form of agency guidance or regulations or through "common law rules of precedential force, through case-by-case adjudication." *Id.* Under these circumstances, Petitioners cannot demonstrate that certification under Rule 23(b)(2) is proper.

### C.    If class certification were proper, membership would have to be restricted to those detained in El Valle Detention Facility.

Even if a class could be certified, the class could not extend beyond aliens in custody in the El Valle Detention Center. "Whenever a § 2241 habeas petitioner seeks to challenge his present physical custody, he should name his warden as respondent and file the petition in the district of confinement." *Padilla*, 542 U.S. at 447.

Here, Respondent Venegas, Facility Administrator of El Valle Detention Facility, is Petitioners' immediate custodian, not a local ICE Field Office Director who exercises only legal control. *See* ECF No. 1, ¶ 23; Cisneros Pet'r Decl., Ex. E, ¶¶ 7, 14, 22. Indeed, *Padilla* makes clear that the warden of the detention facility, who has physical control over the habeas petitioner, is in fact the official who can "produce" the petitioner "that he may be released" pursuant to a writ of habeas corpus. *Padilla*, 542 U.S. at 435; *see also, e.g.*, *da Silva v. Nielsen*, 2019 WL 13218461, at *5–6 (S.D. Tex. 2019); *Bonitto v. ICE*, 547 F. Supp. 2d 747, 751 (S.D. Tex. 2008) ("[T]he proper Respondent is the warden of the facility at which Petitioner is detained."); As Petitioners have named only one warden, Respondent Venegas, it is improper to extend the class beyond this facility.

## V.    Petitioners must provide security.

Under the federal rules, this Court "may issue a preliminary injunction or a temporary restraining order *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (emphasis added). If this Court grants preliminary relief to Petitioners, it should order Petitioners to post security for taxpayer funds expended during the pendency of this Court's order if it is later determined that Respondents were wrongfully enjoined.

**Conclusion**

The motion should be denied.

Respectfully submitted,

**Yaakov M. Roth**
Acting Assistant Attorney General
Civil Division

s/Drew C. Ensign
**Drew C. Ensign**
Deputy Assistant Attorney General
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044-0878
(202) 514-2000
drew.c.ensign@usdoj.gov

MICHAEL VELCHIK
Senior Counsel

ANTHONY NICASTRO
Acting Director

SARAH WILSON
Assistant Director

Dated: April 22, 2025                              *Counsel for Respondents*

**Certificate of Service**

I hereby certify that I served this document on April 22, 2025, by filing it with the Court's

CM/ECF system, which will electronically deliver the document to counsel for all parties.

s/Drew C. Ensign
_____

**Drew C. Ensign**
U.S. Department of Justice

Dated: April 22, 2025                         *Counsel for Respondents*