United States District Court
Southern District of Texas
**ENTERED**
May 01, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| J.A.V., *et al.*, | § | |
| | § | |
| Petitioners, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 1:25-CV-072 |
| | § | |
| DONALD J. TRUMP, *et al.*, | § | |
| | § | |
| Respondents. | § | |

## <u>ORDER AND OPINION</u>

On March 15, 2025, President Donald Trump issued a Proclamation invoking the Alien Enemies Act ("AEA"), 50 U.S.C. § 21, and declaring that Tren de Aragua, a "designated Foreign Terrorist Organization[,] . . . is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States." Under the authority of the AEA, the President proclaimed that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies."

Petitioners J.A.V., J.G.G., and W.G.H. are natives of Venezuela currently detained at the El Valle Detention Center in Raymondville, Texas. They bring this action under 28 U.S.C. § 2241, alleging that by seeking to remove them from the United States based on the Proclamation, Respondents do so unlawfully and in violation of their due process rights under the Fifth Amendment to the Constitution. Petitioners challenge that the President can invoke the AEA under the alleged circumstances, and also deny that they are members of TdA. They bring suit individually and as representatives of a class of persons within the Southern District of Texas whom the Respondents will seek to remove based on the Proclamation and the AEA. Petitioners seek a permanent injunction barring the Respondents from employing the AEA to remove them.

Neither the Court nor the parties question the Executive Branch's authority and responsibility to enforce federal laws and, along with local law enforcement agencies, to protect

the nation's population.  Neither the Court nor the parties question that the Executive Branch can direct the detention and removal of aliens who engage in criminal activity in the United States. The Executive Branch has and will continue to rely on the Immigration and Nationality Act to remove aliens found to represent a danger to the country.  The question that this lawsuit presents is whether the President can utilize a specific statute, the AEA, to detain and remove Venezuelan aliens who are members of TdA.  As to that question, the historical record renders clear that the President's invocation of the AEA through the Proclamation exceeds the scope of the statute and is contrary to the plain, ordinary meaning of the statute's terms.  As a result, the Court concludes that as a matter of law, the Executive Branch cannot rely on the AEA, based on the Proclamation, to detain the Named Petitioners and the certified class, or to remove them from the country.[1]

## I.    Background and Procedural History

### A.  Alien Enemies Act

In 1798, as a possible war with France loomed, the House Committee for the Protection of Commerce and Defense of the Country considered legislation regarding aliens living within the United States, ultimately enacting four laws, including the AEA, now codified at 50 U.S.C. § 21. *See* 8 Annals of Congress 1566; *see also Bas v. Tingy*, 4 U.S. 37, 40 (1800) (describing the "imperfect war" between the United States and France); JOHN MEACHAM, THOMAS JEFFERSON: THE ART OF POWER 312 (2012) (describing the laws as "[p]assed in reaction to the war climate"); *From John Adams to United States Congress, 19 March 1798*, FOUNDERS ONLINE, https://founders.archives.gov/documents/Adams/99-02-02-2382 (imploring Congress "to manifest a zeal, vigor, and concert in defense of the national rights proportioned to the danger with which they are threatened").  The AEA stands at the center of this lawsuit, and reads:

> Whenever there is a declared war between the United States and any foreign nation
> or government, or any invasion or predatory incursion is perpetrated, attempted,

---

[1] Although this conclusion renders it unnecessary to reach all of the challenges that Petitioners present, to facilitate appellate review, the Court reaches some of those other issues. *See, e.g., Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1319 (11th Cir. 2003) ("Given the complexity of the issues, and in an effort to avoid piecemeal appeals, we direct the district court to address all issues and make alternative rulings.").

or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized in any such event, by his proclamation thereof, or other public act, to direct the conduct to be observed on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted, and to provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom; and to establish any other regulations which are found necessary in the premises and for the public safety.

50 U.S.C. § 21.

The AEA grants broad powers to the President, who may invoke the statute when a "declared war" exists between the United States and a "foreign nation or government[,]" or when "any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government." *Id.* Under either condition, the President must "make[ ] public proclamation of the event" before exercising his authority under the statute. *Id.*

Upon the satisfaction of these preconditions, the AEA "confers on the president very great discretionary powers respecting [alien enemies.]" *Ludecke v. Watkins*, 335 U.S. 160, 164 (1948) (quoting *Brown v. U.S.*, 12 U.S. 110, 126 (1814)). Authorities from the time of the AEA's promulgation described these powers "as unlimited as the legislature could make it." *Id.* (quoting *Lockington v. Smith*, 15 F. Cas. 758, 760 (C.C.D. Pa. 1817)).

Once properly invoked, the AEA renders "all natives, citizens, denizens, or subjects . . . of the hostile nation or government" and who are at least 14 years old, within the United States, and not actually naturalized, "liable to be apprehended, restrained, secured, and removed as alien enemies." 50 U.S.C. § 21. The statute authorizes the President "by his proclamation . . . or other public act . . . to direct the conduct [by the United States] toward the aliens who become so liable." *Id.* The President can determine "the manner and degree of the restraint to which [the aliens] shall be subject and in what cases, and upon what security their residence shall be permitted." *Id.*

The President may "provide for the removal of those who, not being permitted to reside within the United States, refuse or neglect to depart therefrom." *Id.*

Before this year, Presidents of the United States had invoked the AEA in connection with three wars. First, during the War of 1812, President James Madison issued a proclamation and required subjects of Great Britain and Ireland "to report themselves to the marshal of the state in which such aliens resided." *Lockington*, 15 F. Cas. at 759. More than a century later, in 1917 and after the United States had declared war against Germany and entered World War I, President Woodrow Wilson invoked the statute and curtailed the ability of German aliens to own weapons or travel freely, and also provided for their possible confinement. *See* 40 Stat. 1651, 1716, 1730, 1772. Finally, one day after the attack on Pearl Harbor in 1941, President Franklin Delano Roosevelt made "public proclamation . . . that an invasion has been perpetrated upon the territory of the United States by the Empire of Japan." 6 Fed. Reg. 6321. The next day, he further proclaimed "that an invasion or predatory incursion is threatened upon the territory of the United States by Germany." 6 Fed. Reg. 6323; *see also* 6 Fed. Reg. 6324 (reflecting a simultaneous proclamation as to Italy); 7 Fed. Reg. 5535 (expanding the declaration to aliens from Hungary, Romania, and Bulgaria, after Congress declared war on those countries). In July 1945, after the Axis powers in Europe had unconditionally surrendered, President Harry Truman issued an amended proclamation that permitted the removal of Japanese, German, Italian, Bulgarian, Hungarian, and Romanian aliens whom the Attorney General deemed "to be dangerous to the public peace and safety of the United States because they have adhered to the aforesaid enemy governments or to the principles of government thereof [.]" 10 Fed. Reg. 8947.

### B. Venezuela and Tren de Aragua

In 2011, President Barack Obama issued an executive order to block property ownership by "transnational criminal organizations." Blocking Property of Transnational Criminal Organizations, 76 Fed. Reg. 44757 (2011). Based on this executive order, the Treasury Department issued regulations prohibiting United States citizens and businesses from engaging

in commerce or otherwise providing material support to designated groups. 31 C.F.R. § 590.201. The regulations, which remain in effect, define a "significant transnational criminal organization" (TCO) as "a group of persons that includes one or more foreign persons; that engages in or facilitates an ongoing pattern of serious criminal activity involving the jurisdictions of at least two foreign states, or one foreign state and the United States; and that threatens the national security, foreign policy, or economy of the United States." 31 C.F.R. § 590.312. President Obama declared that TCO's identified in the executive order were "dangerous to the United States," "increasingly entrenched in the operations of foreign governments," "facilitat[ed] and aggravate[d] violent civil conflicts and increasingly facilitate[d] the activities of other dangerous persons[,]" and posed "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States[.]" 76 Fed. Reg. 44757. An accompanying annex identified specific TCOs, but did not include TdA.

In 2017, the Treasury Department designated Tareck Zaidan el Aissamu Maddah—the then-vice president of Venezuela—as a foreign narcotics trafficker under the Kingpin Act, 21 U.S.C. § 1901, and blocked him from possessing property or engaging in transactions within the United States. *See* Sanctions Actions Pursuant to the Foreign Narcotics Kingpin Designation Act, 82 Fed. Reg. 11101-01. In 2020, the United States indicted Zaidan el Aissamu and two co-defendants for alleged violations of the imposed sanctions. *See United States v. Coro, et al.*, Criminal Case No. 1:19-cr-00144 (S.D.N.Y. 2020).

In July 2024, the Treasury Department placed TdA on its sanctions list as a significant TCO. *See* Notice of OFAC Sanctions Actions, 89 Fed. Reg. 57994-01 (referencing President Obama's Executive Order 13581 of July 24, 2011).

In December 2024, INTERPOL Washington announced the capture in Tennessee of Luis Alejandro Ruiz Godoy, an alleged high-ranking member of TdA. Jeffrey A. Grimming, the then-Acting Director for INTERPOL Washington, commented that "Tren de Aragua has emerged as a

significant threat to the United States as it infiltrates migration flows from Venezuela."[2] *High Ranking Tren de Aragua Fugitive from Venezuela Arrested in Tennessee Thanks to INTERPOL Collaboration*, INTERPOL WASHINGTON, U.S. DEP'T OF JUST. (Dec. 3, 2024), https://www.justice.gov/interpol-washington/pr/high-ranking-tren-de-aragua-fugitive-venezuela-arrested-tennessee-thanks.

On March 15, 2025, President Donald Trump issued the Proclamation at issue in this lawsuit. The Proclamation included several statements regarding TdA and the Venezuelan government:

> [TdA] is a designated [TCO] with thousands of members, many of whom have unlawfully infiltrated the United States and are conducting irregular warfare and undertaking hostile actions against the United States.

> TdA operates in conjunction with Cártel de los Soles, the Nicolas Maduro regime-sponsored, narco-terrorism enterprise based in Venezuela, and commits brutal crimes, including murders, kidnappings, extortions, and human, drug, and weapons trafficking.

> TdA has engaged in and continues to engage in mass illegal migration to the United States to further its objectives of harming United States citizens, undermining public safety, and supporting the Maduro regime's goal of destabilizing democratic nations in the Americas, including the United States.

> TdA is closely aligned with, and indeed has infiltrated, the Maduro regime, including its military and law enforcement apparatus.

> TdA grew significantly while Tareck El Aissami served as governor of Aragua between 2012 and 2017. In 2017, El Aissami was appointed as Vice President of Venezuela.

> Like El Aissami, Nicolas Maduro, who claims to act as Venezuela's President and asserts control over the security forces and other authorities in Venezuela, also maintains close ties to regime-sponsored narco-terrorists. Maduro leads the regime sponsored enterprise Cártel de los Soles, which coordinates with and relies on TdA and other organizations to carry out its objective of using illegal narcotics as a weapon to "flood" the United States.

> Over the years, Venezuelan national and local authorities have ceded ever-greater control over their territories to transnational criminal organizations, including TdA. The result is a hybrid criminal state that is perpetrating an invasion of and predatory incursion into the United States, and which poses a substantial danger to the United States.

---

[2] Interpol Washington is the designated United States representative, on behalf of the nation's Attorney General, to the International Criminal Police Organization (INTERPOL). *See* 22 U.S.C 263a; CFR Title 28 Subpart F-2 § 0.34.

Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren de Aragua, 90 Fed. Reg. 13033 ("Proclamation"). Based on these statements, the President proclaimed:

> I find and declare that TdA is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States. TdA is undertaking hostile actions and conducting irregular warfare against the territory of the United States both directly and at the direction, clandestine or otherwise, of the Maduro regime in Venezuela.

*Id.* at 13034.

### C.  Petitioners

Petitioner J.A.V. is a Venezuelan national who claims that he entered the United States to seek asylum from persecution in Venezuela. In February 2025, ICE agents arrested him at his asylum interview. When questioned, he denied membership in TdA. ICE initially detained J.A.V. in Pennsylvania, but on March 9 transferred him to El Valle Detention Center in Raymondville, Texas. On March 14, J.A.V. was informed that he would be removed within the next two days.

Petitioner J.G.G. is a Venezuelan national who alleges that he entered the United States to escape torture in Venezuela because a family member is a known political dissident. On March 6, he was transferred from California to El Valle. On March 14, the Respondents attempted to remove him, but the airplane did not depart. He was told that he would be removed the following day.

Petitioner W.G.H. is a Venezuelan national who lived in Brooklyn with his wife and stepdaughter. ICE arrested him on February 20, and on March 7 filed a form with the immigration court that identified W.G.H. as a TdA "gang associate." Three days later, he was transferred to El Valle, where guards informed him that he would be removed on March 15 or 16.

### D.  Procedural History

On March 15, the Petitioners (along with two co-plaintiffs) filed a lawsuit in the United States District Court for the District of Columbia challenging the Proclamation, in part under the

Administrative Procedure Act.  After the court issued a temporary restraining order that applied nationwide and enjoined the removal of individuals based on the Proclamation, the respondents appealed and the matter ultimately reached the nation's high court.  On April 7, the Supreme Court dissolved the temporary restraining order, reasoning that because the Petitioners' "claims for relief necessarily imply the invalidity of their confinement and removal under the AEA, their claims fall within the core of the writ of habeas corpus and thus must be brought in habeas." *Trump v. J.G.G.*, — U.S. —, No. 24A931, 2025 WL 1024097, at *1 (Apr. 7, 2025).  The ruling required Petitioners to file the habeas action in the district of their detention. *Id.*

On April 9, Petitioners filed their Class Petition for Writ of Habeas Corpus in this Court, as they are detained in the Southern District of Texas.[3]  They challenge Respondents' ability to remove them based on the Proclamation and the AEA, and also deny their membership in TdA. They sought to represent a class of "[a]ll noncitizens in custody in the Southern District of Texas who were, are, or will be subject to the [Proclamation] and/or its implementation." (Pet., Doc. 1, 15)

The Petitioners simultaneously filed a motion for a Temporary Restraining Order (Doc. 3) to prevent Respondents from removing them or any putative class members.  On April 9, the Court granted the motion and enjoined Respondents from "transferring, relocating, or removing J.A.V., J.G.G., W.G.H., or any other person that Respondents claim are subject to removal under the Proclamation, from the El Valle Detention Center[,]" as well as from "transporting such persons outside of Willacy County or Cameron County, Texas, without an Order from the Court." (TRO Order, Doc. 12, 3)  The Court has extended the temporary restraining order to allow for the

---

[3]  This lawsuit represents one of several that have challenged the removal of Venezuelan aliens designated as alien enemies under the Proclamation, and that petitioners filed after the Supreme Court's *J.G.G.* decision.  *See D.B.U. v. Trump*, No. 1:25-CV-01163-CNS, 2025 WL 1163530 (D. Colo. Apr. 22, 2025); *G.F.F. v. Trump*, No. 25 CIV. 2886 (AKH), 2025 WL 1166911 (S.D.N.Y. Apr. 11, 2025); *Gutierrez-Contreras v. Warden*, No. 5:25-CV-00911-SSS-KES, 2025 WL 1122541 (C.D. Cal. Apr. 16, 2025); *A.S.R. v. Trump*, No. 3:25-CV-00113, 2025 WL 1208275 (W.D. Pa. Apr. 25, 2025); *Sanchez Puentes v. Garite*, No. EP-25-CV-00127-DB, 2025 WL 1203179 (W.D. Tex. Apr. 25, 2025); *A.A.R.P. v. Trump*, No. 1:25-CV-059-H, 2025 WL 1148140 (N.D. Tex. Apr. 17, 2025), *appeal dismissed*, No. 25-10534, 2025 WL 1148141 (5th Cir. Apr. 18, 2025).  Only some courts have reached the merits of the petitioners' claims, typically in the context of determining the petitioners' likelihood of success on those claims.  To the extent that these courts have reached the legal issues that are also pending before this Court, their decisions are not binding, but represent persuasive authority.

development of the record and resolution of the issues presented. (TRO Order, Doc. 34; TRO Order, Doc. 50)

Petitioners then filed a Motion for a Preliminary Injunction (Doc. 42), which the parties have fully briefed. On April 24, the Court held a hearing to consider the request for a preliminary injunction, as well as the then-pending Motion for Class Certification (Doc. 4).

At the April 24 hearing, Respondents represented that during the pendency of this habeas action, they would not seek the removal of the Named Petitioners, unless through removal proceedings under the Immigration and Nationality Act. This stipulation negated the Named Petitioners' request for a preliminary injunction, which would have provided the same protections as the Respondents' stipulation.

The Court notified the parties that it considered the legal issues raised by the Motion for Preliminary Injunction fully briefed and ready for adjudication. The Court stated that it would convert the Motion for Preliminary Injunction into a motion for summary judgment. *See* FED. R. CIV. P. 65(a)(2) (permitting trial courts to consolidate a motion for a preliminary injunction with a trial on the merits); *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (noting that "the parties should normally receive clear and unambiguous notice of the court's intent to consolidate the trial and the hearing either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases") (cleaned up). In response to the Court's inquiry whether the parties objected to this conversion, each side represented that they did not. As a result, the Court will consider the issues that the Motion for Preliminary Injunction raises under Federal Rule of Civil Procedure 56.

On May 1, 2025, the Court granted Petitioners' Motion for Class Certification (Doc. 4) and certified a class composed of Venezuelan aliens, 14 years old or older, who have not been naturalized, who Respondents have designated or in the future designate as alien enemies under the Proclamation, and who are detained or reside in the Southern District of Texas. (See Order and Opinion, Doc. 57)

## II.    Analysis

Petitioners seek habeas relief by challenging the President's invocation of the AEA on three grounds.  First, they contend that the Proclamation fails to provide Petitioners with reasonable notice and a meaningful opportunity to challenge their designation as alien enemies.  Second, they argue that the Proclamation "does not fall within the statutory bounds of the AEA," both because no "invasion" or "predatory incursion" has occurred or been threatened, and no "foreign nation or government" has engaged in such conduct. (PI Mot., Doc. 42, 22)  And third, Petitioners claim that the Proclamation "violates the specific protections that Congress established under the INA for noncitizens seeking humanitarian protection." (*Id*. at 30)

Respondents contest the validity of each ground.  In addition, Respondents present the threshold question of whether the Court may consider the issues at all, arguing that "no jurisdiction [exists] to review the President's Proclamation." (Resp., Doc. 45, 20)

The Court will first address the jurisdictional question before considering the specific arguments that the Petitioners advance.

### A.  Applicable Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  In cases where "the only issues before the court are pure questions of law, summary judgment is appropriate." *Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 11 F.4th 345, 350 (5th Cir. 2021) (cleaned up); *see also Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995) ("Because statutory terms are at issue, their interpretation is a question of law and it is the court's duty to define the appropriate standard.").

Petitioners bring their action in habeas.  Although they do not seek release from detention, individuals can utilize a habeas action to prevent their unlawful removal. *See J.G.G.*, 2025 WL 1024097, at *1 (citing *Nance v. Ward*, 597 U.S. 159, 167 (2022)).  In addition, courts have granted relief in habeas based upon a finding that the detaining agencies have acted contrary to the law.

*See, e.g.*, *Ex parte Milligan*, 71 U.S. 2, 131 (1866) (concluding that a private citizen could not be tried by a military commission during the Civil War when the civilian courts continued to function).

### B. Political Question

The Respondents contend first that the "President's authority and discretion under the AEA is not a proper subject for judicial scrutiny." (Resp., Doc. 45, 20)  Relatedly, they claim that "[w]hether the AEA's preconditions are satisfied is a political question committed to the President's discretion[.]" (*Id*. at 21)  In both instances, they rely on substantial caselaw describing the broad powers that the AEA places in the President.

Petitioners respond that the political question doctrine represents a "narrow exception" to the Court's jurisdiction, and that applying it here to prevent judicial review would undermine congressional authority by rendering the limits that Congress placed in the statute unenforceable. (PI Motion, Doc. 42, 18)  In addition, they note the observation by then-Judge Brett Kavanaugh that "[t]he Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations." (*Id*. at 19 (quoting *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 856 (D.C. Cir. 2010) (Kavanaugh, J., concurring) (emphasis in original)))

"In general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (quoting *Cohens v. Virginia*, 6 Wheat. 264, 404 (1821)).  The Supreme Court, however, has recognized "a narrow exception . . . known as the 'political question' doctrine." *Id.*  The doctrine dates back to the founding era, when Chief Justice John Marshall explained that "[q]uestions, in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in [the] court." *Marbury v. Madison*, 5 U.S. 137, 170 (1803).  The doctrine "reflects the principle that, under our Constitution, there are some questions that cannot be answered by the judicial branch." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008); *see also TransUnion LLC v.*

*Ramirez*, 594 U.S. 413, 423–24 (2021) ("Federal courts do not exercise general legal oversight of the Legislative and Executive Branches.").

The Supreme Court in 1827 analyzed the application of the political question doctrine in *Martin v. Mott*, 25 U.S. 19 (1827), a case concerning the Militia Act of 1795. The statute permitted the President to call up the state militia "whenever the United States shall be invaded, or be in imminent danger of invasion from any foreign nation or Indian tribe." *Martin*, 25 U.S. at 29. As the War of 1812 approached, President James Madison invoked the Militia Act and instructed New York Governor Daniel Tompkins to call up the state militia. When Jacob E. Mott refused to appear after having been summoned, he was court-martialed by the federal government and was fined and had his property seized. He sued to have the fine reversed and his property returned, arguing that he had been unlawfully called into service.

The Supreme Court rejected Mott's argument, explaining that while Congress held the Constitutional power to mobilize the militia to repel invasions, it had delegated that power to the President through the Militia Act. *Id.* at 28 (citing U.S. CONST. art. I, § 8). The Supreme Court framed the crucial question as: "Is the President the sole and exclusive judge whether the exigency has arisen[?]" *Id.* Answering in the affirmative, Justice Joseph Story unambiguously wrote, "[w]e are all of opinion, that the authority to decide whether the exigency has arisen, belongs exclusively to the President, and that his decision is conclusive upon all other persons." *Id.* at 30; *see also id.* at 31–32 ("Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts.").

The Supreme Court in *Martin* recognized the broad power that the Militia Act placed in the President, and the potential for abuse of that power. Justice Story reasoned, however, that the remedy for such abuse lay in the political realm and not in the judiciary:

> It is no answer that such a power may be abused, for there is no power which is not susceptible of abuse. The remedy for this, as well as for all other official misconduct, if it should occur, is to be found in the constitution itself. In a free

> government, the danger must be remote, since in addition to the high qualities which the Executive must be presumed to possess, of public virtue, and honest devotion to the public interests, the frequency of elections, and the watchfulness of the representatives of the nation, carry with them all the checks which can be useful to guard against usurpation or wanton tyranny.

*Id.* at 32; *see also Mitchell v. Forsyth*, 472 U.S. 511, 541 (1985) (Stevens, J., concurring) (writing that when Executive Branch officials "make erroneous decisions on matters of national security and foreign policy, the primary liabilities are political. Intense scrutiny, by the people, by the press, and by Congress, has been the traditional method for deterring violations of the Constitution by these high officers of the Executive Branch").

More than a century later, in the context of World War II, the Supreme Court considered challenges concerning the Alien Enemies Act. In at least two of those cases, the nation's high court recognized the broad powers that the AEA placed in the President. "The very nature of the President's power to order the removal of all enemy aliens rejects the notion that courts may pass judgment upon the exercise of his discretion." *Ludecke*, 335 U.S. at 164. "Executive power over enemy aliens, undelayed and unhampered by litigation, has been deemed, throughout our history, essential to war-time security." *Johnson v. Eisentrager*, 339 U.S. 763, 774 (1950).[4]

In those decisions, however, the Supreme Court also identified issues related to the AEA that *are* subject to adjudication. In *Ludecke*, the Supreme Court confirmed that "resorts to the courts may be had . . . to challenge the construction and validity of the statute and to question the existence of the 'declared war[.]'" *Ludecke*, 335 U.S. at 171; *see id.* at 163–64 ("[S]ome statutes 'preclude judicial review.' . . . *Barring questions of interpretation and constitutionality*, the [AEA] is such a statute.") (emphasis added). And *Johnson* recognized that courts could "entertain [a detained individual's] plea for freedom from Executive custody only to ascertain the existence of a state of war and whether he is an alien enemy and so subject to the [AEA]." *Johnson*, 339 U.S. at 775; *see also Ludecke*, 335 U.S. at 171 ("[R]esort to the courts may be had . . . to question the

---

[4] Lower courts also recognized the President's broad powers under the AEA. *See, e.g, Citizens Protective League v. Clark*, 155 F.2d 290, 294 (D.C. Cir. 1946) ("Unreviewable power in the President to restrain, and to provide for the removal of, alien enemies in time of war is the essence of the Act.").

existence of the 'declared war[.]'").  Relying on these decisions, the Supreme Court recently reaffirmed "that an individual subject to detention and removal under [the AEA] is entitled to 'judicial review' as to 'questions of interpretation and constitutionality' of the Act as well as whether he or she 'is in fact an alien enemy fourteen years of age or older.'"[5] *J.G.G.*, 2025 WL 1024097, at *2.

In 1962, the Supreme Court analyzed the political question doctrine in depth and identified six "formulations . . . in which the issues [that a lawsuit presents] may describe a political question." *Baker v. Carr*, 369 U.S. 186, 216 (1962).  The formulations include:

(1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department;"

(2) "a lack of judicially discoverable and manageable standards for resolving it;"

(3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion;"

(4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government;"

(5) "an unusual need for unquestioning adherence to a political decision already made; or"

(6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question."

*Lane*, 529 F.3d at 558 (quoting *Baker*, 369 U.S. at 217).  "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for nonjusticiability on the ground of a political question's presence." *Baker*, 369 U.S. at 217.

Importantly, the doctrine bars judicial review of "'political questions,' not one of 'political cases.'" *Id.*  As a result, "*Baker* demands a 'discriminating inquiry into the precise facts and posture of the particular case' before a court may withhold its own constitutional power to resolve

[5] Courts can also adjudicate "whether [the affected individual] is an alien enemy and so subject to the Alien Enemy Act." *Johnson*, 339 U.S. 763, 775; *see also Ludecke*, 335 U.S. at 171 n.17 ("The additional question as to whether the person restrained is in fact an alien enemy fourteen years of age or older may also be reviewed by the courts.").  In the present case, Respondents acknowledge that individuals identified as alien enemies under the President's Proclamation are entitled to challenge their designation as TdA members through a habeas proceeding.

cases and controversies." *Lane*, 529 F.3d at 558 (quoting *Baker*, 369 U.S. at 216). "The *Baker* analysis is not satisfied by 'semantic cataloguing' of a particular matter as one implicating 'foreign policy' or 'national security.'" *Id.*; *see also El-Shifa*, 841 F.3d at 836 (recognizing that not "every case or controversy which touches foreign relations lies beyond judicial cognizance").

Respondents argue that reaching the issues that Petitioners present runs afoul of at least two *Baker* formulations. First, Respondents contend that "the determination that an 'invasion' or 'predatory incursion' is being perpetrated sits at the intersection of two areas that the Constitution commits to the political branches: (1) foreign affairs, [ ]; and (2) immigration policy[.]" (Resp., Doc. 45, 22) Second, they argue that "no manageable standards permit[] courts to assess exactly when hostile entry and criminal and violent acts constitute an 'invasion' or 'predatory incursion' for AEA purposes." (*Id.*)

No court appears to have applied the *Baker* analysis to the AEA. Based on the Supreme Court's decisions regarding the AEA, as well as the principles enumerated in *Baker*, the Court concludes that while it may not adjudicate the veracity of the factual statements in the Proclamation, or the propriety of the steps taken by the President as to Venezuelan aliens and TdA members, the Court retains the authority to construe the AEA's terms and determine whether the announced basis for the Proclamation properly invokes the statute.

The Supreme Court in *J.G.G.* confirmed that "questions of interpretation" fall within the Judiciary's responsibility. This role is not surprising, given that whether a government actor's "interpretation of [a] statute is correct . . . is a familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196; *see also Japan Whaling Ass'n v. American Cetacean Soc'y*, 106 U.S. 2860, 2866 (1986) ("[I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts."). "[T]hat a case or controversy may involve the conduct of the nation's foreign affairs does not necessarily prevent a court from determining whether the Executive has exceeded the scope of prescribed statutory authority or failed to obey the prohibition of a statute or treaty." *El-Shifa*, 607 F.3d at 842; *see also Japan Whaling*, 106 U.S. at 2866 ("But under the Constitution,

one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones."). At times, analyzing whether a government official has impermissibly crossed statutory boundaries requires determining the meaning of statutory terms and gauging the government's actions against those determined parameters. *See*, *e.g.*, *Harmon v. Brucker*, 355 U.S. 579, 582 (1958) ("The District Court had not only jurisdiction to determine its jurisdiction but also power to construe the statutes involved to determine whether the respondent did exceed his powers."); *Stark v. Wickard*, 321 U.S. 288, 310 (1944) ("The responsibility of determining the limits of statutory grants of authority in such instances is a judicial function entrusted to the courts by Congress by the statutes establishing courts and marking their jurisdiction."). As applied to the AEA, this principle signifies that only by construing the meaning of "invasion," "predatory incursion," and "foreign nation or government" can the Court analyze whether the President has properly invoked the statute through the Proclamation, or whether he has exceeded his statutory authorization.

Consistent with this conclusion, the Second Circuit during the 1940's construed various provisions of the AEA. *See, e.g., U S ex rel D'Esquiva v. Uhl*, 137 F.2d 903, 905 (2d Cir. 1943) (determining the meaning of "citizen" and "native": "The use by Congress of the four words 'natives, citizens, denizens, or subjects' indicated that each word is to have a significant and different meaning"); *U.S. ex rel. Zdunic v. Uhl*, 137 F.2d 858, 860 (2d Cir. 1943) ("The ultimate issue for determination is whether the relator is a 'native, citizen, denizen, or subject' of Germany. The meaning of those words as used in the statute, [ ] presents a question of law."); *U.S. ex rel. Gregoire v. Watkins*, 164 F.2d 137, 138 (2d Cir. 1947) (considering "whether the relator is a 'native' of Germany within the meaning" of the AEA); *U.S. ex rel. Kessler v. Watkins*, 163 F.2d 140, 142 (2d Cir. 1947) (concluding that the meaning of threatened "invasion" or "predatory incursion" did not require "active hostilities"). And the Court is unaware of any judicial authority declining to determine the meaning of the AEA's terms based on the political question doctrine.

*Baker* does not require a different conclusion.  It is true that the Constitution ascribes authority and responsibility for foreign policy and national security to the Legislative and Executive branches.  And "[m]atters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention." *Haig v. Agee*, 453 U.S. 280, 292 (1981); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."); *Orloff v. Willoughby*, 345 U.S. 83, 91 (1953) (declining to exercise judicial review over the President's decision not to commission Orloff as an Army officer: "Whether Orloff deserves appointment is not for judges to say").  But construing the language of the AEA does not require courts to adjudicate the wisdom of the President's foreign policy and national security decisions.  Determining what conduct constitutes an "invasion" or "predatory incursion" for purposes of the AEA is distinct from ascertaining whether such events have in fact occurred or are being threatened.  The former turns on applying accepted principles of statutory construction; the latter on analyzing factual intelligence and data, including some to which the Executive Branch possesses unique access, and applying independent judgment and weighing competing priorities.  Courts routinely engage in the former, but are ill-equipped to second guess the President's decisions as to the latter.  This distinction also refutes Respondents' contention that applying judicial review would rely on "no manageable standards."  On the contrary, courts regularly apply known canons of construction to determine the meaning of statutory language.

On the other hand, some issues that Petitioners raise present a political question beyond judicial review.  Once a court defines the parameters of what conduct constitutes an "invasion" or "predatory incursion" for purposes of the AEA, the court leaves to the Executive Branch the determination of whether such conduct has been perpetrated, attempted, or threatened.  For example, a court may decide that one aspect of "invasion" and "predatory incursion" requires physical entry into the United States.  In other words, a court may conclude that no invasion or

predatory incursion has occurred or has been threatened if the alleged conduct does not involve the entry of individuals into the country. The court having determined the meaning of these terms, it is left to the Executive Branch to determine whether a foreign nation or government has threatened or perpetrated activity that includes such an entry. As to this decision, the court may not delve into whether the Executive Branch possesses sufficient support for its conclusion, or whether the court agrees with the Executive Branch's determinations. *That* analysis would require the Executive Branch to disclose to the court the domestic and foreign intelligence that undergirds the finding of an actual or threatened invasion or predatory incursion. And requiring the Executive Branch to do so would run counter to the admonition that "it is inconceivable that before an alien enemy could be removed from the territory of this country in time of war, the President should be compelled to spread upon the public record in a judicial proceeding the method by which the Government may detect enemy activity within our borders[.]" *Citizens Protective League*, 155 F.2d at 294; *see* also *Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010) ("[N]ational security and foreign policy concerns arise in connection with efforts to confront evolving threats in an area where information can be difficult to obtain and the impact of certain conduct difficult to assess."); *Chicago & S. Air Lines v. Waterman S. S. Corp.*, 333 U.S. 103, 111 (1948) (explaining that decisions involving national security and foreign policy "are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil"); *Martin*, 25 U.S. at 31 ("[T]he evidence upon which the President might decide that there is imminent danger of invasion [for purposes of the Militia Act of 1795], might be of a nature not constituting strict technical proof, or the disclosure of the evidence might reveal important secrets of state, which the public interest, and even safety, might imperiously demand to be kept in concealment."). Thus, in the present case, while the Court will construe the meaning of the AEA's language, the Court declines to consider Petitioner's argument that "the Proclamation's

conclusory 'findings[]' [regarding Venezuela and TdA] . . . cannot survive even the most minimally searching inquiry because they are simply incorrect as a factual matter."[6] (PI Mot., Doc. 42, 28)

As a corollary, the Court concludes that a Presidential declaration invoking the AEA must include sufficient factual statements or refer to other pronouncements that enable a court to determine whether the alleged conduct satisfies the conditions that support the invocation of the statute. The President cannot summarily declare that a foreign nation or government has threatened or perpetrated an invasion or predatory incursion of the United States, followed by the identification of the alien enemies subject to detention or removal. *Cf. United States v. Abbott*, 110 F.4th 700, 736 (5th Cir. 2024) ("To be sure, a state of invasion under Article I, section 10 does not exist just because a State official has uttered certain magic words.") (Ho, J., concurring). Allowing the President to unilaterally define the conditions when he may invoke the AEA, and then summarily declare that those conditions exist, would remove all limitations to the Executive Branch's authority under the AEA, and would strip the courts of their traditional role of interpreting Congressional statutes to determine whether a government official has exceeded the statute's scope. The law does not support such a position. *See, e.g.*, *Comm. for Nuclear Resp., Inc. v. Seaborg*, 463 F.2d 788, 793 (D.C. Cir. 1971) ("An essential ingredient of our rule of law is the authority of the courts to determine whether an executive official or agency has complied with the Constitution and with the mandates of Congress which define and limit the authority of the executive."); *see also Boumediene v. Bush*, 553 U.S. 723, 783 (2008) (reasoning that a court considering a person's habeas action challenging his detention based on an executive order "must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain").

---

[6] As a result, declarations that Respondents submitted and that contest the factual statements regarding TdA and its links to Venezuela in the Proclamation do not bear on the issues that the Court can consider. (*See* Declaration of Rebecca Hanson, Doc. 42–2; Declaration of Andres Antillano, Doc. 42–3; Declaration of Steven Dudley, Doc. 42–4 ("[The] characterization of the relationship between the Venezuelan state and Tren de Aragua as it relates to its activities in the United States is simply incorrect."))

The Court is mindful that the Executive Branch may possess sensitive and confidential information leading to its conclusion that a foreign nation or government has attempted, threatened, or perpetrated an invasion or predatory incursion of the United States. But this possibility does not require the conclusion that the AEA is an exception to the general rule that courts possess the traditional role of interpreting Congressional statutes and determining whether a government actor has exceeded the scope of the law. While a President's declaration invoking the AEA need not disclose all of the information that the Executive Branch possesses to support its invocation of the statute, it must identify sufficient information to permit judicial review of whether the foreign nation or government's conduct constitutes an actual, attempted, or threatened invasion or predatory incursion of the United States.[7]

Having concluded that the political question doctrine does not preclude the Court from considering some of the arguments that Respondents present, the Court turns to those permissible areas of inquiry.

### C. Adequacy of Notice and Notice Procedures

Petitioners contend that the Respondents' intended application of the AEA fails to satisfy the requirements of the statute itself and to provide adequate due process to the individuals designated as alien enemies. (PI Mot., Doc. 42, 20) In advancing this legal theory, they cite the Supreme Court's recent confirmation that the President must provide "notice" to individuals designated as alien enemies, and "[t]he notice must be afforded within a reasonable time and in such a manner as will allow [AEA detainees] to actually seek habeas relief in the proper venue before [ ] removal occurs." (*Id.* at 11 (quoting *J.G.G.*, 2025 WL 1024097, at *2)) They reject Respondents' position that the AEA and due process rights are satisfied by giving individuals designated as alien enemies 12 hours to express an intent to file a habeas action, and an additional

---

[7] In appropriate circumstances, courts may also employ tools such as the submission of sensitive information for *in camera* review.

24 hours to initiate such a claim, before the Government can move forward with their removal. (*See* Declaration of Carlos D. Cisneros, Doc. 49)

Respondents emphasize that as to the Named Petitioners, any challenge to the adequacy of the notice is moot, as Named Petitioners have challenged their designation as alien enemies. (Resp., Doc. 45, 18 ("[T]his very proceeding refutes that claim."))  The Named Petitioners, according to Respondents, cannot demonstrate any injury from the alleged deficiencies in the notice procedures.

As to the Named Petitioners, the Court agrees.  Standing requires a concrete injury, one that is "real" rather than "abstract." *Texas v. United States*, 126 F.4th 392, 407 (5th Cir. 2025). "A grievance that amounts to nothing more than an abstract and generalized harm to a citizen's interest in the proper application of the law does not count as an injury in fact." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (cleaned up).  For example, while a plaintiff may be injured by the defendant's failure to timely provide certain information, the plaintiff must demonstrate "downstream consequences" stemming from that failure to have a concrete injury. *TransUnion LLC*, 594 U.S. at 442.

In the present case, the notice that the AEA requires serves to allow the designated individuals the ability "to actually seek habeas relief in the proper venue." *J.G.G.*, 2025 WL 1024097, at *2.  The Named Petitioners have sought such relief.  Through their lawsuit here, they have challenged the application of the AEA and have alleged that they are not members of TdA. As a result, the Named Petitioners possess no actual injury from any deficiencies in the notice procedures and, as a result, cannot challenge them.

The same cannot be said for class members, which include individuals who currently or in the future are detained or reside in the Southern District of Texas and who Respondents designate as alien enemies under the Proclamation.[8]  The notice procedures may adversely affect them, to

---

[8] At the hearing on the Motion for Preliminary Injunction, Respondents' counsel represented that no other Venezuelan detained in the Southern District of Texas has been notified of being designated as an alien enemy under the Proclamation.  But nothing would prevent Respondents from transferring individuals to the Southern District of Texas

the extent that inadequacies in the notice procedures may prevent them from initiating a habeas action before their removal.  Ultimately, however, the Court need not reach this issue, given its conclusions as to other issues that the Petitioners present.

Second, Petitioners argue that the Proclamation fails to satisfy the statute's terms by calling for their removal before they have refused or neglected to depart.  The AEA empowers the President "to provide for the removal of those [designated alien enemies] who, not being permitted to reside within the United States, refuse or neglect to depart therefrom." 50 U.S.C. § 21.  Petitioners claim that the Executive Branch has never provided them the opportunity to "refuse or neglect to depart" from the United States after having been designated alien enemies.

As Respondents note, however, Section 21 must be read in conjunction with 50 U.S.C. § 22. *See, e.g.*, *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").  And that provision indicates that an individual designated as an alien enemy under Section 21 will be afforded time "for his departure," unless he is "chargeable with actual hostility." 50 U.S.C. § 22.  When taken together, the statutory language provides that the President acting under the AEA need not offer voluntary departure to alien enemies who the Executive Branch has concluded are engaged in chargeable actual hostility. And in the present case, the Proclamation declares that the designated alien enemies, as members of TdA, have engaged in criminal conduct in the United States.

As a result, the Court concludes that neither the AEA nor the due process clause of the Fifth Amendment requires that Respondents afford an opportunity to voluntarily depart the United States to individuals designated under the Proclamation as alien enemies and who are chargeable with actual hostility.

---

in the future and, once having transferred them there, notifying them that they have been designated as alien enemies under the Proclamation.

### D.  Invocation of the Alien Enemies Act

Petitioners challenge the Respondents' authority to detain them or order their removal based on the AEA, contending that the preconditions for the invocation of the statute do not exist. In particular, Petitioners argue that the government impermissibly "seeks to invoke this limited wartime authority to execute removals untethered to any actual or imminent war or to the specific conditions Congress placed in the statute." (PI Mot., Doc. 42, 22)  They dispute that any "invasion" or "predatory incursion" has occurred, been threatened, or been attempted, as well as that any "foreign nation or government" has engaged in such conduct.

Courts normally interpret statutory terms "consistent with their ordinary meaning at the time Congress enacted the statute." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 277 (2018) (cleaned up); *see also Texas v. Trump*, 127 F.4th 606, 611 (5th Cir. 2025) ("Absent congressional direction to the contrary, words in statutes are to be construed according to their ordinary, contemporary, common meanings.") (cleaned up) (citing *Kennedy v. Tex. Utils.*, 179 F.3d 258, 261 (5th Cir. 1999); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) ("[N]o more persuasive evidence of the purpose of a statute [exists] than the words by which the legislature undertook to give expression to its wishes.") (citing *United States v. American Trucking Assns., Inc.*, 310 U.S. 534, 543 (1940)).  When ascertaining the plain, ordinary meaning of statutory language that harkens back to the nation's founding era, courts rely on contemporaneous dictionary definitions and historical records that reveal the common usage of the terms at issue. *See, e.g.*, *D.C. v. Heller*, 554 U.S. 570, 581–83 (2008) (examining founding era writings and commentaries to determine the commonly understood meaning of "keep and bear arms"); *Utah v. Evans*, 536 U.S. 452, 492 (2002) (Thomas, J., concurring) ("Dictionary definitions contemporaneous with the ratification of the Constitution inform our understanding."); *see also Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020) (considering dictionary definitions from the 1930's to construe the meaning of terms within the Federal Tort Claims Act, enacted in 1946); *Amoco Prod. Co. v. S. Ute Indian Tribe*, 526 U.S. 865, 874 (1999)

(finding that "the common understanding of coal in 1909 and 1910" would not have encompassed coalbed methane gas released in the coalmining process).  While most English words have multiple dictionary meanings, courts "use the ordinary meaning of terms unless context requires a different result." *Gonzales v. Carhart*, 550 U.S. 124, 152 (2007).  At times, terms can hold more than one ordinary meaning. *See, e.g.*, *United States v. Santos*, 553 U.S. 507, 511 (2008) (finding that the word "proceeds" in a money laundering statute had the commonly accepted meanings of "receipts" or "profits").  Reviewing courts, however, apply "the contextually appropriate ordinary meaning, unless there is reason to think otherwise." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 70 (2012).  "That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 568 (2012) (emphasis in original) (citing *Mallard v. U.S. Dist. Court for Southern Dist. of Iowa*, 490 U.S. 296, 301 (1989)).

Accepted canons help construe statutes.  For example, "different words within the same statute should, if possible, be given different meanings." *See BNSF Ry. Co. v. United States*, 775 F.3d 743, 755 n.86 (5th Cir. 2015).  In addition, "in determining the meaning of a particular statutory provision, it is helpful to consider the interpretation of other statutory provisions that employ the same or similar language." *St. Tammany Par., ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 320 (5th Cir. 2009).  This principle allows courts to consider the meaning of Constitutional terms to help determine the ordinary meaning of similar statutory terms or phrases. *See* 2B SHAMBIE SINGER & NORMAN J. SINGER, SUTHERLAND STATUTES & STATUTORY CONSTRUCTION § 51:1–3 (7th ed. Nov. 2024 update); *see also Morse v. Republican Party of Virginia*, 517 U.S. 186, 221 (1996) (applying the meaning of the word "State" in the Fifteenth Amendment to determine the meaning of the same word in Section 5 of the Voting Rights Act).

The historical context for the enactment of a statute can prove relevant, but does not dictate the statutory words' meaning.  *See*, *e.g.*, *Airlines for Am. v. Dep't of Transportation*, 110

F.4th 672, 676 (5th Cir. 2024) (confirming that "legislative history is not the law," and it cannot "muddy clear statutory language"); *Gundy v. United States*, 588 U.S. 128, 141 (2019) (explaining that when attempting to "define the scope of delegated authority," courts may look at "the purpose of the Act, its factual background and the statutory context"). Again, courts seek to apply the plain, ordinary meaning of the words that Congress chose, rather than the subjective intent that Congress or, more accurately, certain members of Congress may have held regarding the statute. *See, e.g.*, *Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022) ("[T]he text of a law controls over purported legislative intentions unmoored from any statutory text."). Thus, discussion by Congressional members regarding a statute proves helpful to the extent that it reveals the accepted usage at the time of the disputed words or phrases. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 828–29 (2010) (Thomas, J., concurring) ("Statements by legislators can assist in this process to the extent they demonstrate the manner in which the public used or understood a particular word or phrase. . . . [T]his evidence is useful not because it demonstrates what the draftsmen of the text may have been thinking, but only insofar as it illuminates what the public understood the words chosen by the draftsmen to mean.").

The canon of *noscitur a sociis* at times proves relevant. A statutory word or phrase derives "more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294 (2008); *see also United States v. Santiago*, 96 F.4th 834, 847 (5th Cir. 2024) ("[W]e must apply *noscitur a sociis* to understand 'use' as akin to, but with a meaning different from, 'open, lease, rent, . . . or maintain.'"). Adhering to this canon "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 537 (2015); *Fischer v. United States*, 603 U.S. 480, 487 (2024) (explaining that *noscitur a sociis* "avoid[s] ascribing to one word a meaning so broad that it is inconsistent with . . . the company it keeps") (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995)). Courts have applied the canon to restrict a term to "one of its many possible applications." SCALIA & GARNER, READING LAW, at 196;

*see also, e.g.*, *Easom v. US Well Svcs., Inc.*, 37 F.4th 238, 242 (5th Cir. 2022) ("Applying *noscitur a sociis* to this case, the appearance of 'natural disaster' in a list with 'flood, earthquake, or drought' suggests that Congress intended to limit 'natural disaster' to hydrological, geological, and meteorological events."); *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 462 (5th Cir. 2020) (applying the canon to exclude "gathering a crop" from the statutory meaning of "harvesting").

To apply *noscitur a sociis*, however, the statute must contain "a string of statutory terms [that] raises the implication that the words grouped in a list should be given related meaning." *United States v. Buluc*, 930 F.3d 383, 390 (5th Cir. 2019); *see also* SCALIA & GARNER, READING LAW, at 196 ("For the associated-words canon to apply, the terms must be conjoined in such a way as to indicate that they have some quality in common."). For example, the Fifth Circuit declined to apply the canon when the statute did not contain a "string of terms," but rather "contain[ed] two independent clauses separated by a disjunctive 'or.'" *United States v. Lauderdale Cnty., Mississippi*, 914 F.3d 960, 966–67 (5th Cir. 2019); *see also Buluc*, 930 F.3d at 390 (declining to apply the canon because the statute contained "not a list of verbs with common features, but two grammatically distinct categories of verbs ('connives or conspires' and 'takes any other action') separated by a disjunctive").

With these principles in mind, the Court turns to the meaning of the disputed words and phrases in the AEA.

### 1. "Invasion" and "Predatory Incursion"

The Proclamation invokes the AEA by declaring that "TdA is perpetrating, attempting, and threatening an invasion or predatory incursion against the territory of the United States."

Petitioners argue that the proper construction of "invasion" and "predatory incursion" reveals that the Proclamation does not satisfy the conditions required to invoke the statute. They highlight that Congress enacted the AEA as a war time measure, and that "Congress understood ['invasion' and 'predatory incursion'] to mean a military incursion into the territory of the United

States." (PI Mot., Doc. 42, 22)  In support of this reading, they rely on various dictionary definitions and historical sources that use those terms in a military context. (*Id*. at 22–23)  They also note, accurately, that no President has invoked the AEA other than during a time of war, including the War of 1812, World War I, and World War II.  Based on their proposed construction, they argue that the conduct by TdA and Venezuela as described in the Proclamation does not arise to an invasion or predatory incursion because it does not entail a military action, either actual or threatened, against the nation. (*See* Reply, Doc. 47, 11 (proposing that Congress limited the AEA "to instances of war or imminent war by a foreign nation or government"))

Respondents urge a broader reading.  They contend that while the definitions for these terms "*include* military action, . . . neither is *limited to* such action." (Resp., Doc. 45, 26 (emphasis in original))  According to Respondents, an invasion can include any "hostile entrance" or "hostile encroachment," while a "'predatory incursion' encompasses (1) an entry into the United States (2) for purposes contrary to the interests or law of the United States." (*Id*.)  Applying these broader concepts to the Proclamation, Respondents argue that the Proclamation accurately describes an "invasion" or "predatory incursion" by detailing that "TdA's illegal entry and continued unlawful presence is an encroachment on U.S. territory that entails hostile acts contrary to the rights of citizens to be free from criminality and violence." (*Id*. at 25)

Petitioners' briefing contains numerous sources contemporaneous to the enactment of the AEA in which "invasion" and "predatory incursion" expressly reference or imply military action.  Those sources include dictionary definitions, historical records such as letters, and court decisions.  For example:

> Webster's Dictionary, *Invasion* (1828): "particularly, the entrance of a hostile army into a country for purpose of conquest or plunder, or the attack of a military force";
>
> Johnson's Dictionary, *Invasion* (1773): "[h]ostile entrance upon the right or possession of another; hostile encroachment," such as when "William the Conqueror invaded England";
>
> "Small, *predatory incursions* of the French, though they might occasion great destruction of property, would not be dangerous, and *the militia* might be

sufficient to repel them; but what we have to guard against is an *invasion* by a powerful *army of veterans*: and I do not know any body of *militia* adequate to stop their progress; and a fatal pannic might be the consequence." Timothy Pickering to Alexander Hamilton (June 9, 1798) (emphasis added).

"I am much obliged to your Excellency for your letter of the 10th. of January, giving me an account of the enemy's *incursion* into your state. . . . But as the evils you have to apprehend from these *predatory incursions* are not to be compared with the injury to the common cause and with the danger to your state in particular, from the conquest of those states southward of you, I am persuaded the attention to your imediate safety will not divert you from the measures intended to *reinforce the Southern Army* and put it in a condition to stop the progress of the enemy in that Quarter." Letter from George Washington to Thomas Jefferson (Feb. 6, 1781) (emphasis added).

*Huidekoper's Lessee v. Douglass*, 7 U.S. (3 Cranch) 1, 11 (1805) (explaining that in 1792, "an Indian war existed on [Pennsylvania's] frontier" and the state population desired to "repel the predatory incursions of the Indians").

(PI Mot., Doc. 42, 22–23)

Respondents do not challenge these usages.  Instead, they contend that other contemporaneous sources reflect a broader understanding of "invasion," with no express or implicit military requirement.  In support of their construction, however, they provide only two examples, both of them from dictionaries.  One authority defines "invasion" as any "hostile entrance." 1 JOHN ASH, THE NEW AND COMPLETE DICTIONARY OF THE ENGLISH LANGUAGE (1775).  And *A Complete Dictionary of the English Language*, a source on which Petitioners also rely, includes "hostile encroachment" as a definition, with no reference to military force. *See Invasion*, A DICTIONARY OF THE ENGLISH LANGUAGE (1773).  Respondents identify no other historical records supporting their proposed meaning of "invasion," and they offer no sources from the nation's founding era as to the ordinary meaning of "predatory incursion."

To augment the parties' submissions, the Court reviewed numerous historical records using "invasion," "predatory incursion," and "incursion" for the period from 1780 through 1820. *See* Appendix A (identifying records and providing links).[9]  The review strongly supported the

---

[9] The Court utilized Founders Online, a database of historical records that the National Archives maintains.  Courts have used this database for similar analyses. *See, e.g.*, *Carpenter v. United States*, 585 U.S. 296, 347 (2018) (Thomas, J., dissenting) (using the database to note that the phrase "expectation(s) of privacy" did not appear in "the papers of the prominent Founders"); *In re MCP No. 165, Occupational Safety & Health Admin., Interim Final Rule: COVID-19*

Petitioners' position. In the significant majority of the records, the use of "invasion" and "predatory incursion" referred to an attack by military forces. This held true even when the historical record did not concern the Revolutionary War or the War of 1812. The usages of "predatory incursion" at times referred to entries by Native Americans into the western territories, as did usages of "incursion." But even these records refer to an organized group of armed individuals entering an area to attack a fort, settlement, or town, and the writer typically discussed the need for a military response to the entry. In only a few sources did the use of "invasion" or "predatory incursion" reference a non-military action. While the Court does not represent that its review constitutes a vigorous *corpus linguistics* analysis, the results provide a significant level of confidence that a complete review would generate similar conclusions.

The Court's research for judicial decisions that utilized "predatory incursion" during the relevant time period returned only two results. In both usages, the courts referenced "predatory incursions" to describe conduct by Native Americans, in one instance as part of an "Indian war" and in the other in connection with the authority of a military officer. *See Huidekoper's Lessee v. Douglass*, 3 Cranch 1, 7 U.S. 1, * 7 (1805) (explaining the passage of a statute as motivated by the fact that "an Indian war existed on [Pennsylvania's] frontier[,]" and the state's population were "bound by their dearest interests to watch and repel the predatory incursions of the Indians"); *Russell's Lessee v. Baker*, 1 H. & J. 71, 1800 WL 441, at *6 (Gen. Ct. Maryland 1800) ("But it does not follow under this grant of power that he had a right to declare war or make peace; for there is no instance of a captain general of an army having the power, as captain general, to do either. The powers, granted under this section of the charter were granted to guard against and repel the predatory incursions of the Indians . . . and to prevent and to suppress insurrections[.]").

---

*Vaccination & Testing*, 20 F.4th 264, 289 (6th Cir. 2021) (Bush., J., dissenting) (using the database to show how the government in the founding era responded to epidemics). The Court reviewed all results for the phrase "predatory incursion," but used a number randomizer to select a subset from the search results for "invasion" and "incursion." *See* https://www.calculator.net/random-number-generator.html. The Appendix contains all results from the random subset for "invasion" and "incursion," including a few that proved not relevant, such as one in a foreign language.

In addition, the Court located only one relevant historical record from the debates over the AEA. Representative Robert Harper moved to strike the phrase "predatory incursion" from the proposed legislation, based on his belief that the bill granted "very extensive" powers that "he did not think ought to be given except in case of serious attack." 8 Annals of Congress 1786. After debate, he withdrew his objection, "alleging that he had not rightly understood the section." *Id*. The usage in this record suggests that the members viewed "predatory incursion" as a term implicitly referencing a "serious attack." *Id*. But as the nature of the "serious attack" is not clear, the reference represents a usage where military context is not present or implicit.

The Constitution itself references "invasion" on two occasions, each time in a military context. In Article IV, Section 4, the Constitution requires the United States to "protect each of [the states] against Invasion." At least one court has concluded that "invasion" under this provision requires "armed hostilities" and does not include mass immigration. *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("In order for a state to be afforded the protections of the Invasion Clause, it must be exposed to armed hostility from another political entity, such as another state or foreign country that is intending to overthrow the state's government."). Also, Article I, Section 9 prohibits Congress from suspending the writ of habeas corpus, "unless when in Cases of Rebellion or Invasion the public Safety may require it." Although courts have not had to define what constitutes an invasion supporting the suspension of the writ, the use of "Rebellion," which refers to an armed uprising, suggests that both terms refer to a military attack, either from within or without. In addition, the Constitution in Article I, Section 10, Clause 3 also provides that a state may not "engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay." This use of the related term, "invaded," expressly concerns warfare.

The historical records that the parties present, supplemented by the additional records that the Court reviewed, demonstrate that at the time of the AEA's enactment, the plain, ordinary meaning of "invasion" was an entry into the nation's territory by a military force or an organized, armed force, with the purpose of conquering or obtaining control over territory. In a similar vein,

the common usage of "predatory incursion" and, to a lesser degree, "incursion," referenced a military force or an organized, armed force entering a territory to destroy property, plunder, and harm individuals, with a subsequent retreat from that territory. Although other uses exist for these terms, those rare uses do not represent the ordinary meaning of those terms.

The Court, however, does not adopt Petitioners' position that the terms require a war or an imminent war. In support of their argument, Petitioners rely on *noscitur a sociis*. But the Court finds the canon inapplicable. The AEA does not contain "a string of statutory terms [that] raises the implication that the words grouped in a list should be given related meaning." *Buluc*, 930 F.3d at 390. Instead, Congress identified three scenarios that enable the President to invoke the AEA—i.e., a declared war, an invasion, or a predatory incursion. The structure of the AEA does not require that the latter two ("invasion" and "predatory incursion") must be precursors to the first ("declared war"). When construing similar grammatical structures, courts have declined to apply the doctrine. *See, e.g.*, *Lauderdale County*, 914 F.3d at 967 (rejecting the application of the canon to text containing "two independent clauses separated by a disjunctive 'or'"); *Buluc*, 930 F.3d at 391 (declining to apply the canon because the statute contained "not a list of verbs with common features, but two grammatically distinct categories of verbs ('connives or conspires' and 'takes any other action')"). Thus, while the Court finds that an "invasion" or "predatory incursion" must involve an organized, armed force entering the United States to engage in conduct destructive of property and human life in a specific geographical area, the action need not be a precursor to actual war.

### 2. "Foreign Nation or Government"

Petitioners also argue that the Proclamation fails to properly invoke the AEA because it is not based on an invasion or predatory incursion "by any foreign nation or government." (PI Mot., Doc. 42, 26–28) In advancing this argument, they propose that the terms "refer to an entity that is defined by its possession of territory and legal authority." (*Id.* (citing *Nation*, JOHNSON'S DICTIONARY (1773) ("A people distinguished from another people; generally by their language,

original, or government.”)))  They note that the AEA references "natives, citizens, denizens, or subjects" of the hostile foreign nation or government, which excludes concepts such as gangs or organizations, which possess members.

For their part, Respondents offer that "government" more broadly references "the power or authority that one person exercises over another." (Resp., Doc. 45, 28 (citing THOMAS DYCHE & WILLIAM PARDON, A NEW GENERAL ENGLISH DICTIONARY (1754)))

Neither party claims that "foreign nation or government" excludes recognized countries such as the United States and Venezuela.  Thus, and for the reasons explained in the next section, the Court finds that resolving the precise meaning of "foreign nation or government" is unnecessary to resolve the issues in this lawsuit.

### 3. Application

Having determined the meaning of the relevant statutory terms, the Court considers whether as a matter of law, the Proclamation exceeded the statutory boundaries that the AEA establishes.  The Court concludes that it did.

First, the Court finds that the Proclamation places the government of Venezuela as the controlling entity over TdA's activities in the United States.  According to the Proclamation, TdA "undertak[es] hostile actions and conduct[s] irregular warfare against the territory of the United States both directly and *at the direction . . . of the Maduro regime in Venezuela*." Proclamation, 90 Fed. Reg. 13033 (emphasis added).  According to the Proclamation, Maduro, "who claims to act as Venezuela's President . . . leads the regime-sponsored enterprise Cártel de los Soles, which coordinates with *and relies on TdA . . . to carry out its objective* of using illegal narcotics as a weapon[.]" *Id.* (emphasis added).  Although the Proclamation focuses on TdA's activities in the United States, it places control of those activities in Maduro, acting in his claimed role of President of Venezuela.  In other words, the Proclamation declares that the country of Venezuela, through Maduro, directs and controls TdA's activities in the United States.  Respondents accurately characterize the Proclamation's message: "TdA has become indistinguishable from the

Venezuelan state." (Resp., Doc. 45, 27)  As a result, the Court concludes that the Proclamation places responsibility for TdA's actions in the United States on the Venezuelan government, which satisfies this aspect of the AEA.[10]

As for the activities of the Venezuelan-directed TdA in the United States, and as described in the Proclamation, the Court concludes that they do not fall within the plain, ordinary meaning of "invasion" or "predatory incursion" for purposes of the AEA.  As an initial matter, no question exists that the Proclamation references the entry of TdA members into the United States.  Proclamation, 90 Fed. Reg. 13033 (declaring that "many" TdA members have "unlawfully infiltrated the United States").  And these members' objectives include "harming United States' citizens [and] undermining public safety[.]" *Id.*  In addition, the Proclamation also references the decision of a federal agency during the administration of President Joseph Biden to designate TdA as a "significant transnational criminal organization," which, in relevant part, denotes "a group of persons that . . . engages in or facilitates an ongoing pattern of serious criminal activity . . . that threatens the national security, foreign policy, or economy of the United States." 31 C.F.R. § 590.312.  That designation received substantial public approval, with supporters often referencing the criminal activity that TdA members allegedly engaged in within the United States.

Those factual statements depict conduct by TdA that unambiguously is harmful to society in this country.  And as previously explained, the political question doctrine prohibits the Court from weighing the truth of those factual statements, including whether Maduro directs TdA's actions or the extent of the referenced criminal activity.  Instead, the Court determines whether the factual statements in the Proclamation, taken as true, describe an "invasion" or "predatory incursion" for purposes of the AEA.

Based on the plain, ordinary meaning of those terms in the late 1790's, the Court concludes that the factual statements do not.  The Proclamation makes no reference to and in no manner

---

[10] Given this conclusion, the Court need not reach whether TdA itself represents a "foreign nation or government."

suggests that a threat exists of an organized, armed group of individuals entering the United States at the direction of Venezuela to conquer the country or assume control over a portion of the nation. Thus, the Proclamation's language cannot be read as describing conduct that falls within the meaning of "invasion" for purposes of the AEA. As for "predatory incursion," the Proclamation does not describe an armed group of individuals entering the United States as an organized unit to attack a city, coastal town, or other defined geographical area, with the purpose of plundering or destroying property and lives. While the Proclamation references that TdA members have harmed lives in the United States and engage in crime, the Proclamation does not suggest that they have done so through an organized armed attack, or that Venezuela has threatened or attempted such an attack through TdA members. As a result, the Proclamation also falls short of describing a "predatory incursion" as that concept was understood at the time of the AEA's enactment.[11]

For these reasons, the Court concludes that the President's invocation of the AEA through the Proclamation exceeds the scope of the statute and, as a result, is unlawful. Respondents do not possess the lawful authority under the AEA, and based on the Proclamation, to detain Venezuelan aliens, transfer them within the United States, or remove them from the country.

### E.  Convention against Torture

Petitioners' final legal theory is that the Proclamation "violates the specific protections that Congress established under the INA for noncitizens seeking humanitarian protection." (PI Mot., Doc. 42, 30–31) They explain that the Foreign Affairs Reform and Restructuring Act codified the United Nations Convention against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (the "Convention"), and that the Convention and United States statutes work together to "ensure that noncitizens have meaningful opportunities to seek protection from

---

[11] The Proclamation also declares that TdA is "conducting irregular warfare." Proclamation, 90 Fed. Reg. 13033. Respondents do not contend that a "declared war" exists between Venezuela and the United States. Thus, to the extent that Respondents argue that "conducting irregular warfare" constitutes an "invasion" or "predatory incursion," the Court finds that the language merely refers to the conduct by TdA as described throughout the Proclamation. And that conduct, as the Court has explained, does not depict an "invasion" or "predatory incursion" for purposes of the AEA.

torture" and to "prohibit[ ] returning a noncitizen to any country where they would more likely than not face torture." (Resp., Doc. 42, 30–31)  They submit evidence describing alarming abuses within the El Salvadorean prison, CECOT, to which Petitioners claim the United States has sent and will continue to send individuals designated as alien enemies under the Proclamation. (*See* Declaration of Juanita Goebertus, Doc. 42–6)

Respondents argue that 8 U.S.C. § 1252(a)(4) "divests this Court of jurisdiction to review any cause or claim under the [Convention]." (Resp., Doc. 45, 25 (quoting *Benitez-Garay v. DHS*, No. SA-18-CA-422-XR, 2019 WL 542035, at *7 (W.D. Tex. 2019)))

The Fifth Circuit does not appear to have addressed a similar issue, and certainly not one involving the interplay between the AEA, the INA, and the Convention.  The Second Circuit, however, in a case analogous to the present lawsuit, recently agreed that Section 1252(a)(4) barred a consideration of Convention-based arguments in a habeas proceeding. *See Kapoor v. DeMarco*, 132 F.4th 595, 608 (2d Cir. 2025).  In that case, a court granted a request for a certificate of extraditability against Monika Kapoor, an Indian citizen.  She filed a habeas petition that "rest[ed] on the central claim that the Department of State failed to conduct a meaningful review of her claim that she will likely be tortured if she is extradited to India, in violation of [the Convention]." *Id*. at 606.  Rejecting that argument, the court emphasized the statute's broad language:

> Notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of any cause or claim under the United Nations Convention Against Torture and Other Forms of Cruel, Inhuman, or Degrading Treatment or Punishment, except as provided in subsection (e).

8 U.S.C. § 1252(a)(4).  Based on this provision, the Second Circuit concluded that "the language of Section 1252(a)(4) plainly bars any habeas review of CAT claims[.]" *Kapoor*, 132 F.4th at 609. The Fourth Circuit and at least one federal district court in Texas have reached similar conclusions. *See Mironescu v. Costner*, 480 F.3d 664 (4th Cir. 2007); *Benitez-Garay*, 2019 WL 542035.

The Court finds the reasoning of these decisions persuasive.  Section 1252(a)(4) leaves no room for discretion, and divests this Court of considering in this habeas action whether removal under the AEA would violate the Convention.  At the hearing on the Motion for Preliminary Injunction, Petitioners' counsel attempted to distinguish *Kapoor* on the grounds that it concerns extradition.  But that distinction does not narrow the reach of Section 1252(a)(4).  As a result, the Court concludes that it does not possess jurisdiction to consider Petitioners' challenges to the Proclamation based on the Convention.

## III.  Conclusion

The Court has concluded that J.A.V., J.G.G., and W.G.H., in their individual capacity and as representatives of the certified class, have demonstrated entitlement to relief in habeas.  Respondents have designated or will designate them as alien enemies under the Proclamation, subjecting them to unlawful detention, transfer, and removal under the AEA.  As a result, J.A.V., J.G.G., and W.G.H. are each entitled to the granting of their Petition for a Writ of Habeas Corpus, and a permanent injunction prohibiting Respondents from employing the Proclamation and the AEA against them.  The certified class warrants similar protection.  The Court will issue a Final Judgment with the appropriate relief.

To the extent that J.A.V., J.G.G., and W.G.H., or any member of the certified class, have been detained or are detained in the future pursuant to the Immigration and Nationality Act, they have not sought and do not obtain any relief.  In addition, the conclusions of the Court do not affect Respondents' ability to continue removal proceedings or enforcement of any final orders of removal issued against J.A.V., J.G.G., and W.G.H, or against any member of the certified class, under the Immigration and Nationality Act.

Signed on May 1, 2025.

*Fernando Rodriguez, Jr.*
Fernando Rodriguez, Jr.
United States District Judge