```
 1              IN THE UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF TEXAS
 2                    BROWNSVILLE DIVISION

 3
     J.A.V. et al                    )
 4                                   )
                                     )
 5   VS.                             ) CIVIL ACTION NO.
                                     ) 1:25-CV-72
 6                                   )
     Trump et al                     )
 7

 8

 9

10                    INJUNCTION HEARING
        BEFORE THE HONORABLE FERNANDO RODRIGUEZ, JR.
11                    APRIL 24, 2025

12

13
                   A P P E A R A N C E S
14

15    FOR THE PETITIONERS:

16        MR. LEE GELERNT
          AMERICAN CIVIL LIBERTIES UNION
17        125 Broad Street
          18th Floor
18        New York, New York 10004

19    FOR THE DEFENDANTS:

20        MR. MICHAEL VELCHIK
          OFFICE OF IMMIGRATION LITIGATION
21        CIVIL DIVISION
          U.S. Department of Justice
22        P.O. Box 878
          Ben Franklin Station
23        Washington, D.C. 20044-0878

24

25
```

1            THE COURT:  You can be seated.

2    Good afternoon.  We are here in the matter of J.A.V.

3    et al. versus Donald J. Trump et al., 25-CV-72.

4            If lead counsel want to go ahead and make

5    their appearances.  And then if others at the table make

6    argument, they can then present themselves at that time.

7            MR. GELERNT:  Good afternoon, Your Honor,

8    Lee Gelernt for the plaintiffs from the ACLU.

9            THE COURT:  Okay.

10           MR. HU:  Daniel Hu for the United States,

11   but Mr. Velchik will argue for the government today.

12           THE COURT:  Thank you.  You're welcome to

13   remain at -- at counsel's table, especially if -- if

14   more than one individual may respond to some of the

15   questions that -- that I have.  Just when you do, please

16   make sure that one of the microphones is pointing toward

17   you so that it picks up your voice well and the record

18   is -- is clearer.

19           We have four pending motions that I did want

20   to address.  We have the Motion for a Preliminary

21   Injunction, that's document 42; a Motion to Certify

22   Class; document 4; Motion to Unseal Cisneros

23   Declaration, that's document 47; and the Motion to

24   Proceed Under Pseudonym, that's document 5.

25           I want to begin first with the Motion to

1    Unseal Cisneros Declaration.  And so question for the

2    respondents here:  The -- the -- how does the

3    declaration and the form AEA-21B reveal confidential

4    investigative methods, thought processes or -- sorry, or

5    jeopardize an ongoing or future investigation?

6              MR. VELCHIK:  Your Honor, the declaration

7    combined with the form does include references to the

8    movements of -- of vehicles, claims timing, the movement

9    on individuals, its center.  So certainly the -- the

10   declaration I think we believe is law enforcement

11   sensitive and we would oppose a -- a motion to unseal

12   that.

13             THE COURT:  The -- is it your contention

14   that the disclosure of the -- the declaration and the

15   form would create a risk of harm to any individual?

16             MR. VELCHIK:  We believe that risks of harm

17   in general apply in like circumstances, but we would

18   emphasize for the court unique circumstances here which

19   are described in Exhibits A & B to the respondent's

20   motions noting the heightened risks to staff posed

21   by gangs in general but in particular members of TdA.

22             And so we think that whatever law

23   enforcement sensitive concerns generally apply in these

24   circumstances, that they are exacerbated in this

25   particular context.

1              THE COURT:  I mean, I'm looking at the

2    declaration, which is under seal, it's document 49,

3    there's perhaps general references to movement of

4    individuals, but nothing particularly specific.

5              And it just describes time periods and the

6    procedures internally that the government would use in

7    its discussions with detainees when providing the notice

8    and explaining it to them in -- in -- in Spanish.

9              I guess I'm -- I have some difficulty

10   understanding what, you know, the -- the declaration

11   itself states that the declaration should be filed and

12   remain under seal because this process is law

13   enforcement sensitive, but -- but it's conclusionary in

14   that sense.  I guess just to ask again, I mean, what --

15   what is it about the procedures that reveals any type of

16   investigative method or that would jeopardize an

17   investigation?

18             MR. VELCHIK:  The declaration does include

19   quantitative estimates that if they were publicly

20   available would allow others to understand and interpret

21   the movement of law enforcement officials' vehicles.

22             And -- and we think that revealing

23   information to members of a foreign terrorist

24   organization about federal law enforcement movement of

25   vehicles, particularly when it pertains to potentially

1    movements to foreign countries in coordination with

2    other sovereigns, poses risks and we believe that

3    release of this information in combination with other

4    information individuals could glean could be used to

5    create risks that we think justify maintaining this

6    under seal.

7                THE COURT:  A response?

8                MR. GELERNT:  Your Honor, I want to choose

9    my words carefully but I -- I would say there is zero

10   merit to this sealing.  To begin with, the forms are

11   supposed to be, by the government's own admission, given

12   to the detainee.  Obviously, the detainee can give it

13   outside of the detention center.  So, right there, I --

14   I think that would have to defeat it.

15              But, more fundamentally, the declaration

16   goes to how much notice they're going to give people.

17   That is what's central to this court's determination on

18   the merits, it's what the Supreme Court is looking at.

19              They have told the Supreme Court and other

20   courts the amount of notice that they think they're

21   going to give, now they're saying in this declaration

22   that they're saying nobody can see.  I -- I can find no

23   conceivable basis for saying that they're not going to

24   let the public or the courts know exactly how much time

25   they're planning on giving people.

1           I don't understand remotely how it would

2    tell people the movements of law enforcement, especially

3    because if the form is given to detainees and they can

4    give it out, there's one sentence there, I don't -- the

5    fact that they think that these people are -- these

6    alleged gang members are dangerous has no bearing on not

7    revealing the notice requirements.

8           They have not submitted it to other courts,

9    presumably, or I -- I don't want to say presumably but

10   maybe that's not why they're not making it public.  We

11   would think they would have at least put it under seal

12   in other courts that are considering this exact issue.

13   As Your Honor knows, it's pending before the

14   Supreme Court.  I -- I -- I'm -- I apologize, I'm sort

15   of at a loss to understand it remotely how this can be

16   something that remains under seal when it goes to the

17   heart of this case, it doesn't go to law enforcement

18   movements.

19           I'm -- I'm happy to answer any questions,

20   Your Honor, but I -- I think -- and I -- I don't mean to

21   be cavalier about it, but I -- I don't see any possible

22   basis for keeping this under seal.

23           THE COURT:  Thank you.

24           Mr. Gelernt and Mr. Velchik, can you

25   approach to side bar.

```
 1                    (BENCH CONFERENCE.)
 2              THE COURT:  This portion of the record will
 3     be under seal for the moment.  So speak a little bit
 4     closer, this should be relatively brief.  So this
 5     portion of the record will be under seal for the moment.
 6              So, Mr. Velchik, this is document 49-1, can
 7     you identify for me the specific information that you
 8     feel is sensitive and law enforcement sensitive.  I see
 9     the reference to the numbers of hours, I don't see other
10     specific information that's (unintelligible) or
11     movement.  So if you can -- if you can take a look and
12     identify for me what you believe is the most sensitive
13     portion.
14              MR. VELCHIK:  In reference to the specific
15     hours that you identified, I think that is the part that
16     I would emphasize.
17              THE COURT:  Okay.
18              MR. VELCHIK:  Just as an abundance of
19     caution.
20              Yeah, certainly references to specific hours
21     are something that the government feels strongly
22     presents risks.  I think -- I think it's important that
23     I emphasize that.  You asked specifically about this is
24     law enforcement, but, as part of the analysis, I would
25     include not just cost but also like what the probative
```

1    benefits.

2              There is ongoing litigation in other courts,

3    I think there are other plaintiffs raising claims where

4    some of that information might actually be necessary for

5    a legal determination.  We believe that the plaintiffs,

6    the named plaintiffs in this case all have actual notice

7    and so some of those things aren't necessary for a legal

8    decision on some of the issues that we think are

9    adequately or correctly presented before this court.  So

10   I think that also forms our analysis.

11             THE COURT:  Okay.  Thank you.  And so we're

12   un -- I unseal this portion of the record, so everything

13   that has been said here is not sealed so you can return.

14             (OPEN COURT.)

15             THE COURT:  The public has a general right

16   to access and inspect judicial records.  I find that the

17   disclosure of form AE -- AEA-21B and the declaration of

18   Mr. Cisneros would not reveal confidential investigative

19   methods, thought processes or jeopardize an ongoing or

20   future investigation and would not pose a risk of harm

21   to any individual.

22             In particular, Mr. Velchik noted that the

23   sensitive information concerned the number of hours that

24   individuals who were designated as enemy aliens would

25   have to notify the government that the person intended

1   to file a petition for habeas relief and the number of

2   hours that the person would have to actually file the

3   habeas action before the government would move forward

4   with removal.

5          That's obviously not part of any

6   investigation because the person's already in custody

7   and has been detained, will not affect any rights or --

8   or any ongoing investigation as to that individual, and

9   it's hard to determine how that would affect

10  investigation as to other individuals for the public to

11  know how much notice the government is providing to

12  designated enemy aliens.

13         So the Motion to Unseal Cisneros Declaration

14  is granted.  I direct the clerk's office to unseal

15  document 49-1.

16         The next -- the next matter is the Motion to

17  Proceed Under Pseudonym.  Does the government oppose

18  that motion, that's document number 5?

19         MR. VELCHIK:  The government does not

20  oppose.

21         THE COURT:  Okay.  So the Motion to Proceed

22  Under -- Under Pseudonym's, document number 5, is

23  granted and we will continue in this proceeding using

24  the initials of the individuals.

25         I have a number of questions on different

1    topics that the Motion for Preliminary Injunction and

2    the Motion to Certify Class raise.  I don't plan to

3    cover all the issues that the motion and the briefs

4    raise, but have questions on some issues that I think

5    will facilitate my consideration of -- of the pending

6    motions.

7                At the end of my questions, I will give each

8    side ten minutes to present on any other issues that we

9    have not covered or that you may want to emphasize to

10   the court.  So you can sort of keep track of the topics

11   that we cover and then choose to either mention

12   something we haven't raised or emphasize a particular

13   point that we have covered.

14               On the first matter I want to talk about is

15   the removal of the named petitioners.  So this is

16   related to J.A.V., J.G.G. and W.G.H.  Question for

17   respondents:  Has the United States Government provided

18   notice to any of the named petitioners, the three, since

19   the Supreme Court's J.G.G. decision and the notice being

20   that they are an enemy alien under the proclamation and

21   subject to removal under the AEA?

22               MR. VELCHIK:  The government is not aware at

23   this time.  We understand that the three named

24   plaintiffs have actual notice of their ability to

25   proceed in habeas, they have done so, we are here, and

1   the government has no plans to remove them pending

2   resolution of this litigation.  We think that this is

3   the appropriate vehicle to evaluate the claims that they

4   have as recognized by the Supreme Court's decision in

5   J.G.G.

6           THE COURT:  So those are my follow-up

7   questions, right, do -- do you -- are you representing

8   that the United States will not remove or deport any of

9   the named plaintiffs based on the AEA and the

10  proclamation during the pendency of this lawsuit?

11          MR. VELCHIK:  That is my understanding of

12  the government's position, yes.

13          THE COURT:  Okay.  And -- and do -- are you

14  representing that the United States will not transfer

15  the named plaintiffs outside of the Southern District of

16  Texas during the pendency of this lawsuit?

17          MR. VELCHIK:  Certainly the government is

18  complying with the Temporary Restraining Order this

19  court has issued and that would be a reasonable like

20  constraint to preserve jurisdiction under this court.

21          THE COURT:  Well, the question is whether I

22  issue a preliminary injunction.  So the question is, if

23  I don't issue a preliminary injunction, will the

24  government nevertheless not transfer the named

25  plaintiffs outside of the Southern District of Texas

1    during the pendency of this lawsuit?

2              MR. VELCHIK:  The government has no

3    intention to transfer them out of the pend-- out of this

4    jurisdiction pending their lawsuit.  We believe this is

5    the appropriate vehicle to do so.  We think this is an

6    appropriate arrangement to pursue their claims as they

7    remain detained here.  This is a proper venue.

8              THE COURT:  And just to make sure, as

9    intentions sometimes change, does the government

10   stipulate that during the pendency of this lawsuit the

11   government will not transfer the named plaintiffs

12   outside of the Southern District of Texas?

13             MR. VELCHIK:  While considering the claims

14   under the Alien Enemies Act, provided there's no

15   independent basis to remove them under Title 8, we think

16   that that is an appropriate stipulation.

17             I -- I'm not aware of any intention to -- to

18   move them and we think this is the appropriate forum for

19   them to litigate their claims under the AEA.

20             THE COURT:  Okay.  And -- and you're

21   choosing words carefully, but I receive your statement

22   as an agreement and representation by the United States

23   that during the pendency of this lawsuit it will not

24   transfer the named plaintiffs outside of the Southern

25   District of Texas during the pendency of this lawsuit.

1          If the United States Government, I know

2   you've indicated that the United States doesn't intend

3   to give notice to the named petitioners, but if the

4   United States Government provided notice next week,

5   tomorrow, to any of the named petitioners that he is an

6   enemy alien under the proclamation and subject to

7   removal under the AEA, would that individual have to

8   restart his habeas action?

9          MR. VELCHIK:  No.  I think that with respect

10  to those named plaintiffs, this is an appropriate forum.

11  Government has no intention to -- to force them to

12  re-litigate that.  They've filed, the court properly has

13  jurisdiction over these claims, we believe.

14          THE COURT:  Okay.

15          And so, Mr. Gelernt, given the responses

16  by -- by the government as to the named plaintiffs, why

17  does the court need to enter a preliminary injunction?

18  Don't the representations by the respondents provide the

19  named plaintiffs the same protection that they seek

20  through the Motion for Preliminary Injunction?

21          MR. GELERNT:  Your Honor, so I think in

22  light of your clarifications, either there was a lot of

23  talking about intentions and -- and you sort of boiled

24  it down to we will not, and I understand the government

25  now to be stipulating that they will not move them out

1    of the district or remove them out of the country on the

2    basis of the Alien Enemies Act.  I think that, we -- we

3    would trust the government to -- to abide by that

4    stipulation to the court.

5            I think the real danger for us is this is

6    exactly what happened in the Northern District of Texas

7    before Judge Hendrix.  The government said --

8            THE COURT:  Well, let me stop you there.

9            MR. GELERNT:  Okay.

10            THE COURT:  That raises the issue of the

11    class.

12            MR. GELERNT:  Right.

13            THE COURT:  But as to the named plaintiffs,

14    no indication that the named plaintiffs in the matter

15    pending before Judge Hendrix have been attempted to be

16    removed or --

17            MR. GELERNT:  Right.

18            THE COURT:  -- or transferred, correct?

19            MR. GELERNT:  That's our understanding, yes.

20            THE COURT:  So we'll get to the issue of the

21    class.

22            MR. GELERNT:  Okay.

23            THE COURT:  All right.  So under -- under

24    appropriate circumstances, a court can convert a Motion

25    for Preliminary Injunction into a Motion for Summary

1  Judgment, particularly on -- on legal issues.  Here,

2  given the government's representations, there is no need

3  for the court to issue a preliminary injunction as to

4  the named plaintiffs.

5          But they continue to advance their attacks

6  on the President's application of the AEA through the

7  proclamation, the court's going to have to reach those

8  issues at -- at some time, the parties have presented

9  substantial briefing on those issues.

10          And -- and I know we've been operating under

11  an abbreviated briefing schedule, the legal issues have

12  been raised in similar litigation in various courts

13  and -- and the briefs that the parties have presented

14  are substantial and are -- are well prepared.

15          On the -- on the legal issues that the

16  Motion for Preliminary Injunction raises, and as to the

17  named petitioners, does either party object to the court

18  converting the Motion for Preliminary Injunction into a

19  Motion for Summary Judgment so as to issue a -- a

20  summary judgment either way on that issue?

21          First from petitioners?

22          MR. GELERNT:  We do not, Your Honor.

23          THE COURT:  Okay.  From respondents?

24          MR. VELCHIK:  No, Your Honor.  And I think

25  doing so would be consistent with the government's

1   interest in facilitating a timely resolution of these

2   important issues.

3               THE COURT:  Okay.  Thank you.

4               Any other evidence or legal arguments, in

5   particular evidence that either side believes they would

6   present with a Motion for Summary Judgment if we sort of

7   followed a more traditional approach and -- and did not

8   raise it for some time period?  Anything else that you

9   would submit from the petitioners, Mr. Gelernt?

10              MR. GELERNT:  Your Honor, we would just ask

11  for 24 hours to see whether there's additional

12  information we need to present with respect to the now

13  unsealed declaration.  As Your Honor knows, we didn't

14  get that till this morning, the actual attachment and

15  the actual declaration till very late, well after the

16  government was supposed to respond.  So we would just

17  ask for 24 hours to examine it a little bit more

18  carefully to see whether there's anything we need to put

19  in, but I suspect there won't be, but I would ask the

20  court's indulgence for that.

21              THE COURT:  Understood.

22              And then from the respondents, anything

23  else?

24              MR. VELCHIK:  We would also use additional

25  time if provided to the opposing side on --

```
1             THE COURT:  Well, the -- the -- my
2   understanding is Mr. Gelernt is asking for an extra day
3   just to file a supplemental reply to exhibit D, document
4   49-1, on that limited issue.  That's -- that's the
5   respondents document --
6             MR. VELCHIK:  Right.
7             THE COURT:  -- so you've submitted that
8   and -- and I'm considering that.  Any other evidence
9   that the -- the government would submit if I allowed
10  more time to consider this as a Motion for Summary
11  Judgment in a more traditional schedule?
12            MR. VELCHIK:  I can't think of any at this
13  time.
14            THE COURT:  All right.  Thank you.
15            So as to the named petitioners, I convert
16  the Motion for Preliminary Injunction into a Motion for
17  Summary Judgment and notify the parties of my doing so.
18            To the extent that I certify a class, I will
19  do the same and convert the Motion for Preliminary
20  Injunction as to the class into a Motion for Summary
21  Judgment.  The issue of whether I certify a class, of
22  course, is -- is separate.
23            One, I -- I do grant the petitioners until
24  tomorrow, April 25th, to file a supplemental reply with
25  argument and/or additional evidence related to the
```

1   declaration of Mr. Cisneros, that is document 49-1.

2           MR. GELERNT:  Thank you, Your Honor.

3           THE COURT:  So now, Mr. Gelernt, one caveat

4   on my converting it into a Motion for Summary Judgment,

5   given the respondent's position, can I reach the named

6   petitioners challenge regarding the notice procedures?

7   Right, the -- the intent of the notice procedures is to

8   allow the individual designated as the enemy alien to

9   seek relief in habeas.  The named petitioners have done

10  so.

11          Even if I conclude that the named

12  petitioners are correct that the government's notice and

13  procedures are inadequate, don't satisfy the -- the AEA

14  based on the language that the Supreme Court in J.G.G.,

15  there's no relief that would stem from that conclusion,

16  is there?  It would effectively be an advisory opinion

17  as to the named petitioners, would it not?

18          MR. GELERNT:  Your Honor, so this is the

19  first time we're hearing that the government is

20  stipulating and so I -- I think, you know, if necessary,

21  we would put something in about that.

22          But I -- I think you can, Your Honor, just

23  because this is a class and so the government can't moot

24  out a -- a ruling by taking the named petitioners off

25  the board.  So that's sort of standard class-action law.

1          So, for that reason, I'm not sure that it

2     ultimately matters as a -- you know, as a sort of

3     practical application of this.  We could always put in a

4     different named petitioner, but I don't think Your Honor

5     would have to have that because, once a class is filed

6     and the papers are on file, the government could

7     continuously moot the issues by just taking the named

8     petitioners off the board.  So I don't think it's

9     necessary.

10          I think the Supreme Court did want new

11     notice.  And you're right, Your Honor, that's a fair

12     point that it was to be able to file a habeas and a

13     habeas is on file, but we don't know exactly what the

14     allegations specifically will be to the named

15     petitioners.  And so, in that respect, we can't assume

16     that -- that the notice won't be necessary if they need

17     to amend their habeas petition in some respect.

18          But I think it's a fair point, Your Honor, I

19     would just say that one way or the other you can

20     ultimately reach the merits because the named

21     petitioners can't be mooted, can't moot the class.

22          THE COURT:  Okay.

23          And respondent, respondents have a position

24     on that point?  Can I reach as to the named plaintiffs

25     the issue of whether the notice and the procedures for

1    the notice satisfy the AEA's requirements as described

2    in J.G.G.?

3                    MR. VELCHIK:  No, Your Honor, for the

4    reasons that you described in your analysis, the named

5    petitioners would lack standing with respect to that

6    point, the court would therefore lack jurisdiction.  To

7    the extent that the court is evaluating punitive class

8    action, that would also destroy typicality or

9    commonality.

10                   THE COURT:  All right.  Thank you.

11                   Let me turn to the political question

12   doctrine.  The D.C. circuit's decision in El-Shifa,

13   Judge, then Judge Kavanaugh notes in his concurrence

14   that the political question doctrine has -- had never

15   been applied to preclude review of a challenge based on

16   a federal statute as opposed to the Constitution.

17                   So question first for -- for the

18   respondents:  Aside from El-Shifa, are you aware of a --

19   of a court applying the political question document to

20   preclude review of a statutory challenge?

21                   MR. VELCHIK:  Standing here now, I cannot

22   name one specifically.  But the government would

23   emphasize that the Alien Enemies Act is a very old

24   statute, dates back to the 5th Congress.  It uses

25   language that is similar to language in the Constitution

1    where we think the political question doctrine is most

2    appropriate.  The government continues to believe that a

3    political question doctrine precludes review of whether

4    or not the conditions have been met.  And that remains

5    our argument from the brief.

6              THE COURT:  And on this point, Mr. Gelernt,

7    does it make a difference that this challenge is -- is

8    statutory?  Aren't -- aren't the principles the same as

9    if we were addressing the Executive Branch's

10   responsibilities and powers under, for example, the

11   invasion clause of the Constitution, don't the *Baker*

12   factors apply equally whether the Executive Branch is

13   making decisions regarding foreign policy and national

14   security based on a Constitutional provision rather

15   than -- and a statute?

16             MR. GELERNT:  Right.  Your Honor, we think

17   it absolutely does, I think for the reasons

18   Judge Kavanaugh said and the reasons the Supreme Court

19   has increasingly emphasized in its political question

20   doctrine that when you have Congress passing a statute

21   and deciding what powers they are going to vest in the

22   Executive Branch, it's critical that the courts be able

23   to review those statutory predicates; otherwise, it's

24   essentially saying the Executive Branch can do whatever

25   they want.

```
 1                  And so I think that's why the Supreme Court
 2    has never permitted the political question doctrine to
 3    divest this -- any court of jurisdiction over the
 4    statutory predicate.  So that -- that's the first thing
 5    generally about political question doctrine.
 6                  THE COURT:  Well, let me -- let me just stop
 7    you there.
 8                  MR. GELERNT:  Yeah.
 9                  THE COURT:  I mean, can't the same concern
10    also be raised as to constitutional issues?  The courts
11    construe the Constitution to determine whether a state
12    actor has exceeded the powers that the Constitution
13    gives that state actor, isn't that the same as -- as
14    with a statute?
15                  MR. GELERNT:  I -- I don't think so,
16    Your Honor, for the following reason that you don't have
17    the same separation of powers question.  It's a fair
18    point, Your Honor, that it does raise delicate questions
19    if the Executive Branch has completely unfettered
20    discretion to interpret the Constitution.  And the
21    Supreme Court generally hasn't done that.
22                  But I think what the Supreme Court is
23    getting at what Judge Kavanaugh was getting at is, where
24    Congress is acting in equal political branch, it's
25    critical that the courts ensure that the Executive
```

1    Branch is not taking power away from Congress.

2              And -- and I would emphasize more

3    specifically as to -- unless Your Honor doesn't want me

4    to go there right now as to the Alien Enemies Act --

5    there has always been review of the statutory

6    predicates.  And I want to turn back to Ludecke, but

7    just in the J.G.G. decision that Your Honor's aware of

8    from April 7th of the Supreme Court, it specifically

9    quoted the language from Ludecke saying the construction

10   and validity of the act can be construed.

11             Otherwise --

12             THE COURT:  Well, we'll get --

13             MR. GELERNT:  Yeah.  Okay.

14             THE COURT:  I'll stop you there and we'll --

15             MR. GELERNT:  Okay.

16             THE COURT:  -- certainly get into those

17   issues.

18             But I have another question for you:  Is it

19   your position -- yes, Mr. Gelernt -- is it your

20   position, that as part of my analysis on the issues that

21   the petitioners raise, I should weigh the truth of the

22   President's statements about Venezuela and TdA and the

23   proclamation and the -- or within the documents

24   referenced in the proclamation?

25             MR. GELERNT:  Your Honor, that's a critical

```
1   question and I'm glad you'd give me a chance to answer
2   that.  We don't think Your Honor has to reach that for
3   the following reason:  We think that if you construe the
4   Alien Enemies Act in the way we have suggested and the
5   way Judge Henderson suggested and they way I think all
6   the historical materials suggest, once you construe
7   those provisions to say it has to be a foreign
8   government, not a gang that has some influence on a
9   foreign government, and it has to be a military action,
10  not a gang that commits criminal activity in the U.S.,
11  if you construe the statute that way, then I don't think
12  you need to test the validity of the factual findings
13  because nothing within the four corners of the
14  proclamation remotely says this is a military action by
15  a foreign government.  And so that's all you would have
16  to do.
17          Now we do think you could review fact -- the
18  facts, the findings based on -- even under a deferential
19  standard, I don't think those findings, those -- they're
20  very conclusionary and I don't think those would stand
21  up.  But we think Your Honor doesn't need to go further
22  than the -- the face of the proclamation and -- and to
23  show that it's inconsistent with the Alien Enemies Act
24  properly construed.
25          THE COURT:  And I understand your position
```

1    regarding the definitions of invasion and foreign

2    government and whatnot, and we'll -- we'll get to that

3    here -- here in a bit, but assuming that I construe the

4    terms more in line with the respondent's position, you

5    submitted -- the petitioners submitted declarations from

6    three individuals --

7                    MR. GELERNT:  Yes.

8                    THE COURT:   -- with extensive information

9    about TdA and the government of Venezuela, the ties

10   challenging the statements within the proclamation and

11   presumably asking me to weigh that against the

12   statements in the proclamation and the, you know,

13   designation of TdA as a transnational criminal

14   organization and things of that nature, isn't that

15   exactly what the political question doctrine teaches

16   that courts should not get into, you know, engaging,

17   weighing decisions by the Executive Branch that rely on

18   intelligence and data, weighing priorities related to

19   national security and foreign policy considerations?

20                    Aren't you -- at least that position seems

21   inconsistent with the principles of the political

22   question doctrine.

23                    MR. GELERNT:  Right.  Well, well, certainly

24   not weighing priorities, I agree that that is something

25   for the Executive Branch.  But factual determinations,

1    straight factual determinations, I think the court

2    always can weigh those and did do that during World War

3    II when we have cited cases.

4         Now Your Honor may decide there is some

5    deference owed to the Executive Branch, but we think the

6    declarations show that the find -- what are ultimately

7    conclusionary findings have no basis in fact.  And under

8    any standard of review, we think they don't hold up.  So

9    I think fact -- straight factual findings, I don't think

10   implicate the political question doctrine.

11        Now if you were to say to me can the

12   government decide TdA is more dangerous than another

13   gang and that's why we're going to prioritize them, I

14   think then we would be getting into a realm where

15   Your Honor would have to step back.

16        THE COURT:  Okay.  Let me --

17        MR. GELERNT:  But not on the straight

18   factual findings.

19        THE COURT:  Right.  I understand.

20        It is relatively easier, I think, to

21   determine does a declared war by Congress exist as

22   opposed to an invasion or a predatory incursion, so

23   the --

24        MR. GELERNT:  Right.

25        THE COURT:  -- the three circumstances under

1    which the AEA has been previously invoked have all

2    concerned declared wars, so it was easier.

3              And I understand that's part of the argument

4    related --

5              MR. GELERNT:  Yeah.

6              THE COURT:  -- to the definition of those

7    terms, but here it's based on invasion, predatory

8    incursion --

9              MR. GELERNT:  Right.

10             THE COURT:  -- threatened invasion,

11   predatory incursion, how do I weigh that without getting

12   into sensitive intelligence and data that the Executive

13   Branch holds?

14             MR. GELERNT:  Well, well, so here -- here's

15   what I would say, Your Honor, and I think that

16   Judge Henderson laid it out nicely, that it would still

17   have to be a military invasion or incursion.  And so I

18   think that's the key.  And because it's paired with

19   declared war, I think that's what Congress was getting

20   at, that's what all the historical materials suggest.

21   And, again, that's what Judge Henderson said.  So once

22   you find that it has to be a military invasion, I don't

23   think that the findings go anywhere near a military

24   invasion.

25             And I would look at the government's own

1    evidence, if you were going to go there, the -- the

2    Smith declaration the government put in about TdA uses

3    the word criminal or crime 15 times and says this is a

4    law enforcement matter.  Never once suggests that TdA is

5    engaging in military activity.

6             So as long as Your Honor was defined that it

7    has to be military, then I don't think it matters how

8    dangerous TdA is, how much the President thinks TdA is

9    engaging in incursion in the U.S.  I think right there,

10   that -- the government's own declaration, again the

11   Smith declaration, shows that even the government is not

12   really suggesting this is military in nature.

13             THE COURT:  Okay.  Thank you.

14             Mr. Velchik, sort of looking at it from the

15   other side, Supreme Court has confirmed that an

16   individual subject to detention and removal under the

17   AEA is entitled to judicial review as to questions of

18   interpretation of the statute.

19             Doesn't that right include the court

20   defining the terms of the AEA to determine whether the

21   Executive Branch has exceeded the scope of the AEA?

22             MR. VELCHIK:  Certainly the Supreme Court's

23   decision in J.G.G. emphasized that there were factual

24   determinations left to review.  We acknowledge that it

25   also included language about the constitutionality in

1    the interpretation of the AEA.

2            The AEA has several sections, there may be

3    some legal terms that may be amenable to interpretation

4    and others may not, I think that this court and

5    plaintiffs have focused on two terms in particular, one

6    of which is the condition about whether there's a

7    declared war or a predatory incursion or even a

8    threatened predatory incursion.

9            For some of the reasons raised by this

10   court, that particular determination could be precluded

11   by the political question doctrine and yet there could

12   be other portions of the statute that might be more

13   amenable to judicial review.

14           I think in particular also emphasize, when

15   it comes to a predatory incursion, there could be

16   evolving situations with military -- with military

17   incursions.  If a court were to say today, you know,

18   this does or does not satisfy a threatened predatory

19   incursion, does that hamstring the ability of the

20   Executive to alter that determination or to try again in

21   other case?  I think there are a number of complications

22   in addition to the judicial amenable standards that this

23   court has raised.

24           A second term of -- of art -- legal term of

25   significance that has been challenged has been a foreign

1    nation or government.  And whether or not TdA satisfies

2    that, I think, is also amenable to the same arguments

3    about it's a political question.  But I think that there

4    are also additional reasons to suggest that it might be

5    inappropriate for a court to second guess the

6    President's determination there.

7            I mean, in particular, Zivotofsky, you know,

8    clarifies that the Executive Branch uniquely holds the

9    power of recognizing foreign nations.  And that might

10   also further counsel of limited review of that term.

11           But, overall, I think the -- the structure

12   with which I would analyze the question is, that as a

13   threshold determination, we think that those two

14   questions are political questions not subject to review

15   by a court.

16           I think that there is a second option which

17   is that this court could review the face of the

18   President's proclamation to see whether it comported

19   with the requirements of the AEA.

20           And then I think there's a third layer,

21   where if this court, if it so chose, could engage in

22   empirical fact finding investigations to determine

23   whether or not there really is a declared war, predatory

24   invasion by a foreign government.

25           There's evidence in the record that -- that

1   both sides have submitted, I think that there are a

2   number of -- of problems with a court weighing those

3   determinations.  And so our first argument is that --

4   that both questions are subject to the political

5   question doctrine.

6           But even if they are reviewable by a court,

7   we believe that there's enough on the face of the

8   President's proclamation, the State Department's

9   designation of TdA as a foreign terrorist organization,

10  offer this court to engage in interpretation to satisfy

11  the Supreme Court's direction for review in this case.

12          THE COURT:  Now you argue in your response

13  that as for whether the acts preconditions are satisfied

14  that is the President's call alone.  The federal courts

15  have no role to play.

16          Is it your position that the President under

17  the AEA and its powers has the authority to define what

18  an invasion or a predatory incursion includes and then

19  declare that an invasion or declaratory -- or predatory

20  incursion has occurred, been attempted or been

21  threatened based on his own definitions?

22          MR. VELCHIK:  Yes, for the -- the same

23  framework that I think I explained.

24          THE COURT:  I mean, doesn't that render the

25  President's powers under the AEA effectively limitless?

1              MR. VELCHIK:  The AEA is an emergency

2    authority and we do recognize that the political

3    question does limit judicial review in certain

4    circumstances, but courts have done so in the context

5    of -- of foreign affairs and national security.

6              But even if this court does interpret those

7    terms for itself, we believe that applying traditional

8    tools of statutory interpretation, combined with what we

9    think would be the appropriate deference to the

10   Executive Branch, would still satisfy the plain meaning

11   of those terms as they've commonly been understood at

12   law and at the time that the act was passed.

13             THE COURT:  I mean, there are various

14   decisions by the Supreme Court and lower courts that

15   have defined terms of the AEA and citizen, denizen, that

16   phrase.  For example, doesn't that reflect that when

17   J.G.G. confirms prior decisions that questions of

18   interpretation of the statute are subject to judicial

19   review, in part, at least means that courts get to

20   define the words of the statute and then determine

21   whether what the President has proclaimed falls within

22   that definition?

23             Not gauge the facts, whether those purported

24   facts are true or not, but is what is described in the

25   proclamation fall within the defined terms of invasion

1   and predatory incursion as commonly, ordinarily

2   understood at the time of its enactment?

3              MR. VELCHIK:  Yes, we acknowledge those

4   authorities.  There are also a number of other

5   authorities that do speak in quite broad terms about the

6   AEA being unreviewable, but, yes, we do believe that the

7   President's proclamation and his exercise of those

8   authorities in this particular case would satisfy a

9   judicial review of all the appropriate terms as they've

10  been used in this case.

11             THE COURT:  Thank you.

12             Mr. Gelernt, in looking at the President

13  Roosevelt's invocation of the AEA in December 1941, the

14  proclamation he issued includes no facts, at least

15  from -- from my review of it, it merely declares that

16  Japan had invaded the United States, declares that

17  Germany and Italy threatened to invade the

18  United States.

19             No one appears to have challenged the

20  proclamation, so we don't have a judicial determination

21  of whether that was appropriate or not, but doesn't

22  FDR's invocation of the AEA in that matter support the

23  idea that a president effectively can merely declare

24  that the exigencies or conditions necessary to invoke

25  the AEA exist without having to provide any additional

1    information?

2              MR. GELERNT:  Yeah, Your Honor, so I feel

3    like what is happening to us is that the government is

4    asking us to fit a square peg into a round hole rather

5    than them doing so.

6              And as Your Honor has noted, the

7    proclamation -- I mean, the Alien Enemies Act has been

8    around since 1798.  It's only been used three times in

9    the country's history, all during declared wars.

10             I don't think that someone thought, well,

11   maybe I can walk into court and say the United States is

12   not at war.  And so I think those are the reasons why

13   these types of questions haven't arisen because every

14   other administration back to 1798 has understood we use

15   this only during a declared war.  And even during those

16   declared wars, we're not aware of any removals except

17   World War II.  So we -- we do think that the

18   proclamation would have to make findings.  I think the

19   Alien Enemies Act, the way the Supreme Court has

20   suggested it, do need to make findings.

21             And I think, you know, just to re-emphasize

22   Your Honor's point about J.G.G. must have meant

23   something, the Supreme Court must have meant something

24   in quoting that language you can construe the act;

25   otherwise, the government -- the President could

1   literally name anybody, any gang under the proclamation.

2   That can't be what Congress meant.

3        You know, I -- I don't need to sort of

4   belabor the point, but every religious and ethnic group

5   in this country has been tied to some criminal

6   organization at some point in the past.  It would mean

7   the President could literally do whatever he wanted and

8   all of a sudden people within 12 hours could be in a

9   Salvadorean prison.

10       And so, you know, not only is it J.G.G. but

11  they did quote Ludecke.  And Ludecke, contrary to the

12  government's understanding of it, did actually construe

13  the terms and reach the merits.  So what the individual

14  in Ludecke walked into court and said is:  There's no

15  declared war.  Meaning, I want to construe the declared

16  war term because there's no longer a shooting war in the

17  Supreme Court's terms.  There's no longer actual

18  hostilities.

19       And the Supreme Court said:  We're going to

20  construe declared war not to mean that there has to be

21  actually shooting going on.  Only after it construed the

22  term to mean it doesn't have to be actual shooting at

23  the time did it then go to say and then Congress and the

24  President will decide when to declare the war over.

25       In case after case, as Your Honor has

1    pointed out, construed statutory terms; otherwise, there

2    would literally be unlimited power.  Congress passed a

3    very specific statute and I think it goes to the fact

4    that we are not here --

5            THE COURT:  Let me stop you there for now --

6            MR. GELERNT:  Yeah, I'm sorry, Your Honor.

7            THE COURT:  -- and move on.

8            Just a follow up to -- to Mr. Velchik, on

9    this issue of limits, under your position, could the

10   President determine that an invasion or predatory

11   incursion has occurred -- and this is a hypothetical so

12   those are always tricky, but -- that -- that a foreign

13   nation has sent or intends to send agents to the

14   United States to obtain positions of authority in

15   corporate America and from there make decisions that

16   destabilize the nation's economy?

17           Is that enough?  And that's an invasion

18   under the proclamation.  If the President gets to define

19   the terms and then declare that it exists, would the

20   President be able to invoke the statute for mere

21   economic injury, the stealing of intellectual property

22   by a foreign nation?

23           MR. VELCHIK:  Certainly if the political

24   question precludes judicial review, that would limit the

25   ability of courts to second guess those determinations

```
1    even in some of the hypotheticals that you've raised.
2              THE COURT:  Well, that's your position, it
3    does preclude political review.  So you're saying that
4    it would preclude judicial review in that scenario?
5              MR. VELCHIK:  And under those scenarios, I
6    mean, there would also be checks on the Executive
7    Branch.  A lot of the sorts of questions that are
8    uniquely committed to the Executive Branch under the
9    political questions doctrine for which there's not
10   judicial review, there are other mechanisms for
11   accountability:  This includes impeachment, democratic
12   elections, so there are other backstops to second
13   guesses and terminations even if judicial review is not
14   available.
15             However, if judicial review is available, we
16   do think that the facts are very different from that
17   hypothetical and fall squarely within the terms as
18   they're commonly understand.
19             THE COURT:  Okay.  And -- and, Mr. Gelernt,
20   right, Mr. Velchik mentioned, I think it's Judge Story
21   in one of the decisions references, I think it's under
22   the militia act, but, you know, can this be abused?
23   Yes, as any statute can be abused.  But when it's a
24   matter that is political in nature, the remedy is the
25   political process.  It's impeachment or the next
```

1  election or -- or Congress amending the statute.  So if

2  the AEA, if I determine that it should be construed

3  broadly, isn't the appropriate remedy the political

4  process and not the courts trying to determine or -- or

5  limiting the President's powers under it that were not

6  intended at the beginning?

7          MR. GELERNT:  Yes, Your Honor, a -- a few

8  things.  One is that obviously the Supreme Court has

9  decided that the political question doctrine should be

10  narrowed in recent times.  And that is why I think

11  Judge Kavanaugh has pointed out that he's not aware of

12  any time, even back in the day when statutes weren't

13  construed, but certainly now the Supreme Court has

14  emphasized it.

15          But I think your question assumes that you

16  are going to review the statute at least to decide what

17  the terms are.  And so I think that goes beyond even

18  what the government is saying you can do.  I mean, if

19  you can't review the statutory terms and there's

20  literally no check and -- and it's not -- the

21  political -- the political process can't be to check if

22  there's a statute, Congress was very clear in

23  (unintelligible).

24          And what I was going to say before is that

25  it's not as if we're here saying you have two choices:

1    Either they can't use the Alien Enemies Act or let

2    everyone roam around even if they think they're

3    dangerous.  No one's saying they can't be criminally

4    prosecuted, no one's saying they can't be removed under

5    the immigration laws.  And, in fact, there's an alien

6    terrorist court that allows them to use special

7    procedures.  No one's saying --

8                THE COURT:  Well, I'll stop you there, I

9    think you're getting off point, but I understand the

10   point.

11               MR. GELERNT:  Yeah, no, I --

12               THE COURT:  And I agree that the ultimate

13   outcome of this lawsuit does not result, at least -- at

14   least as to the named petitioners, the release of the

15   individuals.  They're not seeking release.

16               MR. GELERNT:  Right.

17               THE COURT:  They're seeking adjudication or

18   the ability to proceed under Title 8 in the immigration

19   courts and the procedures that are set forth there.

20               MR. GELERNT:  Yeah.  And so, Your Honor, I

21   just --

22               THE COURT:  But let -- let me turn to a

23   different topic.

24               MR. GELERNT:  Okay.  Well, I was just going

25   to -- I apologize.

```
1                    THE COURT:  Well, I'll just --

2                    MR. GELERNT:  Okay.

3                    THE COURT:  You'll have your ten minutes at

4      the end.

5                    MR. GELERNT:  Okay.  I'm sorry, Your Honor.

6                    THE COURT:  The -- turning to the definition

7      of invasion and predatory incursion, so, first, the --

8      the respondents, just to understand your proposed

9      construction, how do you distinguish between an invasion

10     and a predatory incursion for purposes of the AEA?

11                   MR. VELCHIK:  So the text of the AEA

12     references declared war, which we think is a

13     well-defined term under the Constitution.

14                   THE COURT:  Correct.  I don't think that's

15     at issue here.

16                   MR. VELCHIK:  Correct.  But I would

17     emphasize that invasion does appear in the text of the

18     Constitution under suspension clause.  And to the extent

19     that there are legal authorities interpreting it there,

20     that would also be probative of its interpretation in --

21     in this case.

22                   Just applying purely textural tools of

23     statutory construction, I would emphasize that the text

24     of the AEA in this section is remarkably expansive when

25     compared to any other provision either of the
```

1    Constitution or other similar statutes.

2              There are some provisions in the

3    Constitution section that do turn on a declared war, and

4    that has a legal significance, the suspension clause

5    speaks of invasion or rebellion.  But here we have the

6    inclusion not only of those terms, but also predatory

7    incursion.  And we think that the inclusion of predatory

8    incursion, alongside those other two terms, reflects

9    Congressional intent that the scope of the AEA must be

10   substantially broader; otherwise, you'd be rendering the

11   term predatory incursion nukatory (ph).

12             We also think that those three terms are

13   also read in the same sentence alongside.  There --

14   there's a three-term series about whether it's

15   threatened, and so I think that is further evidence of

16   Congressional intent to be quite expansive in scope.

17             We think that interpreting those terms

18   should be expansive because they are.  And it also

19   reflects a certain amount of deference to the Executive

20   Branch to define that falls anything within either of

21   the three terms or even the threat of those three terms.

22             In addition to strictly looking at the text

23   of the statute, we also believe it's appropriate to look

24   at the original understanding and the history.

25   Certainly at -- at the time of the founding under the

1    5th Congress, the United States not only engaged in

2    formal wars with other traditional European sovereigns,

3    but also dealt with other groups that presented threats

4    to national security of the United States, whether these

5    were predatory attacks by Indian tribes, there were the

6    Barbary pirates under Thomas Jefferson, and then even

7    today the United States Government continues to deal

8    with other threats from entities, governments or

9    terrorist organizations.

10                   There's obviously case law on al Qaeda and

11   increasingly --

12                   THE COURT:  Let me stop you there.

13                   MR. VELCHIK:  Yes, sir.

14                   THE COURT:  So, I mean, on this issue, you

15   note in your response a couple of dictionary definitions

16   that include -- that have a meaning broader than some of

17   the definitions in other documents that petitioners

18   present to the court, are you aware of -- of secondary

19   sources, such as letters or pamphlets, using invasion or

20   predatory incursion, or just incursion for that matter,

21   in a manner that does not expressly refer to or imply

22   military activity or a military context?

23                   I mean, it -- it's understood, I think, I

24   accept that the promulgation of the AEA was with a

25   potential war with France in mind on the -- the

1    potential imminence of a war.  That doesn't necessarily

2    mean that all the phrases of the AEA have to be read in

3    a military context, what we're looking for is the plain

4    ordinary meaning of what those words meant in that

5    society at that time.

6             And so we -- we look for the usages of those

7    terms within the various sources.  There are some that

8    petitioners have presented that are very clearly

9    military in context, but I don't think that the

10   respondents presented those types of usages other than

11   other definitions exist.

12            Are you aware, you know, the pirates, you

13   know, the -- the settlers in the west and perhaps

14   incursions by native Americans, or -- or the French who

15   were out there, were these terms also used to refer to

16   those kinds of incursions?

17            MR. VELCHIK:  I believe so.  We agree with

18   the court that it's appropriate and the court can take

19   legal notice of authorities that are contemporaneous

20   that use those terms, whether they be letters or

21   otherwise, even if they haven't appeared in this brief.

22            I don't have a citation off the top of my

23   head.

24            THE COURT:  Did you provide any to the court

25   other than the dictionary definitions in your briefing?

1              MR. VELCHIK:  I mean, we have what's in the

2    brief, which we refer to the court.  I would emphasize,

3    though, I think even just entomologically, like

4    predatory invasions, I think, implies raids, which is

5    somewhat distinct from a formal, you know, like military

6    with tanks rolling across a -- a border.

7              THE COURT:  Well, well, I'll stop you there.

8              MR. VELCHIK:  Yes, sir.

9              THE COURT:  I mean, you're -- you're giving

10   me your view of what the words mean --

11             MR. VELCHIK:  I understand.

12             THE COURT:  -- in our society today.  We --

13   we obviously were looking at what those words could have

14   meant at the time, which I think we can only determine

15   based on sources from -- from that time.

16             But let me ask you a separate question.  In

17   your briefing, you acknowledge a time that the AEA is a

18   war time act.  And, for example, it appears you argue

19   that because of that the restrictions within the INA

20   don't apply, that this essentially trumps the INA

21   Title 8 because it's a war time act.

22             I mean, doesn't that argument support the

23   petitioner's point that the conditions required to

24   invoke the AEA should include a military context that

25   effectively amount to war or imminent war?

1            MR. VELCHIK:  No.  Our analysis of reading

2    Title 8 and the AEA proceeds chronologically where the

3    AEA was originally enacted in 5th Congress, obviously

4    the INA was passed much later.  Under the traditional

5    rules of a statutory interpretation, courts do not

6    lightly interpret -- interpret implied repeals.

7            We think that whatever the appropriate

8    interpretation of the AEA was enacted, that continues to

9    be a discreet mechanism to remove individuals.  It is

10   codified in a separate title dealing with national

11   security events, but we -- we regard that as an

12   independent mechanism to remove individuals separate

13   from Title 8.

14           THE COURT:  Okay.  And I think I -- just --

15   just to confirm, to the extent that courts have

16   construed the meaning of invasion as used in the

17   Constitution, that would be relevant to the meaning of

18   invasion as to the AEA, is that accurate from your point

19   of view?

20           MR. VELCHIK:  It is correct that to the

21   extent that courts have interpreted the meanings of one

22   word in one text that may be probative of its meaning in

23   another text, it does not mean that they are identical

24   or that it collapses but certainly it would be

25   probative.

1              THE COURT:  And that principal applies to

2    the word invasion in the AEA?

3              MR. VELCHIK:  Yes, correct.  Particularly in

4    light of the -- the timing of the two texts.

5              THE COURT:  On -- on the issue of foreign

6    nation or government, are you aware of any historical

7    record that uses foreign nation, foreign government to

8    refer to a non-political entity or organization, for

9    example, a fraternal order, a society, as opposed to a

10   society or a group of people who are subject to

11   governance and legal judicial political recognition?

12             MR. VELCHIK:  We have the authority cited in

13   the brief.  I would emphasize, that in the AEA, the text

14   includes a foreign nation or a government and those

15   terms are used together and that suggests that they are

16   not fully overlapping.

17             The fact that the term government appears

18   next to foreign nation suggests that the scope of the

19   AEA must be more expansive than might be traditionally

20   interpreted solely from the term foreign nation itself.

21             THE COURT:  Correct.  Right.  And one

22   question I did have for both sides, because I'm not sure

23   that it's briefed as distinctly as it could be, is there

24   a distinction between foreign nation and foreign

25   government for purposes of the AEA?  You know, what's

1    the position of respondents on that?

2              MR. VELCHIK:  Yes.  The -- the very fact

3    that the text of the statute refers to both indicates

4    that -- that they are not co-extensive.  Again, we also

5    think that the inclusion of not just invasion but

6    predatory incursion, you know, presupposes the sort of

7    other sorts of entities that might be engaging in raids

8    other than the traditional format of a foreign nation

9    engaging in a traditional war.

10             THE COURT:  And -- and from petitioners on

11   that point, distinction between foreign nation, for --

12   and -- and I read it as foreign nation or foreign

13   government.

14             MR. GELERNT:  Right.  That's the way we read

15   it, Your Honor.  We have been digging through historical

16   materials, haven't found anything where Congress

17   specifically addressed it, but I do think that foreign

18   government is the entity that makes treaties, nation has

19   a sort of broader term of un -- with citizens and

20   denizens.  And I think that, you know, is, as Your Honor

21   knows in the Alien Enemies Act, is, you know, citizens,

22   denizens.  So I think they both refer to a formal nation

23   government type, foreign as Your Honor as pointed the

24   out.

25             THE COURT:  Thank you.  And let me follow

1    up, Mr. Gelernt, here.  Proclamation states TdA has

2    control over portions of Venezuela, that the government

3    of Venezuela has ceded control of certain territories

4    over Venezuela.  If I accept that statement as true,

5    isn't that an indication that TdA is governing in that

6    portion of Venezuela?

7              MR. GELERNT:  Your Honor, I don't think that

8    the proclamation actually says they currently have

9    control over any particular area of Venezuela.  But even

10   if they did, Your Honor, I don't think that goes to them

11   being the foreign government or nation who has citizens

12   and denizens who can make treaties with other nations.

13   I think that would be a stretch.  I -- I think you could

14   look at almost any country, including ours, where, you

15   know, there may be a gang that has significant control

16   over a few blocks.

17             And I think that's what the proclamation

18   seems to be getting at.  But, even then, it's not saying

19   they currently have control over particular areas, much

20   less they're acting as the government.

21             But they certainly -- I don't -- the -- the

22   proclamation nowhere says and none of the affidavits

23   suggest that TdA is the government, is the nation.

24             And so the fact that they have influence

25   over a few blocks, potentially, or a few areas is no

1    different than in a lot of places.  That can't be

2    what -- what Congress meant.

3              THE COURT:  And -- and I guess to push a

4    little bit on that point, I think they do say that

5    Venezuela and TdA are indistinguishable.  Which, it --

6    it may not be that -- or, effectively, as I read one

7    possible read of the respondent's position is that the

8    proclamation effectively says it is Venezuela that is

9    through TdA that is engaged in these activities.

10             If that's the reading of the proclamation

11   that's appropriate, then Venezuela's certainly a foreign

12   nation or government.

13             MR. GELERNT:  Your Honor, if they're

14   literally saying TdA is the foreign government and TdA

15   and Venezuela are literally the same thing, then we

16   would have a different case.  I think when -- when

17   Your Honor goes back and looks at the proclamation,

18   you'll see that they don't actually go that far.

19             And the affidavits describing TdA don't

20   actually say, nowhere do they actually say TdA is the

21   foreign government or nation, TdA can make treaties, TdA

22   has denizens, TdA is the equivalent of the Venezuelan

23   government.  That's been recognized by our country.

24             I think we have not recognized TdA,

25   obviously that would come with enormous implication

1    consequences if we were to recognize TdA, if TdA were to

2    take a seat at the U.N.  There -- there's some careful

3    wording but they stop very -- they -- they stop very

4    much short of saying TdA is the government or nation.

5            THE COURT:  I don't think that respondents

6    are saying TdA has become the government of Venezuela.

7    But I think their position is that, through the

8    infiltration of TdA into the Maduro government, Maduro,

9    as the claimed President of Venezuela, is directing the

10   conduct of TdA members, directing them to come to the

11   United States and engaged in certain described

12   activities.

13           Doesn't that effectively mean that the

14   proclamation is pointing to Venezuela as the actor

15   through TdA as its agents?

16           MR. GELERNT:  Yeah, Your Honor, I -- I --

17   it's a fair question.  I don't think that the

18   proclamation fairly read is suggesting -- I mean, well,

19   let me -- let me step back one second.

20           Obviously that doesn't go to invasion or

21   incursion and we still have that military point, but I

22   know Your Honor is getting at the foreign government

23   point.  I think it stops short of suggesting that Maduro

24   is actually -- that this is a wing of the Venezuelan

25   government.  And if you were to going to reach the

1    facts, the -- the declarations are crystal clear that

2    there is zero support for that.

3         But I -- I think the proclamation in our

4    view fairly read does not suggest that TdA is acting as

5    a wing of the Maduro government.  And certainly there's

6    zero support out there in the world for that.

7         THE COURT:  And -- and so, Mr. Velchik,

8    on -- on that point, what is the respondents position?

9    There's a line in the response, if I remember correctly,

10   that indicates that TdA and Venezuelan government are

11   indistinguishable.  I read that respondents claiming

12   that effectively it is Maduro as the claimed President

13   of Venezuela directing these activities.  Is that the

14   government's position?

15        MR. VELCHIK:  Yes.  The brief reflects that

16   there's articulation of the government's position.  I

17   think your analysis of respondent's position, I think,

18   has been accurate.

19        Analytically, I mean, I'll point out that

20   one way of approaching this problem could be to say

21   well, Venezuela is the foreign nation or foreign

22   government.  I think it would clearly satisfy the

23   meaning of foreign nation in that term and that the

24   President's exercise of the Alien Enemies Act is very

25   limited in only applying to the TdA members.

1              I -- I think another argument could be that

2    TdA itself gauges in enough attributes of government

3    such that it qualifies for purposes of the AEA, but I do

4    think that the reality is much more complicated, it's

5    much more mixed.

6              There are empirical statements included in

7    the exhibit that you referenced and the statements made

8    by the President's proclamation that we think reflect

9    sort of this -- this mixed situation.  But your

10   characterizations, the characterizations in the brief,

11   we believe, is accurate.

12             THE COURT:  On that point, under your

13   proposed definition of foreign nation or government, is

14   it critical that a group like TdA, MS-13, Mexican

15   cartels have to, I think as the proclamation says,

16   infiltrate or be ceded control over territory to

17   constitute a foreign nation or government for purposes

18   of the AEA?

19             MR. VELCHIK:  We believe that the presence

20   of those factors here make it an easy case in this

21   situation.

22             THE COURT:  And -- and I guess the -- the

23   government's position is, one, it's Venezuela, so that's

24   foreign nation or government; but as to TdA

25   independently would represent a foreign government, not

1    a nation?  Accurate?

2                MR. VELCHIK:  Yeah, I -- yes, I think if --

3    for the argument that TdA itself qualifies under the

4    Alien Enemies Act separate and apart from its -- its

5    relationship with Venezuela, that, yes, it more

6    naturally would fall within the definition of -- of the

7    term government.

8                THE COURT:  Correct.  I mean, you're not

9    claiming that TdA is a nation?

10               MR. VELCHIK:  No.

11               THE COURT:  Going back to -- to the issue of

12   invasion, if -- if I construe invasion or we can look to

13   the word invasion under the AEA similar to the use of

14   invasion for the suspension clause, then would the

15   President or Congress have the ability under the

16   circumstances that the proclamation declares to suspend

17   the Writ of Habeas Corpus based on TdA's activities?

18               MR. VELCHIK:  That is an important and

19   weighty question of Constitutional interpretation.  As

20   we've discussed, the fact that the terms are similar, I

21   think, is probative of how each should be interpreted.

22   I'm not prepared at this time to say definitively what

23   would constitute a suspension for purposes of

24   interpreting the Constitution in that case, but I -- I

25   do agree that -- that that is a appropriate place to

1    look to inform this court's analysis.

2              THE COURT:  Thank you.

3              Mr. Gelernt, just a couple here of sort of

4    side issues or -- or getting away from statutory

5    construction, do you agree that if the government

6    obtains a final order of removal under Title 8 as to any

7    of the named petitioners government can proceed forward

8    with removal under that statute?  And so to the extent

9    that I issue a preliminary injunction, there should be a

10   carve out to allow the government to move forward with

11   removal proceedings as to the individuals under Title 8;

12   and if they obtain a final order of removal, they can

13   proceed as to that individual?

14             MR. GELERNT:  Yes, Your Honor, we're not --

15   we're not arguing anything about Title 8 here.

16             THE COURT:  Okay.

17             And then from Mr. Velchik, do you agree that

18   if -- if the government transferred one of the named

19   petitioners to another federal district that that

20   transfer would not affect this court's jurisdiction over

21   the named petitioners case here?

22             MR. VELCHIK:  For purposes of the habeas

23   action evaluating the constitutional --

24   constitutionality -- or the interpretation of the Alien

25   Enemies Act, I think that sounds appropriate.

1           THE COURT:  Correct.  Right.  And part --
2    one of your arguments is I have no jurisdiction to --
3           MR. VELCHIK:  Correct.
4           THE COURT:  -- enjoin the government from
5    transferring individuals between districts or -- or to
6    different detention facilities.
7           One concern is that the government would
8    take the position that if they transfer the individual
9    that moots or divests this court of jurisdiction over
10   the habeas action even though it existed at the time
11   of -- of the lawsuit's inception.  I just want to make
12   sure you're not taking that position.  If there was a
13   transfer of one of the named petitioners to another
14   federal district, I would still retain jurisdiction over
15   the habeas action that currently exists, correct?
16          MR. GELERNT:  Yes.  That sounds reasonable.
17   We have no intention to remove any of the named
18   petitioners pursuant to the AEA.
19          You've raised concerns about Title 8 and so
20   I just want to be clear that we wouldn't necessarily
21   foreclose the opportunity to continue proceeding with
22   cases under Title 8, but -- but I think what this court
23   said is appropriate.
24          THE COURT:  Okay.  Thank you.
25          Mr. Gelernt, turning to the issue of

1  voluntary departure and -- and whether the AEA's

2  prerequisites have been met through the procedures as to

3  the named petitioner.  So is it your construction of

4  Section 21 that it requires that before the government

5  can detain an individual the government must afford the

6  individual the opportunity to voluntarily depart?

7          MR. GELERNT:  Your Honor, I think certainly

8  before removal --

9          THE COURT:  And so it's possible that the

10 government can detain an individual, notify that person

11 while in detention that the subject is -- that -- that

12 he is subject to removal as an enemy alien and from

13 within the confinement afford them the ability to leave

14 the country voluntarily?

15         MR. GELERNT:  Well, I think that's right,

16 Your Honor.  I think the detention question is an open

17 question.  But let's assume for the moment, just in

18 answering your question, I think, if they did detain

19 them, they would have to give them a time to voluntarily

20 depart.  And I think the government is conflating two

21 different parts of the statute.  Section 21, as

22 Your Honor rightly pointed out, is the voluntary

23 departure provision:  Do you want to voluntary depart

24 rather than us having to issue an Alien Enemies Act

25 removal order.

1          The other part that the government's focused

2     on is getting your affairs together.  And the government

3     did give Germans the -- the right to get their affairs

4     together before they left.  That can be overridden.

5          The voluntary departure thing can't be

6     overridden, it -- the getting your affairs together can

7     be overridden if they claim the individuals are engaged

8     in actual hostilities.

9          They --

10          THE COURT:  And -- and you're referencing

11     22?

12          MR. GELERNT:  Yes.

13          THE COURT:  And the -- and the language of

14     22.

15          MR. GELERNT:  Is about that.

16          THE COURT:  But that refers to Section 21

17     for individuals designated as enemy aliens under

18     Section 21, and so I'm not sure that they're as -- as

19     distinguishable as you're arguing.

20          Doesn't Section 22 effectively describe

21     circumstances under which the ability -- ability to

22     voluntarily depart does not have to be provided to the

23     enemy alien if they're engaged in actual hostilities?

24          MR. GELERNT:  Your Honor, we don't read them

25     as conflating, we read them as two different things that

 1  Congress was affording people who were designated as
 2  alien enemies.  One is the right to voluntarily depart
 3  because if they're dangerous and they can't prove that
 4  they're not then they could voluntarily depart.  The
 5  other is sort of an additional amount of time to
 6  actually get your affairs together.
 7           So we don't -- we don't read them
 8  historically as linked.  Certainly if Your Honor wanted
 9  additional briefing, but we're not aware of any
10  authority for overriding the voluntarily departure
11  provision.
12           THE COURT:  Have -- have any of the named
13  petitioners agreed to voluntarily depart the
14  United States?
15           MR. GELERNT:  They -- I don't think they've
16  been given -- well, I think one of them -- one of them
17  has.  But what -- what it depends on, Your Honor, and
18  this is a critical point, is, under the immigration
19  laws, if they were to voluntarily be removed, they would
20  go back principally to the country from which they came.
21  In here, in this case, Venezuelans.
22           And if the government wanted to send them to
23  a third country, it would have to go through many
24  procedures, including making sure that they wouldn't be
25  tortured in that third country.

1          And certainly if the government was going to

2    send them to a foreign prison, directly to a foreign

3    prison, they would get CAT relief and couldn't be sent.

4    So I think the reason people are nervous if they were

5    given a chance is to make sure they know what country

6    they're going to be sent to.  No one is going to say,

7    yes, I would like to voluntarily be removed to that

8    Salvadorian prison as a Venezuelan.

9          THE COURT:  Thank you.

10         And, Mr. Velchik, so on this issue of

11   voluntary departure, the -- the response doesn't address

12   a couple of the decisions that the petitioners cite

13   in -- in their briefs that appear to state that

14   individuals must be permitted to voluntarily depart.

15   They're from the 2nd Circuit, not binding, persuasive

16   authority, but how do you distinguish them or contend

17   that their reasoning or construction of Section 21 is --

18   is not appropriate?

19         And a couple of examples that I just noted

20   here in my notes, I mean, the Ludwig decision, 1947,

21   that writes that the individual has the right of

22   voluntarily departure and only after his refusal or

23   neglect to leave may the government deport him.

24         The Hayman decision from '47, 2nd Circuit,

25   an individual in custody, this is the individual who was

1  detained in Costa Rica and then brought over to the

2  United States, challenged his removal I believe back to

3  Germany, that it writes it does not appear that this

4  relator has ever refused, or except because of his

5  internment, ever neglected to depart.  His present

6  restraint by the respondent is unlawful insofar as it

7  interferes with his voluntary departure since the

8  enforced removal of which his present restraint is a

9  concomitant is unlawful before he does refuse or neglect

10  to depart.

11         Does the government contend that these

12  individuals, the named petitioners at least, have been

13  given the opportunity to voluntarily depart or how do

14  you distinguish these authorities?

15         MR. VELCHIK:  Yes.  With respect to the

16  three named plaintiffs here, we have no indication that

17  they intend to voluntary -- to -- to voluntarily depart.

18         THE COURT:  But has the government offered

19  them that opportunity?

20         MR. VELCHIK:  I think the government had to

21  arrest and apprehend them for crimes and for removal.

22         THE COURT:  And upon -- upon detaining them,

23  was the opportunity to voluntary depart offered to them?

24         MR. VELCHIK:  I don't have that information

25  before me, but we are -- are skeptical that the three

1    individuals here would voluntarily depart.  We would --

2    we would want to make sure that they -- they did so, of

3    course.

4                    THE COURT:  And -- and is the government's

5    position that under the AEA the Executive Branch can

6    remove an individual to any other country or is it back

7    to -- should it be limited to the individual's native

8    country?

9                    MR. VELCHIK:  I think the Executive Branch

10   has discretion.  I know that there are certain policies

11   that the Executive Branch tries to abide by, including

12   various conventions.  I think traditionally the

13   Executive Branch has returned individuals to their home

14   country.

15                    In this particular circumstance and other

16   circumstances implicating the Alien Enemies Act, I'm

17   sure that there may be sensitive diplomatic negotiations

18   that may be required to effectuate these removals and

19   that could affect the availability of -- of different

20   countries accepting individuals.  I'm sure the Executive

21   Branch would retain the prerogative to have flexibility

22   in light of those diplomatic negotiations.

23                    THE COURT:  And -- and is it accurate that

24   the United States, the Executive Branch, has removed

25   individuals under the AEA and the proclamation to

```
 1   El Salvador to be placed in CECOT?
 2             MR. VELCHIK:  I feel comfortable speaking
 3   about the record in these three cases.  (Unintelligible)
 4   is ongoing litigation in other courts that are public
 5   record.
 6             THE COURT:  Okay.
 7             COURT REPORTER:  I -- I'm sorry, I'm
 8   comfortable -- repeat that.
 9             MR. VELCHIK:  Yes, ma'am.
10             I feel comfortable speaking to the record in
11   this case.  I understand there's ongoing litigation
12   involving other individuals that are matters of public
13   record that this court can reference.
14             THE COURT:  Does the -- does the -- do the
15   respondents believe that the Executive Branch has the
16   authority under the AEA to remove the named petitioners
17   directly to El Salvador to be placed in CECOT?
18             MR. VELCHIK:  I believe the government does
19   not waive that prerogative.
20             THE COURT:  So you -- so your position is
21   the President's --
22             MR. VELCHIK:  I mean --
23             THE COURT:  -- authority under the AEA does
24   include that -- that ability?
25             MR. VELCHIK:  Yes.
```

1          THE COURT:  Turning to the Convention

2    Against Torture, the -- the CAT, and -- and the INA.

3          Mr. Gelernt, a question for you:

4    Respondents in their response argue that

5    8 U.S.C. 1252(A)(iv) divests the court of jurisdiction

6    to review claims based on the CAT within a habeas

7    proceeding, right, which is what we have here.

8          There's the decision of Kapoor, the decision

9    of Mironescu, 4th Circuit decisions that -- that rely on

10   the broad language of 1254 -- 1252(A)(iv) to conclude

11   that an individual in habeas cannot present a challenge

12   based on the CAT.

13          I -- I didn't, reading the reply, did not

14   see or appreciate your attempt to distinguish those --

15   those decisions, in particular, Kapoor.  You have an

16   individual who is under, if I remember correctly, a

17   certificate of extraditability is issued to be

18   extradited to India, challenges extradition to -- to

19   India in habeas, and as part of the challenge raises

20   that doing so would violate the Convention Against

21   Torture.  The Kapoor decision denies jurisdiction over

22   that claim based on the broad language of

23   Section 1252(A)(iv).

24          How do you distinguish that -- that -- those

25   decisions of persuasive authority, not -- not binding on

1   this court, but aren't petitioners in this -- in these

2   habeas actions making the same type of challenge?

3            MR. GELERNT:  So, as -- as far as I recall,

4   and I apologize, I'm not positive, I think those were

5   extradition cases.

6            THE COURT:  Yes.

7            MR. GELERNT:  So extradition has its own set

8   of rules that have always been there, but I think

9   there's authority going both ways.

10           But I want to say, outside of the

11  extradition context, CAT applies, CAT always applies.

12  And the decision I would suggest Your Honor look at is

13  Huisha-Huisha -- H-U-I-S-H-A dash H-U-I-S-H-A -- from

14  the D.C. circuit.  There what the Supreme -- what the --

15  the government said is we're going to remove people

16  under the public health law, what was called title 42,

17  not under the INA.  And, therefore, we don't think the

18  Convention Against Torture applies and we don't think

19  you can bring your claim in District Court.

20           And the D.C. circuit rejected that saying

21  the reason 1252(A)(iv) is there is if someone's going to

22  be removed under the immigration laws then the proper

23  way to raise their CAT claim is the normal way:  You go

24  through the administrative proceedings and then you file

25  a petition for review directly from the Board

1  of Immigration, appeals to the Court of Appeals -- Board

2  of Immigration appeals to the relevant circuit Court of

3  Appeals.  But where the government's operating outside

4  of the INA, you then have no way of following those

5  procedures, you have to be able to enforce the

6  Convention Against Torture, and you can bring it in

7  District Court.  And that's a full analysis and I think

8  that's -- that's how we see this.

9          The government's suggesting we should do it

10 through a petition for review.  How would we do that?

11 They are the ones who are circumventing the immigration

12 laws, they are taking people out immigration

13 proceedings.  All these people have current immigration

14 proceedings, they're taking them out of immigration

15 proceedings where they were applying for asylum and CAT

16 and then putting them into this AEA process.

17         And then when they want to raise these CAT

18 claims, which they clearly have being sent to a

19 Salvadorean prison, they're saying, well, no, no, you

20 can't raise them now in District Court.  So effectively

21 they're saying you can never raise the CAT claim.

22         There's no question -- and the government is

23 saying they're not going to talk about records in other

24 cases.  I think obviously Your Honor knows if you turn

25 on the TV literally any second you know that there's

1    south Venezuelan men in that prison who the government

2    sent there and has said that's lawful.  So they would

3    clearly have CAT claims and there's -- the government's

4    giving them no way to raise those because they're not

5    going to be in immigration proceedings and -- and being

6    able to go to the circuit by petition for review, which

7    is precisely what 1252(A)(iv) is about.

8              THE COURT:  And the named petitioners in --

9    in this action, is it your representation that they have

10   made claims under the convention under Title 8 in -- in

11   their removal proceedings?

12             MR. GELERNT:  They all have made asylum

13   claims, I am fairly certain they have made Convention

14   Against Torture claims but I think one --

15             THE COURT:  One Venezuela, I suspect.

16             MR. GELERNT:  Well, exactly, Your Honor, so

17   that -- that's the critical point is now all of a sudden

18   the rug's being pulled out from under them and they're

19   going to be sent to El Salvador.  And, in a foreign

20   prison, well, of course, they would then make CAT

21   claims.  There -- there's no way they won't be tortured

22   in that prison.

23             And I just want to correct one thing about

24   the three petitioners.  One of them has an immigration

25   court, asked to take voluntary removal but to a country

1    that's not El Salvador and not in that prison.

2              THE COURT:  Okay.  All right.  Thank you.

3              Let me turn to the class action issues.  I

4    mean, effectively, based on the respondent's positions

5    as to the named petitioners, there's no need for a

6    preliminary injunction as to the named petitioners.

7    The -- the protections that the preliminary injunction

8    would afford, the government has stipulated to.

9              The same cannot be said for a class action.

10   The -- the proposed class action, which would include

11   individuals who are within the Southern District of

12   Texas and at some point in the future, or at least in

13   the past week or so, have been notified as being subject

14   to the proclamation and designated enemy aliens under

15   the proclamation and subject to removal under the AEA.

16             So just a couple of -- of questions.  First

17   for Mr. Velchik, just to get an update, last hearing I

18   believe the government's position was that currently the

19   only individuals who were being detained in the Southern

20   District of Texas and who had previously been designated

21   as enemy aliens under the proclamation were the named

22   petitioners in this case and Mr. Zacarias in the other

23   litigation that's pending before me.  Does that continue

24   to be true?

25             MR. VELCHIK:  Yes, Your Honor, I'm aware of

1    four total.

2              THE COURT:  And -- and are there other

3    individuals currently being detained in the Southern

4    District of Texas who since that last hearing have been

5    notified that they are enemy aliens under the

6    proclamation and subject to removal under the AEA?

7              MR. VELCHIK:  The -- the latest numbers that

8    I have today are still four.

9              THE COURT:  Okay.  At some point, and I

10   believe this was in the J.G.G. litigation over in D.C.,

11   there was information that there were over a hundred

12   individuals within the Southern District of Texas who

13   had been designated as enemy aliens under the

14   proclamation and subject to removal under the AEA.  That

15   number is now down to -- to four.  It's unclear were

16   they transferred, were -- or removed, but they're no

17   longer in the Southern District of Texas.

18              But is there an estimate from the

19   respondents as to the number of Venezuelans over the age

20   of 14, not United States citizens or legal permanent

21   residents, who are currently detained in the Southern

22   District of Texas under Title 8?

23              MR. VELCHIK:  I'm still only aware of four

24   subject to the alien removal act.  In terms of any

25   individuals who meet those criteria of merely being

1   Venezuelan citizens, I don't have specific numbers, it

2   could be above that.  But in terms of the AEA

3   individuals, four is the number that I have as of this

4   morning.

5          THE COURT:  Correct.  And I'm trying to

6   determine what's the potential class in the future.  At

7   least, I mean, I -- we don't know whether the

8   United States will transfer individuals in the future

9   into the Southern District of Texas, but I'm just trying

10  to ascertain whether the United States knows if there

11  are other Venezuelan citizens who are being detained in

12  the Southern District of Texas over the age of 14 and

13  not legal permanent residents?

14         MR. VELCHIK:  I don't have a specific number

15  four this morning on that class.

16         THE COURT:  Let me, I guess, continue with

17  Mr. Velchik here.  According to the Supreme Court's

18  decision in J.G.G., and this gets to class action

19  standing, the notice procedures, AEA detainees are

20  entitled to notice and opportunity to be heard

21  appropriate to the nature of the case.

22         Supreme Court required that AEA detainees be

23  given notice after the date of its decision that they

24  are subject to removal under the act.  The notice must

25  be afforded within a reasonable time and in such a

1    manner as will allow them to actually seek habeas relief

2    in the proper venue before such removal occurs.

3            So that's our standard.

4            Purpose of the notice:  Afford the

5    individuals the ability to actually seek habeas relief

6    in the proper venue.

7            Government takes the position 12 hours to

8    indicate an intent to file for a habeas action, followed

9    by 24 hours to actually file the action is -- is

10   sufficient.

11           As to the named plaintiffs, to the extent

12   that they challenge the sufficiency of the notice, they

13   run into an injury in fact problem because they have

14   sought habeas relief.  And -- and so to the extent that

15   the notice was unreasonable, and -- and they weren't

16   under what -- what the government has now prepared or --

17   or adopted, but to the extent that the procedures used

18   as to the named plaintiffs, they -- they have no injury

19   to the extent that that was insufficient because they

20   were able to seek habeas relief which is the whole

21   purpose of the notice.

22           But from my perspective, there's a Catch-22

23   that may exist for the proposed class of individuals in

24   the Southern District of Texas who the United States

25   Government notifies in the future that they are enemy

 1   aliens under the proclamation and subject to removal

 2   under the AEA.

 3                    If the government gives an individual

 4   notice, he files a habeas petition, that individual

 5   can't challenge the reasonableness of the notice because

 6   he was able to seek habeas relief.

 7                    If the government gives an individual notice

 8   and she doesn't have time to file a petition, then the

 9   government removes that individual precluding her from

10   filing for habeas relief and presenting the challenge to

11   the reasonableness of that notice.

12                    How does an individual challenge the

13   reasonableness of the notice in habeas under these

14   circumstances?

15                    MR. VELCHIK:  Yes, Your Honor.  I think it's

16   factually incorrect to suggest that it's impossible for

17   someone to raise those claims or to get judicial relief

18   because in fact this very thing has happened in

19   Colorado.

20                    My understanding is that named plaintiffs

21   there were not subject to the Alien Enemies Act, they

22   alleged that there was an imminent risk that they could

23   be designated under the Alien Enemies Act, and therefore

24   applied for relief in a Federal District Court there

25   under habeas as the appropriate vehicle and received

1    judicial relief in a ruling earlier this week.  So

2    certainly there's ongoing litigation where individuals

3    have been able to raise those notice claims.

4              THE COURT:  But the government has opposed

5    those or does the government agree that that's an

6    appropriate vehicle?

7              MR. VELCHIK:  I mean, the government

8    acknowledges the court's ruling in that case and so

9    certainly --

10             THE COURT:  But you oppose that relief?

11   Did -- did the government not oppose that relief?

12             MR. VELCHIK:  At the time, yes.

13             THE COURT:  Does the government continue

14   to oppose that relief?

15             MR. VELCHIK:  The government is appealing.

16             THE COURT:  So I -- I take that as -- as an

17   opposition.  In this case, can I reach the issue of the

18   reasonable -- reasonableness of the notice as to the

19   named plaintiffs?

20             MR. VELCHIK:  I think the government agrees

21   with your first analysis that they do not have standing

22   or injury in fact in this case, and that continues to be

23   the government's position.

24             THE COURT:  So is this not a circumstance

25   where class certification or a class-like multi-party

1    proceeding, the All Writs Act, would be appropriate to

2    allow the court to reach the legal issue of whether the

3    notice on the notice procedures satisfy the due process

4    requirements that the Supreme Court in J.G.G. recognizes

5    need to be given?

6             MR. VELCHIK:  I understand where the court

7    is coming from, we would push back on -- on two items.

8    Number one, we still think that you would have to

9    satisfy requirements of Federal Rules of Civil Procedure

10   23(A).  And it's not met for any number of reasons.

11            THE COURT:  What about under the All Writs

12   Act?

13            MR. VELCHIK:  Under the All Writs Act, you

14   know, we continue to think that you need at least one

15   individual who would have standing.  To the extent that

16   the three named plaintiffs here do not have standing, it

17   would be inappropriate to form a class, provide

18   injunctive relief, and in particular provide injunctive

19   relief against the Executive Branch in an area involving

20   foreign diplomacy and national security would be --

21   would continue to be inappropriate, so we -- the

22   government opposes.

23            THE COURT:  You might want to slow down just

24   a little bit for the court reporter.

25            MR. VELCHIK:  My apologies.

```
 1                  COURT REPORTER:  Thank you.
 2                  THE COURT:  So if in these contexts the
 3   future individual who ends up being detained in the
 4   Southern District of Texas, notified that he or she is a
 5   enemy alien under the proclamation and subject to
 6   removal under the AEA, the -- the injury related to the
 7   notice, procedures and the form that petitioners
 8   challenge is in some sense transitory, right?  It is --
 9   it exists at the time that they're notified, they're --
10   they -- as they -- as they claim, right?  They -- they
11   challenge the sufficiency of the time, they may
12   challenge, given that -- that the, we'll see, they may
13   challenge the sufficiency of the form and -- and what
14   the information that's included in the form.
15                  But as soon as they file for habeas action,
16   then that -- whatever injury they -- that they -- they
17   had at that moment of being notified disappears because
18   now they've been able to file a habeas action.
19                  And so, in that sense, it is transitory, it
20   exists but then disappears.  Aren't there circumstances
21   similar to that where courts have said when the injury
22   can become moot or is transitory that class
23   certification is proper?
24                  MR. VELCHIK:  I'm not thinking of examples
25   that are on all fours with that and the -- the
```

1  government does not concede that it would be appropriate

2  to certify a class when individual named members don't

3  have standing.  I'm not familiar with a precedence that

4  would support that.

5          THE COURT:  Okay.  I don't know if the

6  petitioners have a position on that point or to address

7  this issue of, at least what I'm referring to, as

8  potential Catch-22?

9          MR. GELERNT:  I think you're absolutely

10  right, Your Honor.  I mean, the implications of the

11  government's position is that, I mean, now the unsealed

12  declaration says 12 hours down from 24, but what if they

13  said one hour?  We would never get into court, no one

14  would ever get into court to challenge that one-hour

15  notice.

16          So you're absolutely right, Your Honor, that

17  you have jurisdiction whether you use the All Writs Act

18  or habeas principles to reach this issue; otherwise,

19  potentially no one will ever get in.

20          And there's also the -- the notion that when

21  you have a class you can't continually moot the class by

22  saying we're going to give petitioners -- certain

23  petitioners relief and then moot the whole class.

24          And we obviously could put in another named

25  petitioner, but we don't need to given the principle

1    you've just outlined about how transitory it is.

2              THE COURT:  And you -- you seek to certify

3    the class under Rule 23(B)(2) which applies when a

4    single injunction or declaratory judgment would provide

5    relief to each member of the class.  I could conclude

6    that the President can invoke the AEA under the

7    proclamation, but still some members of the class would

8    not be entitled to ultimate relief because I could

9    determine that they are members of the TdA and -- and

10   subject to removal under the AEA.

11             Assume that that's a possibility, is it true

12   that the complained-of conduct is such that it can be

13   enjoined or declared unlawful only as to all class

14   members or as to none of them at all?  It seems like it

15   would differ.

16             MR. GELERNT:  Right, Your Honor.  So I -- I

17   think -- I think what -- how we would conceptualize it

18   is there are certain issues that go to everyone that if

19   Your Honor ruled in our favor would enjoin the removal

20   of anybody.  And I think, you know, as we've been

21   talking about whether the proclamation is consistent

22   with the Alien Enemies Act is one of those.  If

23   Your Honor were to determine that it wasn't consistent

24   with the Alien Enemies Act, then no would could be

25   removed under the Alien Enemies Act.  Title 8 would

1    still be out there.

2              I think whether individuals have the right

3    to seek relief under the Convention Against Torture, at

4    least seek it, would, of course, go to everyone.  And

5    also the notice is critical as to everyone, that

6    everyone needs to have that notice so they can get into

7    court.

8              Now if Your Honor were to rule against us

9    and say the court -- the President can use the Alien

10   Enemies Act in this context, it has given sufficient

11   notice, people are being screened for -- for relief

12   under the Convention Against Torture, but an individual

13   then wanted to say, well, I'm not even a gang member so

14   I don't fall within the proclamation, I think those

15   would proceed in individual habeases and I believe

16   Your Honor has one or two of those.  So, at that point,

17   I think those -- those would not be a class -- those

18   issues would not be merged into the class and would be

19   dealt with separately.

20             But I think as what Your Honor was getting

21   at maybe initially in -- in converting this from a PI to

22   a summary judgment is those threshold issues, I think,

23   really need to be resolved; otherwise, we're going to be

24   in fire drills all over the country all the time.  And

25   particularly, I think, in Texas where the government has

1   decided they're going to bring people.

2              Just if I could address your question about

3   people being moved into the -- the district, I mean, I

4   think that's what's happening is the government's moving

5   people from all over the country.

6              Your Honor had a TR -- the -- the

7   individuals who were originally here on March 15th are

8   now in El Salvador.  I think that is public record now

9   and that we're fighting about that in the D.C. courts.

10  That -- that's separate.

11             But now Your Honor issued a TRO, people were

12  moved all over the country.  Venezuelan men over the age

13  of 14 who the government alleges were TdA were moved

14  into the Northern District of Texas and now we're having

15  a fire drill.

16             I suspect if this court doesn't have

17  injunctive relief pending the outcome of its summary

18  judgment ruling, people will then be moved again into

19  the Southern District.  So it's a very fluid situation,

20  I think that's been the problem.

21             THE COURT:  Okay.  Thank you.

22             A question about irreparable injury,

23  Mr. Velchik, you rely on -- on the, I think it's Nken

24  decision from the Supreme Court to argue that removal in

25  itself is not irreparable injury.  It appears to me that

1    the key language in that decision is that Supreme Court

2    notes that the law had changed and that the abilities of

3    individuals had changed as a result under the law.

4            Under the new law that the court was

5    considering, as the court wrote, aliens who are removed

6    may continue to pursue their petitions for review and

7    those who prevail can be afforded effective relief by

8    facilitation of their return along with restoration of

9    the immigration status they had upon removal.

10           That's why removal was not categorically

11   irreparable injury.  Can the same be said in the current

12   circumstances as to the AEA?  If the government removes

13   one of the named petitioners under the AEA, can the

14   person challenge the removal in any manner?

15           MR. VELCHIK:  My understanding is that's a

16   subject of ongoing litigation or diplomatic

17   communications in the 4th Circuit.  I'm aware of that,

18   but I can't speak to that issue.

19           THE COURT:  So you cannot guarantee that the

20   individual could be returned?

21           MR. VELCHIK:  I can refer the court to the

22   4th Circuit's litigation.

23           THE COURT:  I mean, this is -- you're here

24   representing the -- the government, and as to the named

25   petitioners, if they're removed under the AEA, can they

1    continue to seek relief in habeas in this action?

2              MR. VELCHIK:  The government does not --

3              THE COURT:  Or will they be able to?

4              MR. VELCHIK:  -- the government does not

5    waive that -- that argument now.

6              THE COURT:  Does not waive it, they would

7    not be able to because they're no longer being detained

8    here?

9              MR. VELCHIK:  I think that would present

10   obstacles.

11             THE COURT:  And if the individual ultimately

12   prevailed, is there a reasonable probability that the

13   person would be able to obtain relief by being returned

14   to the United States?

15             MR. VELCHIK:  Again, I'm aware that there is

16   ongoing litigation about a particular issue raising some

17   of those concerns, I don't want to speak or implicate

18   those ongoing discussions.

19             THE COURT:  Well, doesn't that distinguish

20   the Nken decision?

21             MR. VELCHIK:  I acknowledge that analysis.

22   We -- we would emphasize that any harm that -- no

23   individual has a liberty interest in remaining in the

24   country illegally.  Particularly if they've been here

25   for less than two years, there's a diminished liberty

1     interest that the Supreme Court recognized in

2     (unintelligible).

3               And certainly to the extent that irreparable

4     harm is being cause by the independent actions of

5     alleged third countries -- third parties in foreign

6     countries to which they may be transferred, I think that

7     that raises concerns, limitations in the irreparable --

8     irreparably harm analysis here.

9               THE COURT:  Let me, a final question, I

10    think, for now to you, Mr. Velchik.  We now have

11    Exhibit D, declaration of Mr. Cisneros describing the

12    procedures that the government has adopted regarding

13    notice under the AEA and the form that it will use to

14    provide notice.  And -- and did the government submit a

15    similar declaration and form in Southern District of

16    New York, Northern District of Texas or the District of

17    Colorado?

18              MR. VELCHIK:  I can't speak to all of that

19    litigation, I'm aware that -- I -- i believe similar

20    counsel in the Colorado case included in the record

21    similar copies of the form that they had provided that

22    had not come from the government.  So it's a different

23    procedural posture, but I believe it was the same

24    document submitted.

25              At least in Colorado, I believe

1    representations were made to the court to the effect

2    that individuals would have at least 24 hours to file

3    for habeas relief.

4              THE COURT:  And that was my follow-up

5    question, right, are the procedures at least in Colorado

6    described the same as what Mr. Cisneros describes in his

7    declaration?  Is the form the same?

8              MR. VELCHIK:  Yeah, I'm not aware of any

9    inconsistencies between the two.

10             THE COURT:  Of any inconsistencies?

11             MR. VELCHIK:  I'm not aware of any

12   inconsistencies between the two.  Obviously it's the

13   government's position that those processes comport with

14   due process.  And we would emphasize that certainly when

15   you compare it to other mechanisms of removal that

16   Congress has created, including expedited removal, which

17   allows for the removal of individuals within 24 hours

18   and no more than seven days, certainly by comparison to

19   that, we think that the Alien Enemies Act procedures, as

20   implemented by that memorandum, comport with due

21   process.

22             THE COURT:  All right.  Thank you.

23             I'm going to take a ten-minute recess and

24   then allow you, I may have a couple of follow-up

25   questions, but then will allow you ten minutes each.

```
1   You don't have to use it, but just want to give you the
2   opportunity if you think that there's a point that we
3   haven't addressed or -- or something you want to go back
4   to that I didn't give you a chance to finish your --
5   your answer.  You have your ten minutes to use that time
6   as -- as you wish.
7                Question?
8                MR. GELERNT:  Your Honor, you ruled that the
9   document should be unsealed, has that been unsealed yet?
10  I think -- all right.
11               THE COURT:  Not -- not yet.
12               MR. GELERNT:  Okay.
13               THE COURT:  But at least in the hearing, we
14  can --
15               MR. GELERNT:  Discuss it?
16               THE COURT:  -- I mean, I referenced it.
17               MR. GELERNT:  Right.
18               THE COURT:  And -- and so essentially the --
19  the key, in terms of the procedures, is that the
20  document allows the individual upon being notified 12
21  hours to state an intent to file for a habeas petition.
22  If they do, and then if they do make that determination
23  or if at any point before they're removed they state an
24  intent to file for habeas petition, they have 24 hours
25  to file it.  After those -- those time periods have
```

1    elapsed.   The government will then proceed with removal,

2    although removal may not occur for days or -- or some

3    time.

4                    MR. GELERNT:  Yes.  Thank you, Your Honor.

5                    THE COURT:  All right.  Thank you.  So we're

6    in recess.

7                    (Court in short recess.)

8                    THE COURT:  You can be seated.

9                    Just a couple of procedural matters before

10   we proceed with your -- your statements.  First of all,

11   I find good cause to extend the current Temporary

12   Restraining Order through next Friday to facilitate the

13   court's consideration of the issues and allow for the

14   court to rule on those issues.  I'll issue the written

15   TRO, but just to let you know that I will be extending

16   it through next Friday.  Hope to rule before then.

17                    It will not be as to the named plaintiffs,

18   but it will cover the punitive class to provide

19   protection, even though government's current position is

20   that there are no individuals within that class in the

21   Southern District of Texas but there could be some that

22   transferred into this district.

23                    Second, we had -- I discussed the issue of

24   converting the Motion for Preliminary Injunction into a

25   motion for what effectively amounts partial summary

```
1    judgment because it doesn't reach all the issues; in
2    particular, for example, the issue of whether one of the
3    named petitioners is a -- a member of TdA.  Obviously,
4    if I -- if I find certain ways on the arguments, then --
5    then the named petitioners would prevail, but -- but
6    they may not on those issues.
7              If I decline the -- the Motion for
8    Preliminary Injunction, that's appealable automatically.
9    Not so with a Motion for Summary Judgment.  And so I
10   would have to certify it for interlocutory appeal under
11   28 U.S.C. 1292B.  And -- and I'm certainly open to doing
12   so, but just want to give notice to the parties of my
13   intent to certify the ruling on the converted motion for
14   partial summary judgment for immediate interlocutory
15   appeal and want to give parties any issue at this point
16   or an opportunity at this point to object if they do so
17   object.
18             From the petitioner?
19             MR. GELERNT:  No objection, Your Honor.
20             THE COURT:  Respondents?
21             MR. VELCHIK:  No objection, Your Honor.
22             THE COURT:  Thank you.  All right.
23             With that, those are the issues.  So first
24   petitioners, you may make a statement if you wish.
25             MR. GELERNT:  Your Honor, just a couple of
```

1    quick things.  Your Honor, as leaving -- one of the

2    issues I was going to address was the danger to the

3    class in light of what happened in the Northern District

4    of Texas.  Your Honor has addressed that by leaving a

5    TRO for the punitive class in place till Friday and

6    hopefully, whichever way you rule, it'll give them

7    protection.  Because I think, absent protection, we'll

8    have a situation like we did in the Northern District of

9    Texas where the Judge -- they didn't give precise

10   representations as to the class.  A few hours later,

11   they were all getting notice and were on buses.  So

12   however Your Honor rules.

13           I -- I want to just on the merits of whether

14   the proclamation's consistent with the TdA, I mean with

15   the AEA.  If Your Honor finds that it needs to be a

16   military invasion or incursion, which we hope that

17   Your Honor will, I don't think you need to reach the

18   foreign government question.  You could assume that away

19   or you could decide it however you want, but that would

20   be sufficient to say that the proclamation is

21   inconsistent with the AEA.

22           And just on to the government's point about

23   incursion or invasion, those were -- are obviously

24   military steps toward an invasion, the French were

25   shooting at the U.S. during that time.  And an incursion

1    is more limited military, the invasion is actually

2    coming onto U.S. territory and invading with, you know,

3    forces in a -- in a more significant way.  And then,

4    obviously, Congress always has the choice to -- to

5    declare a war.

6            Just on the foreign government point,

7    Your Honor, I think if you look at the proclamation on

8    where they're saying that TdA is intertwined with, they

9    stop short.  It's a very carefully phrased proclamation,

10   they stop short of actually saying they are the

11   government or Maduro is directing the government --

12   directing TdA as part of the government.  And I think

13   that's all Your Honor actually needs to understand is

14   that it's too carefully written to actually say TdA is

15   part of the Venezuelan government.

16           The only other thing I would say about that

17   is the government made a point of, well, what happens in

18   the future if -- of course Your Honor's opinion is about

19   this proclamation at this time.  If TdA actually became

20   the Venezuelan government and was invading us, of course

21   Your Honor's opinion wouldn't cover that.

22           If some other gang is -- is invoked under

23   the AEA and there were different -- a different

24   proclamation, of course.  So -- so that's -- I think all

25   those issues are -- are not really relevant.

1           The main point I would just keep stressing

2    is within the four corners of the proclamation, it's

3    very carefully written.  And if you note, the sworn

4    declarations do not actually saying that Maduro is

5    directing TdA as part of the government or that TdA is

6    the government or that they're actually using military

7    means.  That this is a criminal organization, and on

8    that I would look at the Smith declaration.

9           The other two points where we think summary

10   judgment is clearly warranted is the notice is

11   insufficient.  12 hours, now that the government has

12   reduced it from 24 hours to 12 hours, even 12 -- 24

13   hours wasn't sufficient, 12 hours is clearly not

14   sufficient.

15          And I also think Your Honor could hold at

16   this point that people need to be screened for CAT.  If

17   they're going to be sent to El Salvador to a prison,

18   that's very different than deportation.  Not only is it

19   being sent to a foreign country, a third country, but

20   it's being sent directly to a prison where they may

21   never get out of.

22          I think the government has pointed to the

23   4th Circuit's case, Abrego-Garcia, I think the court

24   probably is aware that the government is taking the

25   position, including in the Supreme Court, that once

1    someone's in that prison, the government has no

2    obligation to get them out and that they could be there

3    for the -- for the rest their lives as the Salvadorian

4    prison -- President has said.

5              And so the only other thing I would just say

6    is, with respect to the -- I -- I think I would just

7    re-emphasize your point that of the transitional nature

8    of this, the government can't have a situation where the

9    notice is so short, take the named plaintiffs off the

10   board and then say, well, the court can never reach the

11   notice issue for anybody else because this will just

12   keeping happening.

13             So unless the court has further questions, I

14   will end there and just say that I think if the

15   proclamation is upheld on the AEA, that's going to be

16   a -- really going to have staggering implications that

17   the President could name literally any entity.  And if

18   they can't -- if the courts can't review that or if any

19   kind of conclusory sentence is sufficient, you literally

20   could have anybody being sent to a Salvadorean prison or

21   some other prison in the -- in -- somewhere else in the

22   world.  So I think the court should resist the

23   government's position on that.

24             Thank you, Your Honor.

25             THE COURT:  Thank you.

1          Mr. Velchik?

2          MR. VELCHIK:  Nothing further from the

3   government, Your Honor.

4          THE COURT:  Thank you.  So thank you for

5   your arguments here this afternoon.  So I am taking the

6   pending motions under consideration.  You are excused

7   and so we're adjourned.

8          MR. GELERNT:  Thank you, Your Honor.

9

10                 REPORTER'S CERTIFICATE

11

12   I certify that the foregoing is a correct transcript

13   from the record of proceedings in the above-entitled

14   matter.

15

16

17   _/s/ _Sheila E. Heinz Perales_____
     SHEILA E. HEINZ-PERALES
18   CSR RPR CRR

19

20

21

22

23

24

25